Clerk of the Superior Court
*** Electronically Filed ***
S. Allen, Deputy
4/3/2024 11:48:29 AM
Filing ID 17598867

1  Michael W. Caspino
   *Pro Hac Vice Application Pending*
2  mcaspino@forwardcounsel.com
   FORWARD COUNSEL LLP
3  4340 Von Karman Avenue, Suite 380
   Newport Beach, California 92660
4  (949) 258-9359

5
   John W. Myers IV (#028422)
6  jmyers@beattymyers.com
   Beatty & Myers, LLP
7  444 West Ocean Blvd. Suite 900
   Long Beach, California 90802
8  (562) 606-1535

9  Attorneys for Plaintiffs

10

11              **SUPERIOR COURT OF THE STATE OF ARIZONA**

12                      **COUNRTY OF MARICOPA**

13  Terence William McDonough, Lynette     CASE NO.: **CV2024-007392**
    McDonough, Carolina McDonough,
14                                          **COMPLAINT FOR DAMAGES**
                    Plaintiffs,
15
    vs.
16
    Michael J. Bidwill and Arizona Cardinals
17  Football Club, LLC, dba Arizona Cardinals,
    Counterpoint Strategies, James McCarthy,
18  Donald Peder Johnsen, Gallagher &
    Kennedy and DOES 1-20,
19
                    Defendants.
20

21

22         Plaintiffs, by and through their counsel undersigned, and for their Complaint against

23  Defendants, do hereby allege as follows:

24                      **PARTIES, JURISDICTION AND VENUE**

25         1.      Plaintiff Terence William McDonough ("Terry McDonough") is an

26  individual residing in the State of North Carolina.  He is currently under contract with

27  Arizona Cardinals Football Club LLC, d/b/a Arizona Cardinals ("Cardinals").  He has

28  worked for the Cardinals since 2013.

FORWARD COUNSEL LLP
ATTORNEYS AT LAW
NEWPORT BEACH, CA

2.     Plaintiff Lynette McDonough is a resident of the State of North Carolina. She has been married to Terry McDonough since 2010.

3.     Plaintiff Caroline McDonough is a resident of the State of North Carolina.

4.     Defendant Michael J. Bidwill ("Bidwill") is a resident of the State of Arizona. He is the principal owner, Chairman, and President of the Cardinals. He inherited the team from his late father Bill Bidwill.

5.     Defendant Arizona Cardinals Football Club LLC, d/b/a Arizona Cardinals, is a Delaware limited liability company.  Their principal place of business is in Tempe, Arizona.  The team was established in Chicago in 1898 and joined the National Football League ("NFL") as a charter member in 1920.

6.     Defendant Counterpoint Strategies, LTD ("Counterpoint") is a business form unknown, with its principal place of business in the State of New York.

7.     Defendant James McCarthy ("McCarthy") is a resident of the State of New York.  He is the President and Chief Executive Officer of Counterpoint.

8.     Defendant Donald Peder Johnsen ("Johnsen") is a resident of the State of Arizona.  He is an attorney at law practicing in Scottsdale, Arizona.

9.     Defendant Gallagher & Kennedy is an Arizona professional corporation. Their principal place of business is in Scottsdale, Arizona.

10.     Defendant DOES 1-10 are individuals with identities that are unknown to Plaintiffs.  Once Plaintiffs ascertain the true identities of DOES 1-10, Plaintiffs shall amend this Complaint to identify DOES 1-10.

11.     Defendant DOES 11-20 are business entities form unknown with identities that are unknown to Plaintiffs.  Once Plaintiffs ascertain the true identities of DOES 11-20, Plaintiffs shall amend this Complaint to identify the DOES 11-20.

12.     All of the claims and allegations contained herein arose from actions and/or inactions that occurred, or failed to occur, within the State of Arizona, County of Maricopa.

13.     As set forth herein, each Defendant that resides or operates outside of the State of Arizona, purposely availed themselves of this jurisdiction.  Each such Defendant acted

1  or failed to act, while availing themselves of such jurisdiction, in a manner that caused direct

2  harm to each Plaintiff herein.

3        14.     Each Defendant is the agent, servant and/or employee of the other

4  Defendants, and each Defendant acted within the course and scope of his, or her, or its

5  authority as an agent, servant and/or employee of the other Defendants.

6        15.     Defendants and each of them, are individuals, corporations, partnerships,

7  and/or other entities that have engaged in, joined in, and/or conspired with the other

8  wrongdoers in carrying out the tortious and unlawful activities described herein.

9                          **GENERAL ALLEGATIONS**

10       16.     Terry McDonough grew up around the game of football. He is the son of

11  legendary Boston Globe sportswriter and television personality Will McDonough, whose

12  pioneering journalism helped to propel the explosive growth of the NFL and the League's

13  television ratings in the 1970s and 1980s.

14       17.     Terry McDonough was an accomplished high school running back and

15  Division I prospect before he turned to scouting. He has overcome tragedy and addiction

16  and is a dedicated father, husband, and football man.

17       18.     McDonough began his scouting career in 1989 as an intern with the San

18  Francisco 49ers.  He later worked for the Cleveland Browns, the Baltimore Ravens, and the

19  Jacksonville Jaguars before landing in Arizona in 2013.

20       19.     By early 2014, McDonough had risen to the position of Vice President of

21  Player Personnel—the #2 person in the Cardinals front office, behind general manager

22  Steve Keim.

23       20.     In the spring of 2017, McDonough and the Cardinals agreed to a four-year

24  contract extension for McDonough to serve as Vice President of Player Personnel at a salary

25  of $550,000 per year. In that position, McDonough reported directly to GM Steve Keim.

26  **Cardinals GM Steve Keim Is Suspended For Extreme DUI**

27       21.     The Cardinals training camp in summer 2018 began with great promise.

28  Excitement surrounded newly hired head coach Steve Wilks, and the Cardinals expected to

build on their 2017 record of 8-8.

22.     However, on July 17, 2018, general manager Steve Keim was jailed in Phoenix after pleading guilty to extreme DUI. Keim had been arrested on July 4 after his blood-alcohol content was measured at 0.19, more than twice the legal limit.

23.     After Keim's guilty plea, the Cardinals immediately suspended Keim for five weeks and levied a fine of $200,000. The Cardinals reported that "[d]uring his suspension, effective immediately, Keim will be barred from the Cardinals' facilities and prohibited contact from the team."[1] The Cardinals also prohibited Keim from returning to the team until after he completed counseling and evaluation, completed a DUI education course, and participated in DUI awareness and education programs within the community.  As discussed herein, this was a blatant lie.

24.     The National Football League website stated that; "While serving the 5 week suspension, which is effective immediately, Keim is barred from the team's facilities and is prohibited contact with the team."[2]  This was a grossly inaccurate statement.

25.     Keim's arrest and suspension were during a critical juncture of the NFL preseason.  The Cardinals were left without their GM to weigh in on personnel decisions and make roster moves during the weeks when NFL franchises must reduce their rosters from 90 players to 53 players.

26.     The Cardinals issued the following statement regarding Keim's suspension: "Those

who work within the National Football League – particularly those in leadership positions – bear a greater responsibility and are held to a higher standard than simply a legal one and we feel that these measures are reflective of that."[3]

27.     In the days following Keim's suspension, Bidwill repeatedly assured the

---

[1] https://www.azcardinals.com/news/steve-keim-suspended-five-weeks-fined-after-dui

[2] https://www.nfl.com/news/cardinals-gm-keim-jailed-suspended-for-extreme-dui-0ap3000000940697

[3] Id. (emphasis added.)

COMPLAINT FOR DAMAGES

NFL, Cardinals fans, and the public that the Cardinals were adhering to the terms of the suspension and not communication with Keim.

28.     On July 27, 2018, Bidwill told the press the following: "We can pretty much predict what Steve's decisions here (would be) with pretty good accuracy . . . We've taken the philosophy that, in his absence, we're going to try to make the kind of decisions Steve Keim would make."[4]

29.     Bidwill's statements to the public were lies.  At the same time he was assuring the public that the Cardinals were not communicating with Keim, he was launching an illicit scheme to communicate with Keim via burner phones in violation of the terms of Keim's suspension.

30.     As set forth below, during sworn testimony at deposition and arbitration, Bidwill admitted that he and the Cardinals lied about the Keim suspension.

**The Illicit Burner Phone Scheme**

31.     Between July 18 and July 20, 2018, the Cardinals' Vice President of Football Administration, Mike Disner, distributed burner phones at the direction of Bidwill and Steve Keim to Cardinals head coach Steve Wilks, McDonough, Keim, and Cardinals Vice President of Football Operations and Facilities Matt Caracciolo.

32.     The burner phones were to be utilized to communicate with Keim during his suspension. McDonough still has his burner phone in his possession.

33.     As set forth below, during sworn testimony at deposition and arbitration, Bidwill admitted to the illicit burner phone scheme.  He attempted to blame Mike Disner for the cheating, however, Bidwill also admitted that he did nothing to discipline Disner for the cheating scandal.

34.     McDonough and first year head coach Steve Wilks were deeply uncomfortable with the burner phone scheme.  Neither man wanted to cheat by

---

[4] https://www.azcentral.com/story/sports/nfl/cardinals/2018/07/27/cardinals-bidwill keim/853122002/

1   communicating with Keim in violation of the terms of his suspension.

2       35.    On the morning of July 23, 2018, McDonough and Wilks discussed the burner

3   phone scheme. Wilks called McDonough into his office, placed his burner phone on his

4   desk, and expressed his discomfort with the scheme. McDonough agreed with Wilks and

5   told him that he would speak with Bidwill that afternoon. It was decided that McDonough

6   would talk to Bidwill because Wilks, as a first-year African American coach, did not feel

7   comfortable doing so.

8       36.    On the afternoon of July 23, 2018, about 15 minutes after the conclusion of

9   the Cardinals' practice, McDonough approached Bidwill on the practice field to raise his

10  and Wilks's concerns about the burner phone scheme. There was no one else in their

11  immediate vicinity, and Wilks was walking toward the locker room.

12      37.    McDonough told Bidwill that both he and Wilks were not comfortable

13  speaking to Keim during his suspension via the burner phones; that they could handle the

14  five-week suspension in Keim's absence; and that the Cardinals did not need to cheat to

15  have a successful season.

16      38.    Bidwill immediately stopped McDonough from speaking and started

17  screaming at him at a high volume, accusing McDonough of insubordination and telling

18  McDonough that he didn't "like his attitude." Wilks, who at that time was approximately

19  20 yards away from Bidwill and McDonough, heard the tirade and turned to witness the

20  incident.

21      39.    For approximately 3-4 minutes, Bidwill continued yelling at McDonough,

22  telling McDonough that he didn't like his attitude or his tone of voice.

23      40.    In sworn testimony, at deposition and arbitration, Bidwill lied about the July

24  23rd conversation with McDonough.  Former, team President Ron Minegar and former Head

25  Coach Wilks both provided sworn testimony that corroborates the testimony of

26  McDonough.

27      41.    Later that afternoon, Wilks called McDonough into his office to discuss the

28  incident. Wilks and McDonough agreed that they would have to do the best they could to

get through the next five weeks of Keim's suspension.

**Bidwill Retaliates Against McDonough**

42.   The very next morning, on July 24, 2018, Bidwill summoned McDonough to his office and told McDonough he was "writing him up" for unprofessional conduct in the workplace as a result of the discussion on the practice field the day before and an alleged argument on June 13 between McDonough and Steve Keim.

43.   Bidwill ultimately gave McDonough a memo that states the following: "This is to follow up on your meeting with Michael Bidwill on July 24. As discussed in that meeting, you have demonstrated unprofessional, argumentative conduct in the workplace on two recent occasions: (1) your interactions with Steve Keim on June 13 and (2) your interactions with Michael on July 23. Michael has separately provided you with a message outlining in greater detail the problems with your interactions with him on July 23. This will serve as written confirmation that the club has directed you not to engage in any similar conduct in the workplace in the future. Any failure or refusal to comply with these directions will lead to disciplinary action, up to and including termination of your employment. If these issues are the result of some personal issue, such as a serious health condition or other medical issue, you should seek appropriate professional assistance."

44.   The June 13 interaction between McDonough and Keim referenced in the memo was not an argument. At that time McDonough approached Keim to discuss Keim's drinking, which had grown obviously problematic, and offered advice and assistance to Keim. Keim's drinking had become so problematic, on multiple occasions while having dinner with potential draft picks and other members of the Cardinals organization, he drunkenly and inappropriately groped waitresses.

45.   The memo marked the first and only time McDonough received a disciplinary notice of any kind during his NFL career spanning more than three decades.

46.   After Bidwill delivered the memo to McDonough, he embarked on a campaign of bullying and harassment of McDonough.

**The Cardinals Fire Steve Wilks After One Season**

47.     McDonough and head coach Steve Wilks worked the 2018 season under overwhelmingly difficult and stressful conditions. The Cardinals finished the season with a 3-13 record and immediately fired Wilks after one season at the helm.

48.     On the day he fired Wilks, Bidwill spoke with his bodyguard/driver about the firing.  In a laughing and mocking manner, Bidwill made fun of Wilks for asking for another chance.

49.     At the press conference announcing the firing of Wilks, Bidwill repeatedly stated that "I didn't get it right" in hiring Wilks. Keim, for his part, noted that "we're all held accountable."

50.     The passage of time and exposure of the facts have revealed those comments to be almost perverse in their inaccuracy, misguidedness, and gaslighting nature. Steve Wilks has demonstrated that he is a skilled NFL head coach when he is not forced to cheat and is given an opportunity to succeed. And contrary to Keim's statement, neither he nor Bidwill have ever been held to account for their illicit actions during the 2018 preseason.

51.     Based on his experience with the Cardinals, Wilks recently joined the racial discrimination class action lawsuit brought by former head coach Brian Flores against the NFL and its teams. Wilks alleges that he was hired by Bidwill only to serve as a "bridge coach;" was not given an opportunity to succeed; and was wrongfully terminated as the "fall guy" for failures that were largely attributable to Keim.

52.     On April 8, 2022, after Wilks joined the race discrimination lawsuit, NBC Sports aired a segment with NFL insiders Peter King and Mike Florio entitled "Unpacking Steve Wilks' allegation against Arizona Cardinals." During the segment, Florio alluded to the allegations that Keim's suspension was not honored by the Cardinals and said that, if true, the violation approached in severity the campaign by Miami Dolphins owner Stephen Ross to pay his coaches for tanking.

53.     Florio stated: "Circumstances connected to the underlying allegations can

create chaos for the organization . . . In defending against Steve Wilks's lawsuit the Cardinals will have to deal with this collateral issue of whether and to what extent the terms of the suspension were violated by the organization in order to try and get business done."

54.     On May 1, 2019, the Cardinals announced McDonough's three-year contract extension. Not surprisingly, the move was greeted with bewilderment in NFL circles, because it was widely known that McDonough was on the cusp of landing a GM position.

55.     In January 2023, after the Cardinals hired Monti Ossenfort as their new general manager, McDonough was advised that the Cardinals would honor the terms of his contract but that he was encouraged to seek employment with a different NFL franchise.

56.     Bidwill's mistreatment of McDonough and Wilks is consistent with his dismal stewardship of the storied Cardinals franchise, which Bidwill has taken great pains to conceal from the League and from the public.

57.     Bidwill constantly lashes out at employees for no good reason.  A recent *ESPN* investigative report detailed his spread of "misery" throughout the Cardinals' organization.[5]

58.     The *Athletic* also presented an investigative report that detailed years of continuous abuse by Bidwill perpetrated upon Cardinal's employees.[6]

**McDonough Exercises his Right to Confidential Arbitration**

59.     On April 4, 2023, Terry McDonough filed a confidential arbitration petition before NFL Commissioner Roger Goodell.   Therein, McDonough pursued claims for retaliation, breach of contract, etc.

**In Response, the Defendants Commit Unprecedented and Vicious Acts of Defamation Against Terry McDonough and His Family.**

60.     In the days prior to Terry McDonough's arbitration filing Bidwill, the Cardinals, Johnsen and Gallagher & Kennedy retained McCarthy and Counterpoint Strategies to defame and humiliate each of the Plaintiffs.  As set forth below, this was done

---

[5] https://www.espn.com/nfl/story?id=38734726&_slug_=arizona-cardinals-michael-bidwill-workplace-culture
[6] https://theathletic.com/4949471/2023/10/12/arizona-cardinals-workplace-culture-fear-michael-bidwill/

in an effort to intentionally harm each of the Plaintiffs.

61.     McCarthy describes himself as a "pugnacious" communications consultant who likes to "take the gloves off and throw down"[7] when disparaging and defaming people like the Plaintiffs.

62.     McCarthy and Counterpoint typically represent white collar felons, hedge funds accused of financial misconduct, chemical companies accused of poisoning groundwater, etc.

63.     In 2002, McCarthy and Counterpoint were retained by the Augusta National Golf Club to harass, discredit and intimidate women's rights activist Martha Burke, because of her position that the club should open its membership to women.

64.     When CBS Sports commentator Bryant Gumbel voiced support for Burke's position, McCarthy and Counterpoint ruthlessly went after Gumbel.

65.     McCarthy's entire playbook is to lie so that he can belittle, humiliate and hurt his clients' adversaries and their families.

66.     During his first meeting with Johnsen and Bidwill. McCarthy stated that it was his objective to find information about Terry McDonough that would support allegations of domestic violence, rampant infidelity, illicit drug use, drunk driving and other unlawful activities.

67.     Johnsen, Bidwill, Gallagher & Kennedy and McCarthy all agreed to embark on a reprehensible effort to dig up dirt on the McDonough family in an effort to intentionally hurt the Plaintiffs.

68.     ***When Johnsen, Bidwill, Gallagher & Kennedy, Counterpoint and McCarthy could not find any "dirt" regarding Terry McDonough, they decided to lie and to make up allegations that had no merit***.

69.     In an unprecedented attack, Johnsen, Bidwill, Gallagher & Kennedy,

---

[7] https://sethhettena.com/2011/08/01/who-is-jim-mccarthy-of-counterpoint-strategies/

Counterpoint and McCarthy released the following statement:

*Attribute to Jim McCarthy, external public relations advisor to the Cardinals

We are reluctantly obliged to provide a public response along with broader
context for some disappointing and irresponsible actions by Terry McDonough. Claims he has made in an arbitration filing are wildly false, reckless, and An opportunistic ploy for financial gain. Here is our view on the matter. As part of our transition in leadership, with both a new general manager and head coach, we opted several weeks ago to inform Terry that his contract with the Cardinals would not be renewed. But he was assured that we would honor the compensation terms for the remaining year-plus of that contract and that we would also support any endeavor to continue his own career elsewhere. Our position was consistent with many efforts we've made to accommodate Terry during his time with the team, despite difficulties in his personal life and his often volatile demeanor toward colleagues. That's why we are saddened to see that Terry is now lashing out at our organization with disparagements and threats that are absurdly at odds with the facts. This unnecessary and vindictive action by Terry was intended to malign his co-workers, our owner Michael Bidwill, and our team with outlandish accusations.

We have alerted the league about Terry's maneuvering and provided them with specific details on the distortions that he has put forward. Additionally in recent days we have learned of disturbing allegations of extreme domestic violence by Terry, as detailed below in this response.
Here are some of those particulars about the claims.

• Starting at least in 2019, Terry began a practice of surreptitiously audio recording his interactions with colleagues with the apparent and unethical aim of gaining some future leverage over them. He now insists some of his
illicit recordings show that we somehow "compromised his marriage" and "lied to America."

• During the time that one of our previous executives was serving a team imposed
suspension for misconduct unrelated to the organization, we took additional measures when learned that another executive had interfered with the protocol of that suspension. That second incident involved obtaining mobile phones for communicating during the suspension period. Mr. Bidwill took swift action when he learned of that situation and directed the phones be retrieved and communications stopped. Terry was not privy to the full sequence of those circumstances but has nevertheless contrived the situation
as a broad conspiracy to undermine him personally.

• A passing interaction that Mr. Bidwill had several years ago with a group of free agent players at a tryout has been horrendously distorted in Terry's
account to imply some sort of racial animus – a transparent smear that is truly beneath contempt. In reality, our owner had objected to Terry alone about the overly effusive and awkward fashion that Terry had

displayed while making those introductions, out of concern it seemed condescending to the players. It must be stressed that our owner's long track record of fostering diversity and racial equity within our team and the League make this allegation especially despicable.

• Contrary to Terry's claim, the 2019 employee survey referenced in the complaint was not ignored but in fact formed the basis for significant enhancements to our workplace practices. That included creating a new role
for a Chief People Officer along with boosting our Human Resources staff
and adding robust employee wellness initiatives.

• The bulk of Terry's other stated complaints amount to his entirely subjective view that he was verbally mistreated and professionally thwarted by our team's leadership. But the claims run contrary to many documented
instances, over several years, in which Terry extended unsolicited praise to
Mr. Bidwill, in particular for the extensive support and encouragement that
Terry had received, especially during trying times in his personal life. Our
leadership also repeatedly encouraged and facilitated Terry's wish to continue his career advancement.

• Even a team memorandum to Terry that he includes among the few attachments to his filing shows plainly that he was repeatedly insubordinate
and combative toward colleagues and leadership. The team still tried at that
stage to salvage his role with us, shifting him to assignments that would focus his energies more toward player evaluation and less on collaboration, an area in which Terry had struggled consistently.

That's why it pains us to be forced into a position of exposing the details of
Terry's character and we are distressed to know that our faith in him was so
misplaced. Terry had well-documented troubles earlier in his life and we had always been sensitive to what seemed a sincere atonement and determination to set a positive example. But in retrospect, there were many signs that are consistent with how he has now crossed a line into such drastic hostility. Here are just some of those aspects.

• After we hired Terry, we received a spontaneous overture from a close family member of his, writing that he was "troubled and perplexed" about "recent changes in Terry's behavior" and that Terry had "abandoned responsibility" to one of his children and cut her off financially. He characterized the way Terry "presents his good Dad image" as "all just a ruse" and described the hardship and personal hurt their family was enduring as a result. Nonetheless,
we always took Terry at his word about his family situation and his background, even providing support on occasions when he discussed that
story publicly or in the press.

• We also discovered that he had secretly conveyed private personnel documents, descriptions of private meetings, and other confidential information to selected news media, all with the purpose of aiming criticism

at his colleagues to benefit himself. This was all in violation of our guidelines and the mutual trust in our workplace.

• Over time, a troubling pattern emerged in Terry's conduct. His friction with colleagues and willful insubordination would lead to reprimands, then

seemingly real contrition from Terry, only to be followed by a repeat offense or renewed outburst of anger. In one such instance, in 2018, Terry reacted with outrage to our owner's benign request to be included in personnel discussions during the general manager's suspension, shouting and physically menacing Mr. Bidwill in full view of many colleagues and players. Hours later Terry apologized, writing "You have been a big advocate and supporter of mine [and] I have a great amount of respect for you. It will not happen again."

Some months later, Terry was reprimanded for prolonged tardiness and disregarding team protocol on workplace attire at our offices during the NFL draft. Again he volunteered a written apology, yet then failed to show up at all for the remaining days of that draft, his most important duties of the year, and gave no explanation for his absence. Instead, he sent a hostile note to our owner saying "Everyone in America is going to find out you are a liar." Accordingly, our general manager at the time felt that although Terry was a valuable talent evaluator, his role should be focused on that aspect alone and that Terry should work remotely. That's why we shifted his duties to minimize the need for in-person interaction with co-workers which had grown increasingly rancorous. Terry accepted that adjustment with profuse

gratitude, even as he meanwhile was underhandedly tape recording his colleagues and secretly instigating criticism of them in the press.

More recently, Terry suggested a private meeting with our owner "to put this chapter in the past [and] all parties can walk away unscathed." Despite that veiled threat, Mr. Bidwill agreed to the meeting. But at the appointed time and place, Terry never showed up and instead sent yet another apology.

• There are many such documented instances of Terry's combative behavior in our records, some minor and some major, including threats of violence towards a colleague at a widely-attended Christmas party for co-workers.

• For legal due-diligence reasons, we conducted a records review in recent days that has uncovered a series of disturbing emails to and from Terry's work email account that include alarming, first-hand allegations of extreme

domestic abuse by Terry. Clearly, these latest detailed accounts are even more shocking than the previous behavior by Terry in the workplace that we had already documented. As required under our team and NFL guidelines, we promptly alerted the League to these specifics.

13

1

2

3

4

5

6

7

8

9

10

> Long before we knew these latest details concerning domestic violence, and
> throughout his time with the Cardinals, the team took extraordinary measures to support Terry and assist him in navigating his professional and personal challenges. That included encouraging him to seek expert help for the difficult issues that clearly continue to afflict him. Despite these terrible
> circumstances, we have an ethical duty to confront any claims that wrongly
> malign the integrity that our whole team has worked so hard to build. Again,
> his allegations are wildly false, reckless, and plainly intended to extract financial gain.
>
> If an arbitration process results, we will welcome the opportunity to set the
> record straight in that forum and demonstrate how these claims have absolutely no validity or hard basis.

11    70.    The statement above was placed on Counterpoint's website for a period of

12  eight months (the "Counterpoint statement").  Search engine optimization was employed

13  by the Defendants in an effort to provide maximum exposure and harm to the Plaintiffs.

14    71.    The Defendants then contacted members of the media to further spread these

15  lies about each of the Plaintiffs.

16    72.    At the time the Counterpoint statement was broadcast, each of the Defendants

17  knew it to be untrue.

18    73.    One of the most disgusting of the Defendants' untrue accusations is that Terry

19  McDonough perpetrated acts of "extreme domestic violence" upon Plaintiff Lynette

20  McDonough.  This statement brought Lynette McDonough into disrepute, contempt and

21  ridicule and impeached her honesty, integrity, virtue and reputation.

22    74.    Another disgusting defamatory statement broadcast by the Defendants is that

23  Terry McDonough "abandoned" Caroline McDonough and "cut her off financially."  This

24  statement brought Caroline McDonough into disrepute, contempt and ridicule and

25  impeached her honesty, integrity, virtue and reputation.

26    75.    Terry McDonough promptly amended his arbitration petition to include claims

27  for defamation and invasion of privacy against Bidwill and the Cardinals.

28

**The Arbitration**

76.    On April 18, 2023, NFL Commissioner Goodell appointed Jeffrey Mishkin, Esq, to serve as Arbitrator under the National Football League Dispute Resolution Procedural Guidelines.  The case then proceeded to the discovery stage.

77.    In discovery, Terry McDonough's attorneys sought communications between the Cardinals and Bidwill on the one hand and McCarthy and Counterpoint on the other. The Cardinals and Bidwill refused to provide said documents based on the attorney-client privilege and the work-product doctrine.

78.    On October 24, 2023, Arbitrator Mishkin rejected the Defendants arguments and issued a broad order that compelled production of the communications between Cardinals/Bidwill and McCarthy/Counterpoint.

**The Arbitration Hearing**

79.    During the first day of the arbitration hearing it was discovered that Johnsen and Gallagher & Kennedy had withheld documents in violation of an order of Arbitrator Mishkin.  McCarthy testified to the existence of certain documents that were withheld by Johnsen and Gallagher & Kennedy.  The Arbitrator ordered that these documents be immediately produced.  The documents were damning to the case against the Cardinals and Bidwill.

80.    During the second day of the arbitration hearing, McCarthy testified that ultimate direction and authority over his work rested with Gallagher & Kennedy.  McCarthy further testified that Johnsen was the person responsible for approval of the Counterpoint statement that defamed the Plaintiffs.

**The Arbitrator's Award**

81.    On March 29, 2024, Arbitrator Mishkin issued his "Final Award."  ***In all respects, the Arbitrator's award completely vindicated Terry McDonough***.  For instance, on the Defendants' defamatory statements that he "abandoned" his daughter and "cut her off financially" the Arbitrator stated:

> Mr. McDonough asserts that Respondents defamed him by publishing in the

Counterpoint Statement that he "abandoned responsibility" for his daughter and "cut her off financially." I find that Respondents' statements regarding Mr. McDonough's relationship with his daughter are, when read in context of the Counterpoint Statement as a whole, false and defamatory. McDonough and Ms. McDonough provided credible, unrefuted testimony that Mr. McDonough has never abandoned responsibility for his daughter or cut her off financially.

To the contrary, the evidence in the record plainly shows that Mr. McDonough welcomed the opportunity to move from Arizona to North Carolina to live closer to his daughter and, despite having no legal obligation to do so, has continued to contribute financially to her care. (Hearing Tr. at 78-83; 248-49; 508.)

Exhibit A at pages 37-38

82.     In order to come to this conclusion, it was necessary for the Arbitrator to find that Bidwill lied during his sworn testimony. Bidwill, an NFL owner, has provided perjurious testimony during an NFL arbitration.

83.     Caroline McDonough is a beautiful young lady with special needs. Terry McDonough has dedicated his life to her care.



84.     At the time they made their defamatory statements about Caroline, Bidwill and the other Defendants were well aware of her special needs condition.  They were also aware of Terry McDonough's deep dedication to caring for Caroline.

85.     Bidwill and the other Defendants went out of their way to defame Caroline, a young lady with special needs who is loved and adored by her father.  ***In an act of deep moral depravity, Bidwill and the other Defendants sought to hurt Terry McDonough by defaming his lovely special needs daughter***.

86.     Regarding the Defendants' vile and defamatory statements that Terry McDonough committed acts of "extreme domestic violence" the Arbitrator's award stated:

I likewise find that Respondents' statements regarding "extreme domestic violence" by Mr. McDonough were false and defamatory.

Exhibit A at page 39

87.     Once again, in order to come to this conclusion, it was necessary for the Arbitrator to find that Bidwill lied during his sworn testimony.

88.     Finally, Arbitrator Mishkin found that the Defendants acted with "malice" and awarded punitive damages in favor of Terry McDonough.  In doing so, the Arbitrator stated:

For the foregoing reasons, I find that Mr. McDonough has proven, by clear and convincing evidence, that Respondents acted with actual malice in publishing the false and defamatory statements in the Counterpoint Statement.

Exhibit A at pages 46-47

89.     After McDonough filed his arbitration proceeding, Bidwill did everything he could to hurt McDonough.  In his Final Award, the Arbitrator wrote as follows:

Mr. Bidwill conceded that he knew publishing the defamatory statements would hurt McDonough.

Exhibit A at pages 57-58

90.     In summary, NFL Owner Michael Bidwill has committed the following acts, established through his own sworn testimony before an Arbitrator duly appointed by Commissioner Goodell:

- Bidwill retaliated against McDonough for merely exercising his right to file an arbitration proceeding before Commissioner Goodell.

- Bidwill hired a public relations firm to dig up dirt on Terry McDonough and to spread lies about Terry and his family.

- Bidwill and the other Defendants went after McDonough's family, spreading lies about his wife and daughter.

- Bidwill admitted that he acted with an intent to harm McDonough and his family.

- Bidwill repeatedly lied, in sworn testimony, during a deposition.

- Bidwill repeatedly lied, in sworn testimony, before an Arbitrator duly appointed by Commissioner Goodell.

- Bidwill admitted to violating the terms of Keim's suspension.

- Bidwill admitted to the illicit "burner phone" scheme.

- Bidwill admitted to lying to the public about violating the terms of Keim's suspension.

- Bidwill was well aware of Caroline McDonough's special needs condition, but went out of his way to viciously defame her.

- Bidwill did all of these things in an effort to deter others from ever speaking the truth before the NFL.

91.     If a player, team employee, coach, team executive or league employee committed the above egregious acts, they would be immediately and severely disciplined by Commissioner Goodell.

92.     To date, despite knowing all of the above facts, Commissioner Goodell has done nothing to discipline Bidwill and the Cardinals.

## **DEFAMATION**

*(Terry McDonough Against Counterpoint, McCarthy, Johnsen and Gallagher & Kennedy Only)*
*(Lynette McDonough and Caroline McDonough Against All Defendants)*

93.     Plaintiffs hereby incorporate and re-alleges Paragraphs 1 through 91 as though fully set forth herein.

94.     Terry McDonough asserts his defamation claim against Defendants Counterpoint, McCarthy, Johnsen and Gallagher & Kennedy only.

95.     Lynette McDonough and Caroline McDonough assert their defamation claims against all Defendants.

96.     The Plaintiffs made defamatory statements about each Defendant.

97.     These defamatory statements were false.

98.     These defamatory statements were communicated to third parties.

99.     Each Defendant suffered severe harm as a result of the Defendants' communication of the defamatory statements.

100.    At the time the defamatory statements were made, the Defendants knew the to be false.

101.    At the time the defamatory statements were made, the Defendants acted with deliberate disregard for the truth.

102.    Each Defendant acted with malice in that they intended to hurt each Plaintiff and/or acted with conscious disregard for the truth.

## NEGLIGENCE

*(Terry McDonough Against Counterpoint, McCarthy, Johnsen and Gallagher & Kennedy Only)*
*(Lynette McDonough and Caroline McDonough Against All Defendants)*

102.    Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 101  as though fully set forth herein.

103.    Terry McDonough asserts his negligence claim against Defendants, Counterpoint, McCarthy, Johnsen and Gallagher & Kennedy only.

104.    Lynette McDonough and Caroline McDonough assert their defamation claim against all Defendants.

105.    The Plaintiffs prepared a defamatory statement about the Defendants.

106.    The statements were false.

COMPLAINT FOR DAMAGES

107.   The Defendants conveyed the statements to third parties.

108.   The Defendants were negligent in failing to determine the truth of the statement.

109.   The Defendants' statements caused damage to each Plaintiff.

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ("IIED")

*(Terry McDonough Against Counterpoint, McCarthy, Johnsen and Gallagher & Kennedy Only)*

*(Lynette McDonough and Caroline McDonough Against All Defendants)*

110.   Plaintiffs hereby incorporate and re-allege Paragraphs 1 through 84  as though fully set forth herein.

111.   Terry McDonough asserts his IIED claim against Defendants, Counterpoint, McCarthy, Johnsen and Gallagher & Kennedy only.

112.   Lynette McDonough and Caroline McDonough assert their IIED claims against all Defendants.

113.   In publishing the defamatory statements set forth herein, the Defendants' conduct was extreme and outrageous.

114.   In publishing the defamatory statements set forth herein, the Defendants' conduct was intentional and reckless.

115.   Defendants' conduct caused Plaintiffs to suffer extreme emotional distress, such that an average member of the community would regard their conduct as atrocious, intolerable in a civilized community, and beyond all possible bounds of decency.

116.   The Defendants conduct was intentional in that it sought to cause emotional harm.

### DEMAND FOR JURY TRIAL

Plaintiffs do hereby demand trial by jury.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that the Court award damages as follows:

A.     General damages in an amount to be proven at trial;

B.     Special damages in an amount to be proven at trial;

C.     Punitive damages in an amount to be proven at trial;

D.     Reasonable attorneys' fees and costs; and

E.   Such other and further relief as is just and proper.

DATED:   April 1, 2024              **BEATTY & MYERS, LLP**

                         By: _____
                              John W. Myers IV
                              Attorneys for Plaintiffs

DATED:   April 1, 2024              **FORWARD COUNSEL LLP**

                         By: _____
                              Michael W. Caspino
                              Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES

### ARBITRATION BEFORE THE NATIONAL FOOTBALL LEAGUE

Terence William McDonough,

                Claimant,

    v.

Michael J. Bidwill and Arizona Cardinals

Football Club LLC,

                Respondents.

### FINAL AWARD

On April 18, 2023, I was appointed under the National Football League Dispute Resolution Procedural Guidelines to serve as the hearing officer in the above-captioned matter. Before me for final disposition are Claimant Terence McDonough's claims for unlawful retaliation under the Arizona Employment Protection Act, intentional infliction of emotional distress, defamation, and invasion of privacy. For the reasons explained below, Mr. McDonough's claims for unlawful retaliation, intentional infliction of emotional distress, and invasion of privacy are dismissed. His claim for defamation is upheld.

### Background

Claimant Terence McDonough began his career in the National Football League in 1989. (Hearing Tr. at 52.) He held various positions over the course of his career, starting as an intern for the San Francisco 49ers before becoming Director of Player Personnel for the Barcelona Dragons of the World League of American Football (later known as NFL Europe). (*Id.* at 52-53.) Two years later, Mr. McDonough was hired as a scout for the Cleveland Browns, and over the course of the next ten years held a number of scouting positions with the Cleveland Browns,

Baltimore Ravens, and Jacksonville Jaguars.  In 2013, Mr. McDonough was hired by the Arizona Cardinals.  (*Id.* at 58.)  At the Cardinals, Mr. McDonough rose to the position of Vice President of Player Personnel—the number two person in the Cardinals front office behind Cardinals then-general manager Steve Keim.  (*Id.* at 59.)

In 2017, while employed by and with the support of the Cardinals, Mr. McDonough interviewed for the general manager position with the San Francisco 49ers.  (*Id.* at 59, 392.)  The 49ers interviewed fourteen individuals for the position, and Mr. McDonough was one of three finalists along with John Lynch and George Paton, both of whom are currently GMs for NFL clubs.  (*Id.* at 59.)  Mr. McDonough ultimately was not selected for the 49ers GM job.  In May 2017, the Cardinals gave Mr. McDonough a four-year contract extension to serve as Vice President of Player Personnel at an annual salary beginning at $515,000 and increasing to $545,000.  (Cl. Ex. 4.)

The following summer, on July 17, 2018, during the Cardinals training camp, Cardinals GM Steve Keim pleaded guilty to a criminal charge of extreme DUI.  After Keim's guilty plea, the Cardinals suspended Keim for five weeks and levied a fine of $250,000.  (Hearing Tr. at 399.)  It is undisputed that, notwithstanding Keim's suspension, on or around July 18 or 19, 2018, Cardinals Vice President of Football Administration, Mike Disner, distributed disposable mobile phone, or "burner phones," to certain Cardinals' personnel to use to communicate with Mr. Keim.  (*Id.* at 63-64, 425-27.)  Among the individuals who received "burner phones" were Mr. McDonough, first-year head Coach Steve Wilks, and Cardinals Vice President of Football Operations and Facilities, Matt Caracciolo.  (*Id.* at 106, 606.)

The parties disagree as to whether Respondent Michael Bidwill also had a disposable phone to communicate with Mr. Keim, and whether the terms of the suspension did or did not

permit Mr. Bidwill to communicate with Mr. Keim while the suspension was in effect.  While Mr. McDonough claims the phones were distributed at the direction of Mr. Bidwill (Claimant's Pre-Hearing Br. at 4), Mr. Bidwill claims he had no involvement whatsoever in the distribution of the phones and, in fact, directed that Mr. Disner immediately collect them once he became aware they had been distributed (Hearing Tr. at 425-27).

Prior to the distribution of the phones, it appears that Mr. McDonough and Mr. Bidwill enjoyed a constructive and reasonably harmonious relationship.  But, on July 23, 2018, that relationship changed following an interaction on the practice field.  The parties have proffered entirely different accounts of the events of that day.  Mr. McDonough testified that on the morning of July 23, 2018, he spoke to Cardinals Chief Operating Officer, Ron Minegar, to ask for advice regarding the burner phones—which Mr. McDonough testified he did not feel comfortable using—and Mr. Minegar suggested that Mr. McDonough speak with Mr. Bidwill. Mr. McDonough further testified that Coach Wilks came to his office that day to ask if he had received a burner phone.  Mr. McDonough told Coach Wilks that he had and that—because Coach Wilks also appeared uncomfortable using the phones—Mr. McDonough said he would speak to Mr. Bidwill on Coach Wilks' behalf about the phones.  Mr. McDonough claims that at the end of practice that day, he told Mr. Bidwill that "[w]e received these burner phones.  Neither Coach Wilks, nor I feel comfortable with this."  (Hearing Tr. at 69.)  Mr. McDonough stated, "that's probably the last thing I get in, and then [Mr. Bidwill] just exploded," yelling at Mr. McDonough "You're being insubordinate" and "I don't like your attitude" for approximately five minutes.  (*Id.* at 69-70.)

Mr. Bidwill, by contrast, testified that during the July 23 interaction on the practice field, Mr. McDonough did not raise any issue about mobile phones.  (*Id.* at 409-10.)  Indeed, with the

exception of a text message Mr. McDonogh sent to Mr. Bidwill on April 26, 2019 discussed

below, Mr. Bidwill claims that he and Mr. McDonough never had any communication regarding

the use of burner phones.  (*Id.* at 427.)  Instead, Mr. Bidwill testified that the interaction on July

23 arose after he told Mr. McDonough that, while Mr. Keim was suspended, he wanted

"everybody to be involved in the discussions around personnel and what we're doing," that he

felt Mr. McDonough had been "leaving [him] out," and told Mr. McDonough "don't let me be an

afterthought."  (*Id.* at 407.)  Mr. Bidwill testified that in response to his comments, Mr.

McDonough "got more and more agitated and elevated and started sticking out his chest and

pointing," got in Mr. Bidwill's "personal space, was pointing at [his] face and was yelling at"

him.  (*Id.*)

     Following the interaction on the practice field, Mr. McDonough testified that he was

concerned he was going to lose his job and decided "the only thing [he] could do [was]

apologize."  (*Id.* at 70.)  Later that day, Mr. McDonough sent a text message to Mr. Bidwill

stating:

> Michael, I apologize for the interaction today.  You have been a big advocate
> and supporter of mine.  I have a great amount of respect for you.  I will make
> sure there are no meetings that take place or decisions that are made unless you
> are there.  It will not happen again.

(Resp. Ex. 30.)

     The next morning, on July 24, 2018, Mr. McDonough received a written reprimand for

the interaction with Mr. Bidwill on the practice field the day before.  (Resp. Ex. 9.)  The memo,

issued by the club's general counsel and titled "Unprofessional Conduct in the Workplace,"

stated that Mr. McDonough had "demonstrated unprofessional, argumentative conduct in the

workplace on two recent occasions: (1) your interactions with Steve Keim on June 13 [which the

Cardinals contend, and Mr. McDonough disputes, involved Mr. McDonough speaking with a

reporter during practice] and (2) your interactions with Michael on July 23." (*Id.*)

Mr. McDonough and Mr. Bidwill agree that their relationship changed after the July 23, 2018 interaction. (Hearing Tr. at 70, 527.) Mr. McDonough testified that prior to July 23, 2018, Mr. Bidwill "was always good to me," supporting Mr. McDonough's desire to become a GM, allowing Mr. McDonough to sit next to him in the owner's box, and inviting Mr. McDonough to attend weekly football meetings with team leadership. (*Id.* at 70.) After July 23, 2018, it is undisputed that Mr. McDonough was no longer permitted to sit with Mr. Bidwill in his private box and was no longer permitted to attend the weekly football meetings. (*Id.* at 70-71, 416.)

During the 2019 NFL Draft, Mr. McDonough and Mr. Bidwill had another altercation, this time by text message. The Cardinals had the first overall pick in the draft that year and selected quarterback Kyler Murray. Mr. Bidwill testified that on the morning of April 26, 2019—the second day of the draft—when Mr. Murray and his family were visiting the team's facilities, he saw Mr. McDonough wearing shorts and a t-shirt. (*Id.* at 420.) Mr. Bidwill proceeded to send Mr. McDonough a text message stating:

> There is not one article of clothing you are wearing that complies with our relaxed Friday dress code. You are a Vice President in this organization and need to not just follow our policy but set the standard for others. Walking in at noon in front of Kyler Murray, his family and cameras looking like you just stepped off a beach was embarrassing and unacceptable.

(Resp. Ex. 30.)

Mr. McDonough initially responded by stating that he had his suit with him and was "putting it on right now. I was just walking in the building with my suit to go upstairs and get changed into it." (*Id.*) He then proceeded to send the following text message to Mr. Bidwill:

> I have done everything you have asked since this summer. I have done a great job scouting players, treated everyone with respect etc. I have had to live with the fact that my wife has suffered from panic attacks ever since Steve showed her the burner phones at his house this summer. . . . This Organization has compromised my marriage over cheating. I had to protect myself after you came

5

after me this summer and I have.  I have Steve talking to me during his
suspension and I recorded all of it.  How about these conversations that you were
having with him.  (All on tape) . . . You lied to America when you said "We
can't talk to Steve for the next 5 weeks, but we can think like him."  You
continue for some reason to come after me even though I have done a great job
for you.  You can ruin my reputation with all the BS you want.  Everyone in
America is going to find out you are a liar and a cheat and I have all the evidence
to prove it.  Your move. . . .

(*Id.*)  Mr. Bidwill never responded to Mr. McDonough's text.  Mr. McDonough, for his part, did

not appear for work for the final two days of the draft.  (Hearing Tr. at 206.)

The following month, in May 2019, Mr. McDonough was demoted to Senior Personnel

Executive, signing a three-year employment contract at a reduced salary of $300,000-$320,000

per year, and he and the Club agreed he would relocate from Arizona to Charlotte, North

Carolina.  (Cl. Ex. 5; Hearing Tr. at 207-10.)  The Club agreed to cover Mr. McDonough's

moving expenses and Mr. McDonough began working remotely.  (Hearing Tr. at 210.)

In May 2022, upon expiration of his 2019 contract, Mr. McDonough was demoted again,

signing a two-year contract for a salary of $200,000-$205,000 per year.  (Resp. Ex. 1.)  The

agreement included a "Release of Claims" pursuant to which Mr. McDonough agreed to

"waive[], release[], and discharge[] all of his existing rights to any relief of any kind (known and

unknown) from the Club, its . . . owners, managers, employees, agents . . . , including without

limitation all claims that arise out of or that relate to his employment or his separation from

employment with the Club [and] all claims that arise out of or that relate to any of the statements

or actions of the Employer . . . ."  (*Id.* § 11(a).)

Then, in January 2023, after the Cardinals hired Monti Ossenfort as their new general

manager, Mr. McDonough was encouraged to seek new employment.  On January 24, 2023, Mr.

McDonough was notified by Cardinals Chief People Officer Shaun Mayo that he was being

relieved of "any football related duties under the new leadership," but that the club would

"continue to pay [McDonough] through the end of [his] current employment agreement" as well as "continue health care coverage throughout the duration of the employment agreement." (Resp. Ex. 23.)  At the hearing, Mr. McDonough confirmed that the Cardinals have, in fact, continued to pay the compensation and provide the other benefits called for under his May 2022 employment contract.  (Hearing Tr. at 215.)

On April 3, 2023, Mr. McDonough filed a Demand for Arbitration with the National Football League, asserting claims for (i) breach of contract against the Cardinals; (ii) breach of the implied covenant of good faith and fair dealing against the Cardinals; (iii) retaliation in violation of the Arizona Employment Protection Act against Mr. Bidwill and the Cardinals; (iv) intentional infliction of emotional distress against Mr. Bidwill; (v) defamation against Mr. Bidwill and the Cardinals; (vi) civil conspiracy against Mr. Bidwill; and (vii) age discrimination against Mr. Bidwill and the Cardinals.

One week before filing the Demand for Arbitration with the NFL, counsel for Claimant had sent a draft of the demand to the Cardinals.  Upon receipt of the draft demand, Respondents, through counsel, engaged CounterPoint Strategies and its president Jim McCarthy to provide public relations advice.  (*Id.* at 437.)  Mr. McCarthy recommended that if the allegations in the draft demand were made public, the club should "put out a statement that was somewhat comprehensive responding to the various allegations," "to also speak to the credibility," and "be prepared with something and just have it ready."  (*Id.* at 438-40.)

While the parties have competing theories as to how the allegations in Claimant's confidential Demand for Arbitration made their way into the press, it is undisputed that following the filing of the Demand for Arbitration with the NFL, there was public reporting regarding Claimant's allegations.  Shortly thereafter, Respondents authorized the release of the

following public statement titled "Our View on Claims Raised by Terry McDonough in his

Arbitration Filing" (the "CounterPoint Statement"):

>  *Attribute to Jim McCarthy, external public relations advisor to the Cardinals
>
>  We are reluctantly obliged to provide a public response along with broader context for some disappointing and irresponsible actions by Terry McDonough. Claims he has made in an arbitration filing are wildly false, reckless, and an opportunistic ploy for financial gain.  Here is our view on the matter.
>
>  As part of our transition in leadership, with both a new general manager and head coach, we opted several weeks ago to inform Terry that his contract with the Cardinals would not be renewed.  But he was assured that we would honor the compensation terms for the remaining year-plus of that contract and that we would also support any endeavor to continue his own career elsewhere.
>
>  Our position was consistent with many efforts we've made to accommodate Terry during his time with the team, despite difficulties in his personal life and his often volatile demeanor toward colleagues.  That's why we are saddened to see that Terry is now lashing out at our organization with disparagements and threats that are absurdly at odds with the facts.  This unnecessary and vindictive action by Terry was intended to malign his co-workers, our owner Michael Bidwill, and our team with outlandish accusations.
>
>  We have alerted the league about Terry's maneuvering and provided them with specific details on the distortions that he has put forward.  Additionally in recent days we have learned of disturbing allegations of extreme domestic violence by Terry, as detailed below in this response.

Here are some of those particulars about the claims.

- Starting at least in 2019, Terry began a practice of surreptitiously audio recording his interactions with colleagues with the apparent and unethical aim of gaining some future leverage over them.  He now insists some of his illicit recordings show that we somehow "compromised his marriage" and "lied to America."

- During the time that one of our previous executives was serving a team-imposed suspension for misconduct unrelated to the organization, we took additional measures when learned that another executive had interfered with the protocol of that suspension.  That second incident involved obtaining mobile phones for communicating during the suspension period.  Mr. Bidwill took swift action when he learned of that situation and directed the phones be retrieved and communications stopped.  Terry was not privy to the full sequence of those circumstances but has nevertheless contrived the situation as a broad conspiracy to undermine him personally.

- A passing interaction that Mr. Bidwill had several years ago with a group of free agent players at a tryout has been horrendously distorted in Terry's

account to imply some sort of racial animus – a transparent smear that is truly beneath contempt.  In reality, our owner had objected to Terry alone about the overly effusive and awkward fashion that Terry had displayed while making those introductions, out of concern it seemed condescending to the players.  It must be stressed that our owner's long track record of fostering diversity and racial equity within our team and the League make this allegation especially despicable.

- Contrary to Terry's claim, the 2019 employee survey referenced in the complaint was not ignored but in fact formed the basis for significant enhancements to our workplace practices.  That included creating a new role for a Chief People Officer along with boosting our Human Resources staff and adding robust employee wellness initiatives.

- The bulk of Terry's other stated complaints amount to his entirely subjective view that he was verbally mistreated and professionally thwarted by our team's leadership.  But the claims run contrary to many documented instances, over several years, in which Terry extended unsolicited praise to Mr. Bidwill, in particular for the extensive support and encouragement that Terry had received, especially during trying times in his personal life.  Our leadership also repeatedly encouraged and facilitated Terry's wish to continue his career advancement.

- Even a team memorandum to Terry that he includes among the few attachments to his filing shows plainly that he was repeatedly insubordinate and combative toward colleagues and leadership.  The team still tried at that stage to salvage his role with us, shifting him to assignments that would focus his energies more toward player evaluation and less on collaboration, an area in which Terry had struggled consistently.

That's why it pains us to be forced into a position of exposing the details of Terry's character and we are distressed to know that our faith in him was so misplaced.  Terry had well-documented troubles earlier in his life and we had always been sensitive to what seemed a sincere atonement and determination to set a positive example.  But in retrospect, there were many signs that are consistent with how he has now crossed a line into such drastic hostility.  Here are just some of those aspects.

- After we hired Terry, we received a spontaneous overture from a close family member of his, writing that he was "troubled and perplexed" about "recent changes in Terry's behavior" and that Terry had "abandoned responsibility" to one of his children and cut her off financially.  He characterized the way Terry "presents his good Dad image" as "all just a ruse" and described the hardship and personal hurt their family was enduring as a result.  Nonetheless, we always took Terry at his word about his family situation and his background, even providing support on occasions when he discussed that story publicly or in the press.

- We also discovered that he had secretly conveyed private personnel documents, descriptions of private meetings, and other confidential information to selected news media, all with the purpose of aiming criticism at his colleagues to benefit himself. This was all in violation of our guidelines and the mutual trust in our workplace.

- Over time, a troubling pattern emerged in Terry's conduct. His friction with colleagues and willful insubordination would lead to reprimands, then seemingly real contrition from Terry, only to be followed by a repeat offense or renewed outburst of anger. In one such instance, in 2018, Terry reacted with outrage to our owner's benign request to be included in personnel discussions during the general manager's suspension, shouting and physically menacing Mr. Bidwill in full view of many colleagues and players. Hours later Terry apologized, writing "You have been a big advocate and supporter of mine [and] I have a great amount of respect for you. It will not happen again."

  Some months later, Terry was reprimanded for prolonged tardiness and disregarding team protocol on workplace attire at our offices during the NFL draft. Again he volunteered a written apology, yet then failed to show up at all for the remaining days of that draft, his most important duties of the year, and gave no explanation for his absence. Instead, he sent a hostile note to our owner saying "Everyone in America is going to find out you are a liar."

  Accordingly, our general manager at the time felt that although Terry was a valuable talent evaluator, his role should be focused on that aspect alone and that Terry should work remotely. That's why we shifted his duties to minimize the need for in-person interaction with co-workers which had grown increasingly rancorous. Terry accepted that adjustment with profuse gratitude, even as he meanwhile was underhandedly tape recording his colleagues and secretly instigating criticism of them in the press.

  More recently, Terry suggested a private meeting with our owner "to put this chapter in the past [and] all parties can walk away unscathed." Despite that veiled threat, Mr. Bidwill agreed to the meeting. But at the appointed time and place, Terry never showed up and instead sent yet another apology.

- There are many such documented instances of Terry's combative behavior in our records, some minor and some major, including threats of violence towards a colleague at a widely-attended Christmas party for co-workers.

- For legal due-diligence reasons, we conducted a records review in recent days that has uncovered a series of disturbing emails to and from Terry's work email account that include alarming, first-hand allegations of extreme domestic abuse by Terry. Clearly, these latest detailed accounts are even more shocking than the previous behavior by Terry in the workplace that we had already documented. As required under our team and NFL guidelines, we promptly alerted the League to these specifics.

10

> Long before we knew these latest details concerning domestic violence, and throughout his time with the Cardinals, the team took extraordinary measures to support Terry and assist him in navigating his professional and personal challenges.  That included encouraging him to seek expert help for the difficult issues that clearly continue to afflict him.  Despite these terrible circumstances, we have an ethical duty to confront any claims that wrongly malign the integrity that our whole team has worked so hard to build.  Again, his allegations are wildly false, reckless, and plainly intended to extract financial gain.
>
> If an arbitration process results, we will welcome the opportunity to set the record straight in that forum and demonstrate how these claims have absolutely no validity or hard basis.

(Cl. Ex. 1.)

In response to the CounterPoint Statement, on May 12, 2023, Claimant filed the First Amended Demand for Arbitration ("FADA").  The FADA restates the previously asserted causes of action for breach of contract (Count 1), breach of the implied covenant of good faith and fair dealing (Count 2), retaliation in violation of the Arizona Employment Protection Act (Count 3), intentional infliction of emotional distress (Count 4), defamation (Count 5), civil conspiracy (Count 6), and age discrimination (Count 7), while adding allegations to several of those claims related to the CounterPoint Statement.  Claimant also asserts a new cause of action for invasion of privacy (Count 8).

## **Procedural History**

On April 18, 2023, I was appointed under the National Football League Dispute Resolution Procedural Guidelines to serve as the hearing officer in this matter.  On May 1, 2023, I held an initial case management conference with the parties, setting a schedule for Claimant to submit the FADA and Respondents to submit a pre-hearing motion.

On May 22, 2023, Respondents submitted their "Dispositive Motion," moving to dismiss

all the claims set forth in the original Demand for Arbitration as restated in the FADA.[1]  On June

26, 2023, I issued an Order on Respondents' Dispositive Motion, granting the motion in part.  In

that Order, I held that Mr. McDonough had released "all of his existing rights to any relief of any

kind (known and unknown)" on May 24, 2022 when he signed his most recent employment

contract with the Cardinals.  Counts 1-6 of the FADA were therefore dismissed "only to the

extent the claims are based upon rights existing as of May 24, 2022, and the Motion [was]

otherwise denied."  In short, Counts 1-6 survived Respondents' Dispositive Motion only to the

extent they were based upon alleged wrongdoing not covered by the release, namely that (i) "on

January 24, 2023, [Mr. McDonough] was notified . . . that he was being relieved of 'any football

related duties'", and (ii) in April 2023, Respondents "posted an untrue statement about

McDonough on the team website" and "released this untrue and reprehensible statement to

hundreds of media outlets," i.e., the CounterPoint Statement.  Count 8 (invasion of privacy) also

remained in the case because it was not the subject of Respondents' motion.[2]

　　　　The matter thus proceeded to discovery, subject to the limitations set forth in my Order

on Respondents' Dispositive Motion.  Throughout discovery, the parties filed numerous motions,

which were all promptly resolved.  For purposes of this Final Award, it is unnecessary to

describe all the discovery disputes and rulings.  Instead, I provide only a brief summary of those

motions that implicate further rulings in this Final Award.

---

[1] While their Dispositive Motion was pending, Respondents also submitted their Response to the
FADA.

[2] Count 7 (age discrimination) against the Cardinals was suspended pending the submission of
additional evidence from Claimant, while Claimant's age discrimination claim against
Respondent Bidwill was dismissed.

First, following public reporting of allegations in Mr. McDonough's Demand for Arbitration, the parties entered into a Consent Confidentiality Order, which I "so ordered" on May 12, 2023.  Under the Consent Confidentiality Order, the parties agreed to "maintain the confidentiality of these proceedings, and the confidentiality of all communications relating to these proceedings," and to "refrain from any direct or indirect communication with any member of the media regarding these proceedings."

On September 14, 2023, Respondents moved for sanctions for Claimant's breach of the Consent Confidentiality Order based on an exchange of emails Mr. McDonough had with a member of the media, Mike Florio, on May 19, 2023, and sought an order (i) ending discovery immediately; (ii) accelerating the hearing date; (iii) issuing a formal warning that any future violation would result in more severe sanctions; (iv) ordering Claimant to show cause why his tort claims arising from the CounterPoint Statement should not be dismissed; and (v) imposing any other sanctions the Hearing Officer deemed just and proper.  Mr. McDonough opposed the requested sanctions sought by Respondents.  On October 3, 2023, I concluded that Mr. McDonough had breached the Consent Confidentiality Order.  With respect to sanctions, I denied Respondents' request to end discovery immediately as well as their request requiring Clamant to show cause why his tort claims should not be dismissed.  I did, however, order that the hearing date be accelerated while leaving for later resolution the issue of what other sanctions would be imposed for the violation, inviting Respondents to submit a detailed statement of counsel's time and expenses incurred in preparing the motion for sanctions.

Second, on October 12, 2023, I granted Claimant's motion to compel requests for production for "[c]ommunications between [the Arizona Cardinals or Michael Bidwill] and Jim McCarthy, only to the extent the communications relate to the April 2023 press release," and

13

"[c]ommunications between [the Arizona Cardinals or Michael Bidwill] and any representative of CounterPoint Strategies, only to the extent the communications relate to the April 2023 press release."[3]  In response to my ruling, Respondents served supplemental responses to Claimant's discovery requests asserting that all their communications with Mr. McCarthy and CounterPoint were protected by the attorney-client privilege and/or were prepared in anticipation of litigation, and thus Respondents withheld the documents from production.

Claimant moved for both issue and monetary sanctions against Respondents.  After reviewing the parties' submissions, on October 24, 2023, I directed Respondents "to produce for *in camera* inspection by the Hearing Officer unredacted copies of all communications of any kind between the Cardinals or Mr. Bidwill, or anyone acting on their behalf (including outside or inside counsel), and CounterPoint Strategies, or anyone acting on its behalf (including outside or inside counsel), relating to the press release issued on April 3, 2023."  After reviewing the documents at issue, I concluded that the documents were not protected by the attorney-client privilege, but that the documents were eligible for work product protection.  I further held, however, that Claimant had demonstrated a substantial need for the documents and thus ordered all the documents produced to Claimant, with the exception of four documents that contained opinion work product.

Third, on October 12, 2023, I issued a separate order denying without prejudice Claimant's Motion and Offer of Proof on Prima Facie Case for Punitive Damages.  In that motion, Claimant sought an order compelling Respondents to respond to Claimant's requests for financial information.  I concluded that Claimant had not, at that time, satisfied his burden of

---

[3] Claimant's motion to compel covered nearly 350 discovery requests, the vast majority of which I concluded were not reasonably necessary to arbitrate this dispute under Section 6.1 of the National Football League Dispute Resolution Procedural Guidelines.

making a prima facie showing on his claim for punitive damages, while noting that "[i]f, however, after the hearing, I conclude that Claimant has proven he is entitled to punitive damages, Claimant will be permitted to renew his request for Respondents' financial information at that time."

Following the conclusion of discovery, the parties submitted simultaneous pre-hearing opening briefs on November 20, 2023, and simultaneous pre-hearing response briefs on November 27, 2023.  A two-day hearing was held in New York, New York on December 6-7, 2023.  At the hearing, the following individuals provided oral testimony:

<u>For Claimant</u>

- Terence McDonough, Claimant

- Lynette McDonough, Claimant's spouse

- Ron Minegar, former COO of the Arizona Cardinals

- Steve Wilks, former head coach of the Arizona Cardinals

- Jim McCarthy, president of CounterPoint Strategies

- Dr. Trevor Small, Clinical Psychologist (Expert Witness)

- Dave Gettleman, former GM of the Carolina Panthers and New York Giants (Expert Witness)

- Dean Kevin Quinn, Ph.D, Dean of Donald J. Schneider School of Business and Economics (Expert Witness)

<u>For Respondents</u>

- Michael Bidwill, Respondent

- Steve Keim, former GM of the Arizona Cardinals

- Monti Ossenfort, current GM of the Arizona Cardinals

During the hearing, Claimant filed a "Motion for Issue Sanctions on Liability" after learning that Respondents had failed to produce all the documents called for by my orders requiring Respondents to produce for *in camera* inspection, and thereafter to Claimant (with the exception of four documents containing opinion work product), "all communications of any kind between the Cardinals or Mr. Bidwill, or anyone acting on their behalf (including outside or inside counsel), and CounterPoint Strategies, or anyone acting on its behalf (including outside or inside counsel), relating to the press release issued on April 3, 2023." During the hearing, Mr. McCarthy "revealed the existence of further communications with Respondents that were never produced and whose existence was entirely unknown to Claimant and the Arbitrator." (Mot. at 4.) I ordered that Respondents immediately produce the documents, and Respondents produced 182 pages of documents the night before the second day of the hearing. (*Id.*) Claimant contends that "Respondents willfully disobeyed the Arbitrator's order and refused to provide key documents to Claimant. The Arbitrator should impose issue sanctions on the issue of liability in favor of Claimant McDonough." (*Id.* at 8.) At the hearing, I ruled that I was deferring consideration of the motion but directed that Mr. McCarthy return for further examination given the newly produced documents. (Hearing Tr. at 383.)

In lieu of oral closing arguments, the parties submitted post-hearing briefs on December 21, 2023. Claimant also gave notice after the hearing that he was withdrawing his claims for breach of contract (Count 1), breach of the implied covenant of good faith and fair dealing (Count 2), and age discrimination (Count 7).

## The Parties' Contentions

A summary of the parties' contentions is set forth below. In light of my Order on Respondents' Dispositive Motion and Claimant's subsequent withdrawal of certain of his claims,

only the following claims, subject to the limitations set forth in my Order on Respondents'

Dispositive Motion, remain in this case and will be addressed:  Count 3 (retaliation in violation

of the Arizona Employment Protection Act), Count 4 (intentional infliction of emotional

distress), Count 5 (defamation), and Count 8 (invasion of privacy).[4]

## I.    Claimant's Contentions

### A.    Retaliation in Violation of the Arizona Employment Protection Act (Count 3)

Claimant contends that he has proven all the elements of his retaliation claim because (i)

he had information or a reasonable belief that Respondents had violated or were violating

National Football League rules through the "burner phone scheme"; (ii) he disclosed and

objected to the "burner phone scheme"; and (iii) Respondents retaliated against him, culminating

with Mr. McDonough being relieved of his duties in January of 2023.  (Claimant's Pre-Hearing

Br. at 20-21.)  Claimant asserts that "[t]he timeline in this case greatly supports the argument that

McDonough was relieved of his duties in retaliation for objecting to the burner phone scheme."

(Claimant's Closing Br. at 19.)  In support of his argument, Claimant points to Exhibit 47 (text

messages between McDonough and Bidwill), which he contends "show positive and glowing

messages prior to July 23, 2018 [while] [e]very text message thereafter is negative and

demeaning.  McDonough was eventually 'moved out of the building' and repeatedly demoted.

Bidwill renewed McDonough's contract and moved him 'out of the building' to keep

McDonough from talking about the burner phone scheme."  (*Id.*)  Claimant further contends that

testimony elicited at the hearing from Steve Keim that he had entered into a "Cooperation

---

[4] Although Claimant did not expressly withdraw his claim for civil conspiracy (Count 6),
Claimant made no mention of that claim in his pre-hearing or post-hearing submissions or at the
hearing.  Because Claimant has submitted no argument or evidence in support of his civil
conspiracy claim, to the extent the claim has not been effectively abandoned, I conclude that
Claimant has failed to prove that claim.

Agreement" with Respondents paying him $1,000,000 and requiring him to refrain from disparaging Respondents "shows a systematic attempt to cover-up the retaliatory conduct" against Mr. McDonough.  (*Id.*)

Claimant asserts that Monti Ossenfort's testimony that he independently made the decision not to retain Mr. McDonough and was not aware of the "burner phone" issue cannot be credited because "Ossenfort is clearly biased in favor of Respondents."  (*Id.*)  According to Claimant, "Ossenfort could provide no sound reason for relieving the Cardinals' best talent evaluator from his duties."  (*Id.*)

### B. *Intentional Infliction of Emotional Distress (Count 4)*

Mr. McDonough contends that he satisfies all the elements of a claim for intentional infliction of emotional distress based on Respondents' issuance of the CounterPoint Statement. (*See* Claimant's Pre-Hearing Responsive Br. at 11-12 (agreeing that "an employee termination claim alone cannot support an IEED claim" while contending that "the IEED claim was created by the outrageous defamation and invasion of privacy claims")).  First, Claimant contends that Respondents' conduct was "extreme and outrageous" because "[a]ny 'average member of the community' would consider publicly alleging that a person 'abandoned' their special needs child, 'financially cut her off' and perpetrated acts of 'extreme domestic violence' is conduct that is 'atrocious, intolerable in a civilized community, and beyond all possible bounds of decency,'" especially "in light of the Respondents' admission that these statements had nothing to do with the claims presented at arbitration."  (Claimant's Closing Br. at 23.)  Second, Mr. Bidwill testified that the CounterPoint Statement was made intentionally.  (*Id.*)  And third, Claimant argues that the testimony of Dr. Small proves that Respondents' dissemination of the CounterPoint Statement caused him "severe emotional distress."  (*Id.*)

18

### C. *Defamation (Count 5)*

Like his intentional infliction of emotional distress claim, Claimant now focuses his defamation claim entirely on the CounterPoint Statement, and, in particular, "on three statements [therein]. One, that McDonough financially cut off his special needs daughter; two, that McDonough abandoned responsibility for his special needs daughter; and three, that McDonough perpetrated acts of 'extreme domestic violence.'" (*Id.* at 20.) Claimant contends that these assertions in the CounterPoint Statement constitute actionable defamation because (i) Respondents admit that they made, said, or wrote the defamatory statement of fact; (ii) the statement was false because "there is no evidence to confirm or even suggest that McDonough is a perpetrator of 'extreme domestic violence', abandoned his special needs daughter or 'financially cut-off' his special needs daughter"; (iii) Respondents admit that they published the statement; (iv) Respondents were negligent in failing to determine the truth of the statement as "Respondents did nothing to confirm the falsity of the statements"; and (v) Respondents' statement caused Mr. McDonough to be damaged, as set forth in the expert reports of Dr. Small, Mr. Gettleman and Dr. Quinn. (Claimant's Pre-Hearing Br. at 22-23.)

Claimant argues that the evidence shows Respondents were aware that the statements at issue were false before issuing the CounterPoint Statement. Claimant asserts that "[f]ive days prior to telling the world that McDonough abandoned his special needs daughter, Bidwill . . . draft[ed] a memo about how McDonough sacrificed and relocated to North Carolina so that he could be with that daughter." (Claimant's Closing Br. at 20 (citing Ex. 46).) Claimant also argues that the evidence shows Respondents knew it was not true that Mr. McDonough financially cut-off his daughter, as Respondents were in possession of emails discussing the amount of child support necessary for McDonough's daughter's care, as well as a court order

19

declaring that Mr. McDonough had no responsibility for support.  (*Id.* at 20-21.)  And with respect to the claim of "extreme domestic violence," Claimant argues that "Respondents have acted with reckless disregard for the truth" as they "did nothing to confirm the validity of the claim."  (Claimant's Pre-Hearing Response Br. at 10.)

Mr. McDonough disputes Respondents' assertion that he is a "limited purpose public figure" and that under Arizona law, he must therefore establish that the alleged defamatory statements were made with "actual malice."  With respect to Respondents' contention that Mr. McDonough is a limited purpose public figure because he "disseminated copies of his arbitration demand to members of the media," Mr. McDonough argues that "when it came time to prove these claims, Respondents could offer no evidence."  (Claimant's Closing Br. at 21.)  And with respect to Respondents' contention that Mr. McDonough is a limited purpose public figure because he was the subject of an article published by ESPN in 2019, Mr. McDonough asserts that "[t]he role McDonough assumed in the ESPN article has nothing to do with the role he assumed in the arbitration or the allegations made in the Counterpoint statement."  (*Id.*)  Nevertheless, Claimant argues that "[e]ven assuming arguendo that McDonough is a limited purpose public figure," his claim should still succeed because "Respondents clearly acted with malice in publishing the CounterPoint statement."  (*Id.* at 22.)

### D.  *Invasion of Privacy (Count 8)*

Claimant "admits that he has pled alternative and contradictory claims in defamation and invasion of privacy."  (*Id.* at 20.)  While Claimant vehemently argues that the statements at issue in the CounterPoint Statement are false, according to Claimant, "[i]f the Arbitrator finds that any of the allegations . . . are true, McDonough is entitled to damages under his invasion of privacy claim."  (*Id.*)  Claimant contends he otherwise satisfies all the elements of a claim for invasion of

privacy under Arizona law because (i) Respondents publicly disclosed private information about McDonough; (ii) the public disclosure of being labelled a perpetrator of "extreme domestic violence," someone who financially "cut off" his special needs daughter, and a person who would "abandon" his daughter would be highly offensive to a reasonable person; (iii) Mr. Bidwill testified that the information disclosed was private; (iv) the disclosure caused Mr. McDonough's injuries, as set forth in the expert reports of Dr. Small and Mr. Gettleman; and (v) McDonough's economic losses are calculated by Dr. Quinn.  (Claimant's Pre-Hearing Br. at 24-25.)

Claimant disputes Respondents' contention that his claim is precluded because he had no expectation of privacy with respect to emails sent and received using his work email address. Claimant contends that "the Respondents are guilty of invasion of privacy because they publicized information that they admit is 'not already known in the community.'  The source of those facts is irrelevant."  (Claimant's Closing Br. at 23.)

### E. Damages

Mr. McDonough requests an award of damages that includes damages for lost future earnings, emotional distress, reputational harm, and punitive damages.

With respect to lost future earnings, Mr. McDonough contends that, based on the testimony of Dr. Quinn, "as a result of the actions of Respondents, McDonough will suffer $15 million in losses over the next 10 years." (*Id.* at 24.)  Claimant argues that "[i]f Respondents contest this number, they should have offered their own expert testimony on the subject." (*Id.*)

Regarding emotional distress, Claimant contends that "an award of $10 million is a fair and reasonable request for the pain and suffering caused by the Respondents' conduct." (*Id.* at 26.)  Regarding reputational harm, "Claimant submits that an award of $10 million is a fair and

reasonable request for the loss of reputation caused by the Respondents' conduct." (*Id.* at 27.)
And finally, with respect to punitive damages, Claimant argues that he has proven by clear and
convincing evidence that: (i) Respondents' misconduct was intended to cause harm; or (ii)
Respondents' misconduct was motivated by spite or ill will; or (iii) Respondents' misconduct
was (a) outrageous, oppressive or intolerable, and (b) Respondents knew or intentionally
disregarded that their conduct created a substantial risk of significant harm to others." (*Id.* at 27-
28.)  Claimant asserts that "a punitive damage award of at least 1-1.5% of the value of the
Arizona Cardinals should be awarded against the Respondents, jointly and severally," and thus
requests "a punitive damages award of at least $60-$90 million." (*Id.* at 29-30.)

## II.     Respondents' Contentions

### A.  *Retaliation in Violation of the Arizona Employment Protection Act (Count 3)*

Respondents contend that "[t]he evidence confirms that the respondents are entitled to an
award in their favor on Mr. McDonough's retaliation claim" for several reasons.  (Respondents'
Post-Hearing Br. at 2.)  First, Respondents argue that the weight of the testimony at the hearing
"belies Mr. McDonough's claim that he complained about the mobile phones to begin with."
(*Id.*)  Respondents argue that Mr. Bidwill testified that Mr. McDonough "never expressed any
opposition to the phones" and that "Mr. Keim testified that Mr. McDonough actually was one of
the originators of the phone idea." (*Id.*)  Second, Respondents argue that "[t]he AEPA requires
that Mr. McDonough prove that he believed that the Club was violating Arizona law and that he
disclosed that belief to the Club," but Mr. McDonough testified that he "had no idea" whether
any laws were being broken by the alleged burner phone scheme.  (*Id.* at 3-4.)

Third, Respondents argue that Mr. McDonough did not establish a causal link between
his alleged complaint and his termination.  Respondents assert that "the evidence was undisputed

that newly hired General Manager Monti Ossenfort made the decision to relieve Mr. McDonough of his duties, that he made that decision independently, and that he was not even aware of the 'burner phone' episode."  (*Id.* at 5.)  Respondents further argue that "the passage of more than four years between Mr. McDonough's supposed complaint and his non-renewal further dispels any possible inference of causation."  (*Id.* at 6; *see also* Respondents' Pre-Hearing Br. at 7.)

Fourth, Respondents contend that Mr. McDonough's retaliation claim fails because Respondents provided a legitimate, non-retaliatory reason for the decision not to renew Mr. McDonough's contract—namely, that "[t]he Club hired a new General Manager (Mr. Ossenfort) in January 2023 [and] [s]uch a transition typically involves significant staff turnover." (Respondents' Post-Hearing Br. at 6.)  Respondents thus contend that Mr. McDonough "had the ultimate burden to show by 'specific and substantial evidence' that the Club's proffered reason for his non-renewal was a pretext for unlawful retaliation," but Mr. McDonough has failed to present any evidence of "pretext."  (*Id.* at 7.)

### B. *Intentional Infliction of Emotional Distress (Count 4)*

Respondents contend that they are entitled to an award in their favor on Mr. McDonough's intentional infliction of emotional distress claim for two reasons.  First, Respondents argue that "Mr. McDonough's intentional infliction claim is based solely on the alleged defamatory publication of the CounterPoint Statement" and "alleged defamation is not 'extreme and outrageous' conduct—as a matter of law."  (*Id.* at 8; *see also* Respondents' Pre-Hearing Br. at 11-12.)

Second, Respondents contend that Mr. McDonough has failed to prove that Respondents intended to cause emotional distress or that they "recklessly disregarded the near certainty" of

23

such distress based on the testimony of Mr. McCarthy and Mr. Bidwill.  (Respondents' Post-Hearing Br. at 9.)  Mr. McCarthy testified that "[t]he intention was to demonstrate to anyone reading Mr. McDonough's allegations against the respondents that he himself was unreliable, had ulterior motives, and had broken trust with others."  (*Id.*)  And Mr. Bidwill testified that he "felt it was important for the club to stand up and speak out and protect our brand, protect our reputation."  (*Id.*)

### C.  *Defamation (Count 5)*

Respondents contend that "[t]he evidence presented at the hearing likewise demonstrates that the respondents are entitled to an award in their favor on Mr. McDonough's defamation claim, as he presented no competent evidence on two essential elements of his claim: falsity and actual malice."  (*Id.* at 10.)

Respondents describe Mr. McDonough's defamation claim as "rest[ing] on two statements contained in the CounterPoint Statement": "[t]he first is the Club's summary of allegations that Stan Kavan [Mr. McDonough's former father-in-law] (unprompted) made to the Club," and "[t]he second statement details the fact that the Club received disturbing allegations of extreme domestic violence against Mr. McDonough."  (*Id.* at 10-11.)  Respondents argue that "[e]ach of these assertions is true—or, at absolute minimum, is substantially true."  (*Id.* at 11.)  Respondents emphasize that "[t]he claimant has the burden of proving that the statements are false," "the statements at issue must be 'considered in their context,'" and "under the substantial truth doctrine, 'slight inaccuracies will not prevent a statement from being true in substance, as long as the 'gist' or 'sting' of the publication is justified.'"  (*Id.*)

With respect to the first statement, Respondents contend that "[w]hile Mr. McDonough's counsel made frequent references to the respondents supposedly accusing Mr. McDonough of

abandoning responsibility for his daughter . . . that is not an accurate reading of the CounterPoint Statement." (*Id.* at 12.)  Respondents argue that "[i]n the full context of the CounterPoint Statement, the Club merely reports that it 'received a spontaneous overture from a close family member,' who wrote that Mr. McDonough had 'abandoned responsibility to one of his children and cut her off financially.'" (*Id.*)  Respondents contend that Claimant's arguments that "the CounterPoint Statement contained inaccurate quotes . . . and . . . that Mr. Kavan was not a 'close family member' [do not] alter[] the truth of the underlying statement." (*Id.* at 12-13.)

With respect to "the second statement at issue—read, as it must be, in its entirety and in the context of the entire CounterPoint Statement—is that the respondents discovered emails containing credible allegations of extreme domestic abuse and violence against Mr. McDonough, which they then reported to the League." (*Id.* at 14 (internal citations omitted).)  Respondents contend that "[w]hile Ms. McDonough testified that she lied when she wrote the emails accusing Mr. McDonough of extreme domestic violence . . . that is immaterial [because] [t]he CounterPoint Statement does not accuse Mr. McDonough of perpetrating extreme domestic violence in a vacuum or without any additional context.  Rather, as Mr. McCarthy testified, the CounterPoint Statement (accurately) details 'documentation about the allegation made by another party namely, his wife,' regarding domestic violence." (*Id.* at 15.)

Respondents argue that they "also are entitled to the Arbitrator's award in their favor on the defamation claim for the separate and independent reason that Mr. McDonough, as a limited purpose public figure, failed to establish actual malice by clear and convincing evidence." (*Id.* at 15.)  Respondents contend that "[w]here a claimant, through his own efforts, 'invites attention and comment' on an issue, he becomes a limited purpose public figure on that issue." (*Id.* at 16.)  Respondents argue that "[t]he evidence established that Mr. McDonough is a limited purpose

public figure who—on his own initiative—thrust himself into two separate public controversies. . . . Mr. McDonough testified that he publicly discussed his relationships with his spouses and his children (including Caroline), as well as his mental health and substance abuse issues in detail in a 2019 ESPN article." (*Id.*) Respondents also argue that "[b]ecause Mr. McDonough, in filing his Arbitration Demand, 'categorized his complaint and allegations contained therein as a matter of 'public importance,' he 'voluntarily created and injected himself into the public controversy.'" (*Id.* at 17.) According to Respondents, Mr. McDonough "disseminated copies of his arbitration demand to members of the media, and he and his counsel were both quoted in the media discussing his claims on the day he filed his demand." (Respondents' Pre-Hearing Br. at 13.)

Respondents contend that "Mr. McDonough presented no evidence that the respondents harbored serious, subjective doubts about either of the allegations concerning him and, therefore failed entirely to prove, by clear and convincing evidence, that the respondents published the CounterPoint Statement with a reckless disregard of the truth—let alone that they knew that the allegations were false." (Respondents' Post-Hearing Br. at 18-19.) Respondents assert that "Mr. McCarthy testified that he had no doubts about the accuracy of the CounterPoint Statement or its sourcing at the time it was published," and Mr. Bidwill likewise testified that "he believed that the letter from Mr. Kavan was authentic and reliable" and "had no doubts about either the authenticity of the emails from Ms. McDonough or the substance of the domestic violence allegations she made against Mr. McDonough." (*Id.* at 19.)

### D.  *Invasion of Privacy (Count 8)*

Respondents contend that they are entitled to an award in their favor on Mr. McDonough's privacy claim first, and foremost, because "[a]n invasion of privacy claim requires proof that the underlying statements are true" and "Mr. McDonough consistently asserted

throughout the hearing that the CounterPoint Statement was false." (*Id.* at 22.)  Respondents

further argue that Mr. McDonough had "no legal expectation of privacy in email

communications that he sends or receives on the Club's server," and thus his "tort claim for

invasion of privacy fails as a matter of law." (*Id.* at 23.)  Similarly, regarding the Stan Kavan

letter, Respondents assert that "Mr. McDonough ha[d] no legal privacy right to the content of

communications that a third party sends to the Club." (*Id.* at 24.)

### E.  Damages

While Respondents contend that "all of Mr. McDonough's remaining claims fail on the

merits," they also contend that the evidence "confirms that he may not recover the damages he

seeks." (*Id.* at 25.)

Respondents assert that "Mr. McDonough's wage loss claim is based solely upon a string

of 'unfulfilled contingencies'; his expert's evidence does not support any conclusion that he

actually sustained (or will sustain) the wage loss for which he argues." (*Id.* at 26.)  Respondents

argue that Dr. Quinn's reliance on the "Markov" model does not constitute a reasonable basis for

calculating Mr. McDonough's claimed lost wages because the model is "memoryless" and "does

not tell us anything about what any given person in any given job title is going to do in the

future." (*Id.* at 26-27.)  "In short, Dr. Quinn's conclusion that Mr. McDonough sustained $15.9

million in wage loss rests upon nothing but contingencies for which his method of analysis does

not account." (*Id.* at 28.)

Respondents argue that "[o]ne of the biggest 'unfulfilled contingencies' upon which Dr.

Quinn's report is based is his assumption that Mr. McDonough 'became unemployable' in April

2023," but Mr. Gettleman [former GM of the Carolina Panthers and the New York Giants and an

expert witness for Claimant] "effectively conceded that he cannot assess what might happen if an

owner were to give someone in Mr. McDonough's situation a chance to explain the accusations against him."  (*Id.* at 28-29.)  Respondents also note that "Dr. Quinn's analysis . . . is based expressly upon the assumption that Mr. McDonough was in the position of Vice President of Player Personnel . . . in April 2023," but Mr. McDonough "was demoted out of that job in 2019." (*Id.* at 30.)  Respondents further argue that Mr. McDonough has failed to mitigate his claimed damages, and thus cannot recover damages for alleged wage loss after the expiration of his current contract.  (*Id.* at 30-31.)

Respondents also contend that Mr. McDonough has failed to establish any basis for recovery of punitive damages.  "Under Arizona law, a claimant seeking punitive damages must prove that the defendant acted with an 'evil mind,'" but "Mr. McDonough presented no evidence that the respondents acted with an 'evil mind.'  He did not establish by any burden of proof— much less by the clear and convincing burden applicable to his claim—that the respondents intended to harm him, that they were motivated by spite, or that their conduct involved a level of 'outrage' similar to that usually found in criminal behavior."  (*Id.* at 32-33.)

Finally, Respondents contend that they are entitled to an award of attorneys' fees and costs incurred in connection with their successful defense of Mr. McDonough's abandoned contract-based claims (Counts 1 and 2) and his claim for alleged age discrimination (Count 7). Respondents request leave to submit an application documenting the attorneys' fees and costs that they incurred in their successful defense of these claims.  (*Id.* at 36-38.)

<u>**Discussion**</u>

## I.   *Retaliation in Violation of the Arizona Employment Protection Act (Count 3)*

Under Arizona Employment Protection Act ("AEPA") § 23-1501(A)(3)(c)(ii), an employer is liable to an employee if it terminated the employee in retaliation for:

> The disclosure by the employee in a reasonable manner that the employee has information or a reasonable belief that the employer, or an employee of the employer, has violated, is violating or will violate the Constitution of Arizona or the statutes of this state to either the employer or a representative of the employer who the employee reasonably believes is in a managerial or supervisory position and has the authority to investigate the information provided by the employee and to take action to prevent further violations of the Constitution of Arizona or statutes of this state or an employee of a public body or political subdivision of this state or any agency of a public body or political subdivision.

Thus, to prevail on his claim, Mr. McDonough must prove that (1) he engaged in a "protected activity", meaning he disclosed to an appropriate supervisor "in a reasonable manner" that he had "information or a reasonable belief" that the employer or one of its employees had or would violate Arizona law; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Casaceli v. Liberty Healthcare Corp.*, 2023 WL 5308553, at *5 (D. Ariz. Aug. 17, 2023).

Respondents have argued that, as a threshold matter, Mr. McDonough's claim fails because the "weight of the testimony belies Mr. McDonough's claim that he complained about the mobile phones to begin with." (Respondents' Post-Hearing Br. at 2.) The parties provided conflicting evidence regarding whether the interaction between Mr. McDonough and Mr. Bidwill on the practice field on July 23, 2018 related to the "burner phones." On the one hand, Mr. Bidwill testified that Mr. McDonough did not raise any issue regarding mobile phones during the July 23, 2018 interaction or, with the exception of one text message in April 2019, at any time thereafter. (Hearing Tr. at 409-10, 427.) Mr. Bidwill's testimony was supported by the testimony of Mr. Keim who testified that Mr. McDonough actually was the one to first suggest the use of burner phones during Mr. Keim's suspension. (*Id.* at 554-55.)

On the other hand, Mr. McDonough testified that the altercation on July 23, 2018 was the direct result of his objecting to the use of the burner phones. (*Id.* at 69-70.) Mr. McDonough's

testimony was supported by the testimony of Steve Wilks and Ron Minegar.  Coach Wilks testified that he communicated to Mr. McDonough that he was uncomfortable using the burner phones, that Mr. McDonough told him he was likewise uncomfortable, and that Mr. McDonough stated he would speak to Mr. Bidwill.  (*Id.* at 105-07.)  Coach Wilks further testified that he saw Mr. McDonough speak with Mr. Bidwill from about 15-20 yards away and witnessed a "heated argument" with Mr. Bidwill "doing most of the . . . yelling."  (*Id.* at 107.)  Coach Wilks stated that Mr. McDonough reported that he had told Mr. Bidwill they were not comfortable using the burner phones, and in response Mr. Bidwill "started just berating him, you know, yelling at him right on the practice field, and that was the part that I saw and heard from a distance."  (*Id.* at 107-08.)

Mr. Minegar likewise testified to having a discussion with Mr. McDonough on July 23, 2018, in which Mr. McDonough expressed that he was uncomfortable using burner phones to communicate with Mr. Keim during his suspension, and Mr. Minegar recommended that Mr. McDonough speak with Mr. Bidwill about the issue.  (*Id.* at 259-61.)  Mr. Minegar further testified that from a distance he saw a conversation between Mr. McDonough and Mr. Bidwill in which Mr. Bidwill was "very agitated."  (*Id.* at 263-64.)  Mr. Minegar stated that following the interaction on the playing field, later that day Mr. McDonough "came up, told me what had happened, told me that [Mr. Bidwill] had gotten very, very upset with him, and that kind of confirmed what I had witnessed with my own eyes."  (*Id.* at 265.)

Notwithstanding the conflicting testimony provided by Claimant's and Respondents' witnesses, it is unnecessary for me to resolve the factual issue of exactly what conversation occurred between Mr. McDonough and Mr. Bidwill on the practice field on July 23, 2018 because Mr. McDonough's retaliation claim is deficient on two separate dispositive grounds.

First, Mr. McDonough has failed to prove that he engaged in "protected activity" under the AEPA.  Under the AEPA, while an aggrieved employee does not need to cite a specific statute when reporting purportedly illegal activity to his supervisor, he "must actually disclose belief of a violation."  *Secord v. Marketo Inc.*, 2020 WL 1033165, at *2 (D. Ariz. Mar. 3, 2020).  "[A]t the time of disclosure, the employee must have information or a reasonable belief that law was violated."  *Seballos v. Freeport-McMoran*, *Inc.*, 2023 WL 5624716, at *3 (Ariz. Ct. App. Aug. 31, 2023).  "[T]he information an employee discloses must convey to the employer conduct that violates a state constitutional or statutory law in enough detail to alert the employer of the perceived statutory or constitutional violation."  *Id.*  An employee who merely expresses discomfort with employer conduct fails to engage in protected activity under the AEPA.  *See id.* (holding plaintiff's statement that he "did not feel comfortable" with conduct "does not show he was disclosing a statutory or constitutional violation"); *Murar v. Autonation Inc.*, 2021 WL 3912849, at *6 (D. Ariz. Sept. 1, 2021) ("It is not enough for an employee to report general concerns over the employer's actions"; "[i]nstead, an employee must call out the action's illegality.")

Mr. McDonough testified that during the July 23, 2018 interaction, he told Mr. Bidwill: "'We received these burner phones.  Neither Coach Wilks, nor I feel comfortable with this,' and that's probably the last thing I get in, and then [Mr. Bidwill] just exploded."  (Hearing Tr. at 69.) By Mr. McDonough's own account, he merely expressed to Mr. Bidwill that he did not "feel comfortable" using the burner phones, which is insufficient to prove a claim under the AEPA. Mr. McDonough also unequivocally testified that he did not have any understanding at the time he complained to Mr. Bidwill about the burner phones about whether the conduct involved a violation of Arizona law or the Arizona Constitution.  (*Id.* at 198.)  Mr. McDonough's testimony

31

precludes his claim.  See *Rowberry v. Wells Fargo Bank NA*, 2015 WL 7273136, at *5 (D. Ariz. Nov. 18, 2015) (holding plaintiff cannot prevail on AEPA claim "because she admits that she did not know whether changing customer phone numbers violates Arizona law").

Mr. McDonough's assertion in his pre-hearing brief that he had "information or a reasonable belief that Respondents had violated, or was violating, or would violate National Football League rules" does not support a claim under the AEPA.  "The AEPA prohibits retaliation for disclosing violations of Arizona law not an employer's internal policies or actions that are simply unethical or immoral."  *Murar*, 2021 WL 3912849, at *7; *see also Galati v. Am. West Airlines, Inc.*, 69 P.3d 1011, 1014 (Ariz. Ct. App. 2003) ("[T]he language chosen by our legislature is unequivocal. . . . The statute reiterates that it is against violations of the Arizona Constitution and Arizona statutes that protection is provided.").  And, in any event, at the hearing, Mr. McDonough disclaimed any knowledge about whether the alleged "burner phone scheme" violated any NFL rules.  (Hearing Tr. at 176-78.)

Second, Mr. McDonough's unlawful retaliation claim fails on the independent ground that Mr. McDonough was not able to prove a "causal link" between his alleged complaints regarding the burner phones in 2018 and the termination of his employment in 2023.  Mr. McDonough must "prove he was terminated *because* of his disclosure of an Arizona statutory or constitutional violation."  *Seballos*, 2023 WL 5624716, at *5.  "To establish a causal link, the employee must show that the employer's retaliatory motive played a part in the employment action" and "that the employer was aware of the protected activity."  *Murar*, 2021 WL 3912849, at *8.

While Mr. McDonough has argued that "[t]he timeline in this case greatly supports the argument that McDonough was relieved of his duties in retaliation for objection to the burner

phone scheme" (Claimant's Closing Br. at 19), Mr. McDonough must prove causation and is not eligible for an inference of causation given that more than four years passed between his alleged complaint regarding the burner phones and his termination.  *See Murar*, 2021 WL 3912849, at *8 ("A causal link 'can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.'").  But Mr. McDonough has presented no evidence that he was relieved of his duties because of his objection to the burner phones.  To the contrary, the overwhelming evidence suggests that Mr. McDonough was relieved of his duties as a result of a staffing decision made by the Cardinals' new general manager, Monti Ossenfort.

At the hearing, Mr. Ossenfort credibly testified that he independently made the decision not to retain Mr. McDonough.  Mr. Ossenfort explained that he told Mr. Bidwill that he "wasn't quite sure" what Mr. McDonough's role was at the Cardinals, but "this is somebody that [he didn't] see as part of the future of the regime that [he was] building" and was "somebody that [he] want[ed] to move on from."  (Hearing Tr. at 675-77.)  Mr. Ossenfort further testified that at the time he decided to let Mr. McDonough go, he had no knowledge or awareness of the use of burner phones in the summer of 2018.  (*Id.* at 678.)  Mr. Ossenfort's testimony was unrefuted.

While Mr. McDonough has argued that Mr. Ossenfort "could provide no sound reason for relieving the Cardinals' best talent evaluator from his duties" (Claimant's Closing Br. at 19), Mr. McDonough himself acknowledged that it is "[n]ot unusual at all" for a new general manager to "shuffle the staff."  (Hearing Tr. at 211.)  In fact, shortly after being notified that he was being relieved of his duties, Mr. McDonough left Mr. Ossenfort a voicemail stating: "I understand I am no longer an employee of the Cardinals.  I respect your decision, and I completely understand that when men come in and take over their own ship, they need their own guys."  (Resp. Ex. 25.)  Furthermore, when asked at the hearing whether he had any basis to

believe that "Monti Ossenfort knew about this mobile phone issue before the decision to non-renew your employment," Mr. McDonough testified: "I don't think anybody knew."  (Hearing Tr. at 222.)  Mr. McDonough's own testimony and contemporaneous statements confirm that even he did not believe he was relieved of his duties in retaliation for having complained about the burner phones.  Accordingly, Mr. McDonough has failed to prove the necessary "causal link" required to sustain a claim for unlawful retaliation under the AEPA.

For the foregoing reasons, I find that Mr. McDonough has failed to prove his claim for retaliation in violation of the AEPA.

## II.    *Intentional Infliction of Emotional Distress (Count 4)*

A claim for intentional infliction of emotional distress has three elements: "first, the conduct by the defendant must be 'extreme' and 'outrageous'; second, the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and third, severe emotional distress must indeed occur as a result of defendant's conduct."  *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987).  To satisfy the first element, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  *Johnson v. McDonald*, 3 P.3d 1075, 1080 (Ariz. Ct. App. 2000).  "It is not enough 'that the Defendants have acted with an intent which is tortious or even criminal, or that they have intended to inflict emotional distress, or even that their conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."  *Allen v. Quest Online, LLC*, 2011 WL 4403674, at *10 (D. Ariz. Sept. 22, 2011) (citing Restatement (Second) of Torts § 46, cmt. d (1965)).

Mr. McDonough's claim for intentional infliction of emotional distress is based entirely

on the CounterPoint Statement and the alleged defamatory statements therein.  Defamatory statements, however, "are generally not sufficiently extreme and outrageous to support an [intentional infliction of emotional distress] claim." *Carlson v. Geneva City Sch. Dist.*, 679 F. Supp. 2d 355, 372 (W.D.N.Y. 2010).[5]  Mr. McDonough has failed to present any evidence or authority to support his position that the CounterPoint Statement—while defamatory, for the reasons discussed below—is, in itself, "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Johnson*, 3 P.3d at 1080; *see also Rich v. Fox News Network, LLC*, 322 F. Supp. 3d 487, 499 (S.D.N.Y. 2018) ("[D]efamatory statements to news outlets 'fall well short of meeting the high standard for extreme and outrageous conduct.'"); *Allen,* 2011 WL 4403674, at *10 (holding statements made in interviews, press releases, blog posts and internet postings, while sufficient to state a claim for defamation, "does not, in itself, demonstrate conduct by the Defendants that is 'so extreme in degree, as to go beyond all bounds of decency'" for intentional infliction of emotional distress); *Carlson*, 679 F. Supp. 2d at 372-73 ("[A] false charge of sexual harassment . . .  [and] false accusations of criminal conduct generally do not rise to the level of extreme and outrageous conduct that is necessary to support an [intentional infliction of emotional distress] claim.").

Accordingly, I find that Mr. McDonough has failed to prove his claim for intentional infliction of emotional distress.

### III.    *Defamation (Count 5)*

"Under Arizona law, a claim for defamation requires evidence '(1) that the defendant made a false statement; (2) that the statement was published or communicated to someone other

---

[5] Courts in both Arizona and New York have adopted Section 46 of the Restatement (Second) of Torts as the standard for a cause of action for intentional infliction of emotional distress.

than plaintiff; and (3) that the statement tends to harm plaintiff's reputation.'" *Lundin v. Discovery Comm'cns Inc.*, 352 F. Supp. 3d 949, 960 (D. Ariz. 2018).  In cases where the defamatory statement concerns a "private person," the plaintiff must also show that the defendant "(a) knows that the statement is false and it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them." *Reynolds v. Reynolds*, 294 P.3d 151, 155 (Ariz. Ct. App. 2013).  In cases were the defamatory statement concerns a "public figure," the plaintiff must meet the higher standard of proving by clear and convincing evidence that the defamatory statements were made with "actual malice." *McCoy v. Hassen*, 2022 WL 3754244, at *3 (Ariz. Ct. App. Aug. 30, 2022).

Mr. McDonough's defamation claim arises from Respondents' issuance of the CounterPoint Statement and focuses on two categories of statements therein: (i) statements regarding Mr. McDonough's relationship with his daughter, specifically that he "abandoned responsibility" for her and "cut her off financially"; and (ii) statements that Mr. McDonough perpetrated acts of "extreme domestic violence."  Respondents admit that they published the CounterPoint Statement but argue that Mr. McDonough's defamation claim fails because he cannot establish that Respondents made any "false statement" or acted with "actual malice."  For the reasons explained below, I find that Mr. McDonough has proven his defamation claim based on Respondents' publication of the CounterPoint Statement.

## A. False Statement

Mr. McDonough unequivocally asserts that the statements in the CounterPoint Statement are false.  (Hearing Tr. at 233.)  "To be defamatory, a publication must be false and must bring the defamed person into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty, integrity, virtue, or reputation." *Turner v. Devlin*, 848 P.2d 286, 288-89 (Ariz. 1993).  "The

requirement of a 'false statement' means the statement must have been an 'assertion of objective fact.'" *Lundin*, 352 F. Supp. 3d at 960 (quoting *Yetman v. English*, 811 P.2d 323 (Ariz. 1991)). "And even assertions of objective facts that are false are not actionable provided they are 'substantially true.'" *Id.* "Slight inaccuracies will not prevent a statement from being true in substance, as long as the 'gist' or 'sting' of the publication is justified." *Read v. Phoenix Newspapers, Inc.*, 819 P.2d 939, 941 (Ariz. 1991)).

In analyzing a purportedly defamatory statement, one "must objectively determine the statement's 'natural and probable effect on the mind of the average recipient.'" *Rogers v. Mroz*, 502 P.3d 986, 993 (Ariz. 2022). The "meaning of words and statements should not be construed in isolation." *Reynolds*, 294 P.3d at 155. "[R]ather, consideration should be given to the context and all surrounding circumstances, including the impression created by the words used and the expression's general tenor." *Id.*; *see also Rogers*, 502 P.3d at 994 (explaining that the court "must view the statement within the entirety of the publication, as the meaning or implication is only fully apparent in context"); *Sign Here Petitions LLC v. Chavez*, 402 P.3d 457, 463 (Ariz. Ct. App. 2017) ("In determining whether speech is actionable, 'courts must additionally consider the impression created by the words used as well as the general tenor of the expression, from the point of view of the reasonable person' at the time the statement was uttered and under the circumstances it was made.").

Mr. McDonough asserts that Respondents defamed him by publishing in the CounterPoint Statement that he "abandoned responsibility" for his daughter and "cut her off financially."[6] I find that Respondents' statements regarding Mr. McDonough's relationship with

---

[6] Mr. McDonough also takes issue with Respondents' use of quotes around the phrase "abandoned responsibility" in the CounterPoint Statement because that phrase does not appear in the letter from Mr. Kavan and further disputes their characterization of Mr. Kavan as a "close

his daughter are, when read in context of the CounterPoint Statement as a whole, false and

defamatory.  Mr. McDonough and Ms. McDonough provided credible, unrefuted testimony that

Mr. McDonough has never abandoned responsibility for his daughter or cut her off financially.

To the contrary, the evidence in the record plainly shows that Mr. McDonough welcomed the

opportunity to move from Arizona to North Carolina to live closer to his daughter and, despite

having no legal obligation to do so, has continued to contribute financially to her care.  (Hearing

Tr. at 78-83; 248-49; 508.)

I reject Respondents' contention that the statements regarding Mr. McDonough's

relationship with his daughter are true or substantially true because, "[i]n the full context of the

CounterPoint Statement, the Club merely report[ed] that it 'received a spontaneous overture from

a close family member,' who wrote that Mr. McDonough had 'abandoned responsibility to one

of his children and cut her off financially.'"  (Respondents' Post-Hearing Br. at 12.)

Respondents' interpretation does not account for the full context of the CounterPoint Statement

at all, but rather seeks to read a single sentence of the CounterPoint Statement in isolation.

Respondents ignore the paragraph immediately preceding Respondents' description of the

"spontaneous overture from a close family member," in which Respondents state that they are

"exposing the details of Terry's character," "are distressed to know that [their] faith in him was

so misplaced," that "there were many signs that are consistent with how [Mr. McDonough] has

---

family member."  It is undisputed that the underlying source of these statements is a letter sent
by Mr. McDonough's former father-in-law, Stan Kavan, to Mr. Larry Fitzgerald, former star
wide receiver for the Arizona Cardinals, on September 22, 2018.  (Hearing Tr. at 493-95.)  It is
true that the precise phrase "abandoned responsibility" does not appear in Mr. Kavan's letter, and
that Respondents' characterization of Mr. McDonough's former father-in-law as a "close family
member" is undoubtedly a stretch.  But these types of "slight inaccuracies" do not alter the "gist"
or the "sting" of the statements at issue.  *See Chapman v. Journal Concepts, Inc.*, 401 F. App'x
243, 245 (9th Cir. 2010) (holding that inaccurate quotations are "minor inaccuracies [and] do not
amount to falsity so long as the substance, the gist, the sting of the libelous charge is justified").

now crossed a line into such drastic hostility," and that the information that followed described "just some of those aspects."  The context of the CounterPoint Statement makes clear that Respondents did not "merely report" that a third party had alleged Mr. McDonough "abandoned responsibility" for his daughter and "cut her off financially," but rather that Respondents fully adopted and endorsed those allegations as true "details of Terry's character."  Indeed, at the hearing, Mr. Bidwill acknowledged that by issuing the CounterPoint Statement, Respondents adopted the statement in Mr. Kavan's letter that Mr. McDonough had cut off his daughter financially.  (Hearing Tr. at 511-12.)

I likewise find that Respondents' statements regarding "extreme domestic violence" by Mr. McDonough were false and defamatory.  At the hearing, Mr. McDonough and Ms. McDonough both provided unrefuted testimony that Mr. McDonough has never committed an act of domestic violence or domestic abuse.  (*Id.* at 85-86; 250-51.)  Respondents do not dispute that Mr. McDonough has never committed any acts of domestic violence or abuse, but nonetheless argue that the CounterPoint Statement is true or substantially true because "the second statement at issue—read, as it must be, in its entirety and in the context of the entire CounterPoint Statement—is that the respondents discovered emails containing credible allegations of extreme domestic abuse and violence against Mr. McDonough."  (Respondents' Post-Hearing Br. at 14.)  Stated differently, Respondents argue, that "[w]hile Ms. McDonough testified that she lied when she wrote the emails accusing Mr. McDonough of extreme domestic violence . . . that is immaterial [because] [t]he CounterPoint Statement does not accuse Mr. McDonough of perpetrating extreme domestic violence in a vacuum or without any additional context," but rather "(accurately) details 'documentation about the allegation made by another party namely, his wife,' regarding domestic violence."  (*Id.* at 15.)

Once again, Respondents ignore the full context they themselves provided in the CounterPoint Statement.  The statements regarding allegations of domestic violence are part of a list of "aspects" that Respondents contend "expos[e] the details of Terry's character," show that their "faith in him was so misplaced," and are a "sign[] . . . consistent with how he has now crossed a line into such drastic hostility."  In addition, immediately after Respondents describe the emails containing the allegations of domestic violence, the CounterPoint Statement provides that "these latest detailed accounts are even more shocking than the previous behavior by Terry in the workplace that we had already documented."  The CounterPoint Statement continues, "[l]ong before we knew these latest details concerning domestic violence, and throughout his time with the Cardinals, the team took extraordinary measures to support Terry and assist him in navigating his professional and personal challenges . . . includ[ing] encouraging him to seek expert help for the difficult issues that clearly continue to afflict him."  When read in the context of the CounterPoint Statement as a whole, Respondents have not merely described documentation containing allegations of domestic violence, but rather have adopted and endorsed the allegations of domestic violence as true.  Accordingly, I conclude that Mr. McDonough has proven that the Respondents made "false statements" as required for his defamation claim.

**B.  Actual Malice**

To determine the legal standard that applies to Mr. McDonough's defamation claim, I must determine if he is a "limited purpose public figure."  If he is, he must prove by clear and convincing evidence that Respondents published the defamatory statement with "actual malice," "that is, with knowledge that it was false or with reckless disregard of whether it was false or not."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964); *Dombey v. Phoenix*

*Newspapers, Inc.*, 724 P.2d 562, 573 (Ariz. 1986).

"[P]ublic figures may reach that status because of their position, their 'purposeful activity' in 'thrusting' themselves into matters of public controversy or their close involvement with the resolution of matters of public concern." *Dombey*, 724 P.2d at 569. "Some persons 'may achieve such pervasive fame or notoriety that they become a public figure for all purposes and in all contexts,'" known as all-purpose public figures. *McCoy*, 2022 WL 3754244, at *4 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)). "Other persons, such as those active in community and professional affairs, may voluntarily inject themselves or be drawn into a particular public controversy and thereby become a public figure for a limited range of issues, especially when we 'reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.'" *Id.*

Respondents have argued that Mr. McDonough is a limited purpose public figure because he (i) described his arbitration demand as containing matters of "public importance" and disseminated copies to the media; and (ii) publicly discussed his wife and children in a 2019 ESPN article. (Respondents' Post-Hearing Br. at 15-17; Respondents' Pre-Hearing Br. at 13.) First, Respondents argue that Mr. McDonough's arbitration demand "is replete with references to ostensible issues of public importance, such as public hearings before the U.S. House of Representatives Committee on Oversight and Reform . . . and a racial discrimination lawsuit currently pending against the NFL." (Respondents' Post-Hearing Br. at 17.) But Respondents provide no authority to support the assertion that tangential references to public hearings and litigations in a confidential arbitration filing are sufficient to make a claimant a limited purpose public figure. Notably, Respondents previously argued that it was Mr. McDonough's

dissemination of the arbitration demand that made him a limited purpose public figure.  Had Respondents produced any evidence that Mr. McDonough sent his arbitration demand to the media, I would certainly have agreed that such conduct would have made Mr. McDonough a limited purpose public figure.  But Respondents have produced no such evidence.  I therefore find that Mr. McDonough's arbitration demand does not make him a limited purpose public figure.

Second, Respondents argue that Mr. McDonough's voluntary cooperation with the author of a 2019 ESPN article, titled "A fatal accident, jail, alcoholism and addiction:  NFL exec Terry McDonough tells his story," has made him a limited purpose public figure.  The article describes Mr. McDonough's background, including a conviction for motor vehicle homicide when he was in high school, his struggles with alcohol, and his career in the NFL.  The article mentions, to varying degrees, his familial relationships.  Respondents contend that "Mr. McDonough 'invited attention and comment' on his personal life and relationships he described in the article, establishing himself as a limited purpose public figure."  (*Id.*)

Whether Mr. McDonough is a limited purpose public figure based on the 2019 ESPN article is a difficult question.  On the one hand, Mr. McDonough testified that he was interviewed "many times" for the article, he believed all his family members were interviewed for the article, the article identifies all his family members by name, he was photographed for the article, and his wife supplied photographs of Mr. McDonough and his family for the article. (Hearing Tr. at 223, 231-32.)  Furthermore, the article briefly discusses Mr. McDonough's daughter and his relationship with her.  Specifically, the article states that Mr. McDonough's daughter "graduated as a special-needs student from the Wolfe School in Monroe, North Carolina, and remains by all accounts her father's clear favorite.  'My everything,' Terry called

her.  According to a school official . . . McDonough is responsible for funding Wolfe's new sensory room, which provides a calming atmosphere for children with physical and intellectual disabilities."  By specifically discussing his relationship with his daughter in the article, Mr. McDonough has arguably "invited attention and comment" concerning that relationship.  *See Thomas v. Los Angeles Times Comm'ns LLC*, 45 F. App'x 801, 803 (9th Cir. 2002) (holding plaintiff was a limited purpose public figure "because by authorizing a biography and soliciting press coverage of that work, [plaintiff] 'invited attention and comment'").[7]

On the other hand, the article makes only passing reference to Ms. McDonough, and I find questionable that such limited reference renders Mr. McDonough a limited purpose public figure with respect to the personal details of his relationship with his wife.  Indeed, Respondents' argument to the contrary seemingly proves too much as Respondents essentially seek a determination that Mr. McDonough is a public figure for every aspect of his personal life for all of time, effectively that Mr. McDonough is not a limited purpose public figure at all but rather an all-purpose public figure.

Ultimately, I need not decide whether Mr. McDonough is a limited purpose public figure for purposes of the defamatory statements at issue because I find Mr. McDonough has proven, by clear and convincing evidence, that Respondents published the defamatory statements with actual malice.  "A statement is made with actual malice when the declarant makes the statement with knowledge that it was false or with reckless disregard for the truth."  *Morris v. Warner*, 770 P.2d 359, 367 (Ariz. Ct. App. 1988).  The "actual malice" standard is satisfied by proof that "the

---

[7]   While I note that the ESPN article was published four years before the publication of the defamatory statements at issue, the Ninth Circuit has stated that "the passage of time does not alter an individual's status as a limited purpose public figure."  *Peterson v. Gannett Co.*, 2021 WL 5507338, at *1 (9th Cir. Nov. 24, 2021).

defendant in fact entertained serious doubts as to the truth of his publication.  Publishing with

such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."  *St.*

*Amant v. Thompson*, 390 U.S. 727, 731 (1968).  But the "cases are clear that reckless conduct is

not measured by whether a reasonably prudent man would have published or would have

investigated before publishing."  *Id.*  Thus, according to the Arizona Supreme Court, "[t]he

disregard must be more than 'reckless'—*conscious* disregard would be a better description of the

test."  *Dombey,* 724 P.2d at 573.

Respondents argue that Mr. McDonough cannot prove "actual malice" because both Mr.

McCarthy and Mr. Bidwill testified they had no doubts about the accuracy of the Counterpoint

Statement or the reliability of materials they relied on for the statements at issue.  But that is not

enough.  As the Supreme Court has explained:

> The defendant in a defamation action . . . cannot . . . automatically ensure a
> favorable verdict by testifying that he published with a belief that the statements
> were true.  The finder of fact must determine whether the publication was indeed
> made in good faith.  Professions of good faith will be unlikely to prove
> persuasive, for example, where a story is fabricated by the defendant, is the
> product of his imagination, or is based wholly on an unverified anonymous
> telephone call.  Nor will they be likely to prevail when the publisher's allegations
> are so inherently improbable that only a reckless man would have put them in
> circulation.  Likewise, recklessness may be found where there are obvious
> reasons to doubt the veracity of the informant or the accuracy of his reports.

*St. Amant*, 390 U.S. at 732.

Here, there were "obvious reasons to doubt the veracity of the informant or the accuracy

of" the allegations in the letter from Mr. Kavan and the emails from Ms. McDonough.  With

respect to the letter from Mr. Kavan, Mr. Kavan expressly identified Mr. McDonough as his

"former son-in law," suggesting anything but a close current relationship.  Furthermore, Mr.

Kavan did not send the letter to an executive of the team or an individual in the human resources

department, but rather to Cardinals' star wide-receiver Larry Fitzgerald.  Given the source and

44

tone of the letter, it is not surprising that when Mr. Fitzgerald gave the letter to Mark Dalton, Cardinals Senior Vice President of Media Relations, Mr. Dalton did not notify Mr. Bidwill of the allegations in the letter.  Instead, Mr. Dalton put the letter in Mr. McDonough's employment file and never spoke a word of it to Mr. Bidwill until nearly five years later when Respondents were searching Mr. McDonough's emails and files for potential content to include in the CounterPoint Statement.  (Hearing Tr. at 441-42.)  Respondents' own conduct in giving the letter no credence or consideration whatsoever at the time they received it is clear evidence of their own subjective doubts about the veracity and accuracy of the allegations therein.

In addition, prior to publishing the CounterPoint Statement, Respondents had in their possession documents undermining the allegations in Mr. Kavan's letter.  For example, prior to publishing the CounterPoint Statement, Respondents possessed emails between Mr. McDonough and his ex-wife discussing the amount of child support to be paid for his daughter (Resp. Ex. 5), and court records reflecting that Mr. McDonough had no legal obligation to pay child support in 2018 (Resp. Ex. 8).  Furthermore, less than a week before publishing the CounterPoint Statement, Mr. Bidwill acknowledged that Mr. McDonough had been offered a contract in 2019 "to become a senior scout and relocate back to North Carolina where his adult disabled daughter lives" and "[h]e enthusiastically embraced the new role."  (Cl. Ex. 46.)  The contemporaneous documents thus show that at the time the CounterPoint Statement was published, Respondents consciously disregarded information in their possession that Mr. McDonough had not abandoned responsibility for his daughter or cut her off financially.  Respondents nevertheless proceeded to publish the Counterpoint Statement in reckless disregard of the truth or falsity of the allegations in Mr. Kavan's letter.

There were likewise obvious reasons for Respondents "to doubt the veracity . . . or

accuracy of" the allegations of domestic violence in the email from Ms. McDonough.  The allegation of domestic violence was a single, stray line in a series of emails between Mr. McDonough and Ms. McDonough contained in a heated exchange relating to Mr. McDonough having had an affair.  (Resp. Ex. 14-20.)  The email exchange occurred in October 2020, approximately two-and-a-half years before the CounterPoint Statement was published.  In searching Mr. McDonough's emails for content for the CounterPoint Statement, Respondents found no other evidence or indication that Mr. McDonough had ever committed an act of domestic violence in the seven years he worked for the Cardinals prior to 2020 or the two years thereafter.

Mr. McCarthy, on behalf of Respondents, also undertook a public records search of Mr. McDonough and specifically looked for "[c]ourt documents affirming years of spousal abuse including violence, rampant infidelity and drug abuse."  Mr. McCarthy made clear that such conduct was "[t]he kinds of aspects that would be, you know, particularly noteworthy and that would be important to, you know, zero in on" as content for the CounterPoint Statement. (Hearing Tr. at 631; *see also id.* at 636 ("[W]hen we get records back and examine them, that these were aspects I thought that we might, we meaning me and my team, might encounter and ought to, you know, zero in on and capture if we did.").  Despite specifically searching for evidence of "spousal abuse" by Mr. McDonough, Mr. McCarthy found none.  Respondents chose to consciously disregard the glaring absence of any evidence that Mr. McDonough had committed acts of domestic violence, and nevertheless proceeded to publish the CounterPoint Statement in reckless disregard of the truth or falsity of that allegation.

For the foregoing reasons, I find that Mr. McDonough has proven, by clear and convincing evidence, that Respondents acted with actual malice in publishing the false and

defamatory statements in the CounterPoint Statement.

Having concluded that Mr. McDonough has proven his claim for defamation, Claimant's December 7, 2023, Motion for Issue Sanctions is DENIED as MOOT.

### IV.   *Invasion of Privacy (Count 8)*

A claim for invasion of privacy under Arizona law requires the disclosure of private "true statements."  *See Dyer v. Dirty World, LLC*, 2011 WL 2173900, at *3 (D. Ariz. June 2, 2011) (citing Restatement (Second) of Torts § 652D).  Mr. McDonough "admits that he has pled alternative and contradictory claims in defamation and invasion of privacy" and acknowledges that he can only recover under his claim for invasion of privacy if the statements at issue in the CounterPoint Statement are found to be true.  (Claimant's Closing Br. at 20; *see also* Hearing Tr. at 755 (The Arbitrator: "[D]o you dispute that for purposes of an invasion of privacy claim, statements of fact must be true?"  Mr. Caspino: "I do not dispute that.").)

Because I have found that the statements at issue in the CounterPoint Statement are false, I conclude that Mr. McDonough has failed to prove his invasion of privacy claim.

### V.   *Damages*

Having concluded that Mr. McDonough has proven his claim for defamation based on Respondents' publication of the CounterPoint Statement, I must next determine whether Mr. McDonough can recover the damages he seeks, namely (i) special damages of $15 million for lost future earnings; (ii) general damages of $10 million for emotional distress; (iii) general damages of $10 million for reputational harm; and (iv) punitive damages of $60-$90 million. Under Arizona law, before I can assess damages against Respondents, I must find that Respondents' defamatory statement was a cause of Mr. McDonough's injury.  "A defamatory statement causes damage if it helps produce the damage, and if the damage would not have

happened without the defamatory statement."  Revised Arizona Jury Instructions (Civil) 7th, Defamation 6 (Causation).  If the defamatory statement caused Mr. McDonough damage, he is entitled to damages "that will reasonably and fairly compensate [him] for each of the following elements of damage proved by the evidence to have been caused by Respondents' false and defamatory statements": "1. Impairment of reputation and standing in the community suffered and reasonably likely to be suffered in the future; 2. Emotional distress, humiliation, inconvenience, and anxiety experienced and reasonably probable to be experienced in the future; 3. Monetary loss experienced and reasonably probable to be experienced in the future."  *Id.* at Defamation 7 (Damages Generally).

For the reasons explained below, I find Mr. McDonough is entitled to an award of general damages totaling $750,000 and an award of punitive damages totaling $2,250,000.

## A. Special Damages for Lost Future Earnings

Mr. McDonough asserts that his "career path was on a trajectory towards a general manager position" but that "[h]e is now unemployable."  (Claimant's Pre-Hearing Br. at 2.) Relying on the testimony of his expert Dean Kevin Quinn, Mr. McDonough contends that "as a result of the actions of Respondents, McDonough will suffer $15 million in losses over the next 10 years."  (Claimant's Closing Br. at 24.)

Mr. McDonough bears the burden of proving that Respondents' defamatory statements caused lost future earnings, and I find Mr. McDonough has failed to meet that burden.  The evidence in the record simply does not support Mr. McDonough's assertion that he would have obtained a general manager position in the absence of the CounterPoint Statement.  While there is no dispute that Mr. McDonough was one of three finalists for the general manager position for the 49ers in 2017, between 2017 and 2023—when the CounterPoint Statement was published—

Mr. McDonough had no other interviews for general manager positions.

Mr. McDonough's own testimony and argument confirms that his career path towards a general manager position was halted long before the CounterPoint Statement was issued. At the hearing, Mr. McDonough testified that he would have had additional interviews for general manager positions "until July 23, 2018"—the day that he and Mr. Bidwill had an altercation on the practice field, and nearly five years before the CounterPoint Statement was published. (Hearing Tr. at 171.) In his pre-hearing brief, Mr. McDonough further confirmed that his inability to obtain a general manager position, or even an interview, was not caused by Respondents' issuance of the CounterPoint Statement in 2023, but instead was the result of his being demoted in 2019 and again in 2022. According to Mr. McDonough, the demotions "did not go unnoticed throughout the league and led to teams questioning why McDonough was being demoted. Interest in McDonough as a General Manager evaporated as a result of these demotions." (Claimant's Pre-Hearing Br. at 7.) Mr. McDonough's own admissions plainly establish that his claimed lost future earnings were not caused by Respondents' publication of the CounterPoint Statement, but rather by conduct occurring before Mr. McDonough signed his most recent employment contract with the Cardinals. Because, as set forth in my Order on Respondents' Dispositive Motion, Mr. McDonough released "all of his existing rights to any relief of any kind (known and unknown)" on May 24, 2022 when he signed his most recent employment contract, he cannot recover lost future earnings for his inability to obtain a general manager position caused by conduct occurring before May 24, 2022.

Whether the CounterPoint Statement has prevented Mr. McDonough from obtaining a lower-ranking, non-general manager position in football is a closer call. In support of his theory of causation, Mr. McDonough submitted the expert report of Mr. Dave Gettleman, former

general manager of the New York Giants and Carolina Panthers.  Mr. Gettleman opined that

based on his "deep understanding of the hiring practices for NFL executives," "[t]he allegation

that Terry is guilty of 'extreme domestic violence' most certainly could preclude Terry from ever

working again in football—college or professional," and the "the accusation that Terry

'abandoned' his special needs daughter . . . is so abhorrent that no one in football is ever likely to

consider hiring Terry."  (Cl. Ex. 54.)  Mr. Gettleman also opined that Mr. McDonough "is an

excellent NFL executive" based on his win-loss ratio from the 2014-2018 seasons.  (*Id.*)  But Mr.

Gettleman's opinions do not give any consideration to the fact that Mr. McDonough was twice

demoted after the 2018 season, first in 2019 to "the lesser position of Senior Personnel Executive

(the #7 person in the Cardinals' front office, down from #2)," and then, in May 2022, "from the

#7 to the #9 position in the Cardinals front office."  (FADA ¶ 70, 76.)  As Mr. McDonough has

asserted, these demotions "did not go unnoticed throughout the league and led to teams

questioning why McDonough was being demoted."  (Claimant's Pre-Hearing Br. at 7.)  While

Mr. Gettleman has opined that the CounterPoint Statement "could preclude Terry from ever

working again in football," he has not provided any opinion as to whether "the damage would

not have happened without the defamatory statement," *i.e.*, whether Mr. McDonough would have

obtained another position in football in the absence of the CounterPoint Statement given the

trajectory of his career from 2019-2023.

The only other evidence Mr. McDonough has to support his theory that the CounterPoint

Statement has precluded future employment is his testimony that Eric DeCosta and Joe Douglas,

current general managers in the NFL, informed him "they would love to hire [him]," but "under

the circumstances of what happened they can't."  (Hearing Tr. at 217-19.)  Mr. McDonough

described Mr. DeCosta and Mr. Douglas as his "best friends" (*id.* at 217), yet he called neither as

a witness to provide testimony at the hearing.  I do not find Mr. McDonough's hearsay testimony sufficient to meet his burden of proving he would have obtained another position in the NFL in the absence of the CounterPoint Statement.  Given Mr. McDonough's multiple demotions before the CounterPoint Statement was published, the absence of any evidence that any clubs had expressed interest in hiring Mr. McDonough after he had been demoted in 2019 and 2022, and Mr. McDonough's failure to make any effort to obtain employment from other clubs between January 2023 and April 2023 (even after he had been expressly encouraged by the Cardinals to seek new employment), I find that Mr. McDonough has failed to prove he would have obtained even a lower-ranking, non-general manager position had Respondents not published the CounterPoint Statement.

In addition, Mr. McDonough has failed to present any reliable evidence to establish the damages he claims to have suffered.  Mr. McDonough relies entirely on the expert report of Dean Kevin Quinn, Ph.D to prove his economic damages.  Dr. Quinn used the "Markov" model to "determine the likelihood that Mr. McDonough would have remained in his original job with the Cardinals, the likelihood of his moving to another job level, and the expected value of the lost wages that resulted."  (Cl. Ex. 55.)  Specifically, Dr. Quinn's "calculation seeks to estimate the total lost wages from 2024-2033 assuming that [Mr. McDonough] had been in the VPPP [Vice President of Player Personnel] role until April 2023."  (*Id.*)

While Mr. McDonough asserts that Dr. Quinn's "model is not dependent upon McDonough becoming a General Manager" (Claimant's Closing Br. at 18), Dr. Quinn's damages calculation is expressly dependent on Mr. McDonough having been in the role of Vice President of Player Personnel in April 2023.  (Hearing Tr. at 749 "Q:  Does your conclusion depend upon the presumption that McDonough was in a VPPP job in April of '23.  A:  Yes.")

Mr. McDonough, however, had not held that role since 2019.  According to Mr. McDonough, in 2019 he was demoted to "the lesser position of Senior Personnel Executive (the #7 person in the Cardinals' front office, down from #2)."  (FADA ¶ 70.)  Then, in May 2022, "Mr. McDonough was demoted again, falling from the #7 to the #9 position in the Cardinals front office."  (*Id.* ¶ 76.)  Because Dr. Quinn's damages calculation is based entirely on Mr. McDonough having held a role he did not have, Dr. Quinn's damages calculation is not reliable.  When asked what Mr. McDonough's calculated damages would be if Mr. McDonough had held a lesser position in April 2023, Dr. Quinn testified: "I couldn't say off the top of my head.  It would be a different number. . . . It would be different because the career path would look different."  (Hearing Tr. at 749.)  Mr. McDonough has presented no evidence as to what that "different number" would be.

Moreover, even if Dr. Quinn had accounted for Mr. McDonough having held a lower-level position in April 2023, I still would not have found that Dr. Quinn's analysis provides a reasonably reliable method for calculating Mr. McDonough's lost wages.  As Dr. Quinn explained, the Markov model looks only at the "median person" and "does not tell us anything about what any given person in any given job title is going to do in the future."  (*Id.* at 743, 747.)  The model does not take into account any event that transpired before the individual moved into the position, whether an individual is a good performer or a bad performer, the personnel decisions that any individual hiring manager might make in a given case, or the individual needs or requirements of an organization.  (*Id.* at 730-31.)  Dr. Quinn thus readily acknowledged that "when you try to apply this [Markov model] to an individual, it can be a little bit tricky."  (*Id.* at 739.)  Given the undisputed limitations of the Markov model, I find Dr. Quinn's analysis does not, on its own, provide a reliable method for quantifying Mr. McDonough's claimed lost future earnings, and Mr. McDonough has presented no other evidence of his claimed lost future

earnings.

For the foregoing reasons, I award Mr. McDonough no special damages.

**B.  General Damages**

Mr. McDonough seeks general damages of $10 million for emotional distress and $10 million for reputational harm.  Mr. McDonough has argued that "[i]n the matter at hand, damages for defamation are presumed . . . because one of the statements made by the Respondents impute that he committed a criminal offense punishable by imprisonment," namely that he committed an act of "extreme domestic violence."  (Claimant's Pre-Hearing Br. at 27.) Even presumed damages, however, must not be "wholly unsupported by the evidence presented."  *Prendeville v. Singer*, 155 F. App'x 303, 305 (9th Cir. 2005).  Ultimately, the issue of whether Mr. McDonough's general damages are "presumed" has no effect on the outcome of this case because Mr. McDonough has proven that he suffered actual damages in the form of both emotional distress and reputational harm.

*1.  Emotional Distress*

In support of his request for damages for emotional distress, Mr. McDonough proffered the expert testimony of Dr. Trevor Small, a clinical psychologist.  Dr. Small provided compelling, unrefuted testimony that the issuance of the CounterPoint Statement has caused Mr. McDonough significant emotional distress.  Following a three-day independent psychological evaluation of Mr. McDonough, Dr. Small opined that "since the release of the online document by the Cardinals organization, Mr. McDonough has evidenced a significant increase in his mental health symptoms that clearly have impacted his personal and professional life."  (Cl. Ex. 52. at 18; *see also id.* ("[I]t is the opinion of this examiner that Mr. McDonough's symptoms increased subsequent to the public release of statements that he felt damaged his character in

2023 after he filed his request for arbitration with the NFL.").)

Dr. Small administered multiple diagnostic measures as part of the independent psychological evaluation.  For example, Mr. McDonough was administered the Patient Health Questionnaire (PHQ-9) and obtained a score consistent with "Moderately Severe Depression." (*Id.* at 13.)  Mr. McDonough was also administered the Generalized Anxiety Disorder-7 (GAD-7), and his score was "indicative of severe anxiety symptoms."  (*Id.* at 13-14.)  Dr. Small noted that "Mr. McDonough was administered both the GAD-7 and PHQ-9 by his primary care physician in 2021 and scored in the minimal anxiety and minimal depression symptoms."  (*Id.* at 14.)

Other diagnostic measures administered by Dr. Small resulted in scores "clinically significant and positive for the diagnosis of PTSD" (*id.* at 13), and "suggesting that [Mr. McDonough] is experiencing significant psychological difficulties," including "elevations in the areas of depression, anxiety, unresolved conflict, frustration, extreme self-deprecation, and self-devaluation" (*id.* at 14).  Dr. Small further reported that Mr. McDonough "indicated that many of the symptoms that he had experienced 40 years prior that were identified as relating to post-traumatic stress disorder resurfaced after the release of a document that he felt tarnished his image."  (*Id.* at 17.)  At the hearing, Dr. Small confirmed that he would classify Mr. McDonough's mental distress from the CounterPoint Statement as severe.  (Hearing Tr. at 295.) I find Dr. Small's methods and opinions are reliable and establish that Respondents' defamatory statements have caused Mr. McDonough emotional distress.

Although Dr. Small opined that Mr. McDonough's symptoms increased following publication of the CounterPoint Statement, he also opined that "Mr. McDonough experienced a significant anxiety reaction and shock since the initial conflict with the organization began in

2018." (Cl. Ex. 52 at 17; *see also* Hearing Tr. at 311-12.)  Because Mr. McDonough released "all of his existing rights to any relief of any kind (known and unknown)" on May 24, 2022 when he signed his most recent employment contract with the Cardinals, he cannot recover damages for emotional distress caused by conduct occurring before May 24, 2022.  Instead, he can only recover damages for emotional distress that was caused by Respondents' defamatory statements.

At my request, Claimant and Respondents submitted information in their post-hearing briefs regarding jury verdicts in Arizona involving damages for emotional distress.  Having reviewed the jury awards provided by the parties and based on the evidence and circumstances of this case, including that the only compensable damages are those caused by the CounterPoint Statement, I award Mr. McDonough $600,000 in damages for emotional distress caused by Respondents' defamatory statements.

### 2.  *Harm to Reputation*

Mr. McDonough and Ms. McDonough provided unrefuted testimony regarding the harm Mr. McDonough has suffered to his reputation because of Respondents' defamatory statements. For example, Mr. McDonough testified that he became "an immediate pariah" after the CounterPoint Statement was published.  (Hearing Tr. at 74-75.)  He further testified that the CounterPoint Statement "has minimized [his relationships with others] by at least 95 percent," and even his mother and sister no longer call him.  (*Id.* at 132.)  Ms. McDonough confirmed that publication of the CounterPoint Statement has resulted in significant "backlash," "our friends aren't our friends, I basically feel like I'm isolated."  (*Id.* at 251-52.)  In addition, despite having built relationships with 20-30 individuals in the NFL over the course of his career, Mr. McDonough testified that he only has two remaining relationships with individuals in the NFL

following publication of the CounterPoint Statement.  (*Id.* at 132-33.)

Mr. McDonough has proven that Respondents' defamatory statements have caused harm to his reputation.  Having reviewed the jury awards provided by the parties and based on the evidence and circumstances of this case, including that the only compensable damages are those caused by the CounterPoint Statement, I award Mr. McDonough $150,000 in general damages for the harm to his reputation caused by Respondents' defamatory statements.

### C.  Punitive Damages

Mr. McDonough seeks punitive damages of $60-$90 million for Respondents' defamatory statements.  In Claimant's supplemental brief regarding damages, Mr. McDonough highlighted that the jury in *Carroll v. Trump* recently returned a verdict of $83.3 million, consisting of compensatory damages of $18.3 million and punitive damages of $65 million, in a defamation case that Mr. McDonough claims has "facts that resemble those in the matter at hand."  (Claimant's Supplemental Brief Regarding Damages at 1-2.)  Mr. McDonough asserts that "an award should issue, in his favor, that is in excess of the $83.3 million awarded to Ms. Carroll."  (*Id.* at 3.)

"To be entitled to punitive damages, once a plaintiff establishes that the defendant engaged in tortious conduct of any kind, intentional or negligent—that is, acted with an 'evil hand,'—the plaintiff must prove the defendant engaged in such conduct with an 'evil mind.'" *Swift Transp. Co. v. Carman*, 515 P.3d 685, 692 (Ariz. 2022).  "To establish an evil mind requires clear and convincing evidence that the defendant's actions either (1) intended to cause harm, (2) were motivated by spite, or (3) were outrageous, creating, a 'substantial risk of tremendous harm to others.'"  *Id.*  The plaintiff's burden of showing an evil mind by clear and convincing evidence may be met by either direct or circumstantial evidence and "may be inferred

from a defendant's conduct or objectives." *Symbiont Nutrition LLC v. Western Agric. Ins. Co.*, 2023 WL 3205529, at *6 (D. Ariz. May 2, 2023); *see also Scottsdale Publ'g, Inc. v. Superior Court*, 764 P.2d 1131, 1141 n.7 (Ariz. Ct. App. 1988) (explaining that an evil mind "may be established by defendant's express statements or inferred from defendant's expressions, conduct, or objectives").

Here, Mr. McDonough has proven by clear and convincing evidence that Respondents, consciously and deliberately, intended to cause him harm in publishing the defamatory statements. After receiving the draft demand for arbitration from Claimant's counsel, Respondents began searching Mr. McDonough's emails and files for potential content to include in the CounterPoint Statement. In addition, Mr. McCarthy, on behalf of Respondents, searched public records specifically looking for "[c]ourt documents affirming years of spousal abuse including violence, rampant infidelity and drug abuse." According to Mr. McCarthy, these were "[t]he kinds of aspects that would be, you know, particularly noteworthy and that would be important to, you know, zero in on" as content for the CounterPoint Statement. (Hearing Tr. at 631.)

Despite acknowledging that the defamatory statements included in the CounterPoint Statement had nothing to do with the claims Mr. McDonough was asserting in the arbitration (*id.* at 495), Respondents published the statements to put "Terry's credibility at issue and his reliability and what his ulterior motives are and what his personal character is like" (*id.* at 357). Mr. McCarthy testified that the "intention was to demonstrate that [Mr. McDonough] was unreliable, had ulterior motives, [and] broke trust with others." (*Id.* at 358.) Mr. Bidwill similarly testified that the purpose of publishing the defamatory statements was to "creat[e] context regarding [Mr. McDonough's] credibility." (*Id.* at 519-20.) Mr. Bidwill conceded that

he knew publishing the defamatory statements would hurt Mr. McDonough (*id.* at 509), and I find the evidence clearly shows that Respondents intended to cause harm to Mr. McDonough's reputation and credibility by publishing the defamatory statements.

I next must determine what punitive damages award "is reasonable under the circumstances." *Hawkins v. Allstate Ins. Co.*, 733 P.3d 1073, 1080 (Ariz. 1987). "Although a precise laundry list of relevant evidence is impossible, evidence is properly considered by the trier-of-fact-in assessing punitive damages if it bears upon the purpose and function of punitive damages," which is "not to compensate the plaintiff, but to express society's disapproval of outrageous conduct and to deter such conduct by the defendant and others in the future." *Id.* Relevant evidence includes "the nature of the defendant's conduct, including the reprehensibility of the conduct and the severity of the harm likely to result, as well as the harm that has occurred, from the defendant's conduct," "[t]he duration of the misconduct, the degree of defendant's awareness of the harm or risk of harm," "any concealment of" the misconduct," and "defendant's financial position." *Id.*

In connection with his request for punitive damages, Mr. McDonough has sought discovery related to Respondents' financial position. While I acknowledge that "defendant's financial position" is one of several relevant considerations when awarding punitive damages, I do not find that discovery of the precise details of Respondents' financial position is needed to calculate punitive damages here because, ultimately, "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 427 (2003). "[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Id.* at 426. As the Supreme Court has explained, "few awards exceeding a

58

single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425.

Here, Mr. McDonough seeks Respondents' financial information to support his request for a punitive damages award of $60-90 million.  In light of my award of $750,000 in compensatory damages, Mr. McDonough's requested punitive damages would result in a ratio of punitive to compensatory damages of 80:1 or 120:1.  Mr. McDonough's requested punitive damages would not comport with due process.  *See State Farm*, 538 U.S. at 425-26.  Accordingly, I deny Mr. McDonough's request for Respondents' financial information.

Instead, I find that a punitive damages award equal to three-times Mr. McDonough's compensatory damages is both reasonable and proportionate.  To be sure, Respondents' conduct in publicly attacking Mr. McDonough's personal character by publishing false and defamatory statements entirely unrelated to matters at issue in the arbitration was unjustified in the circumstances and is deserving of punishment.  I also note that the defamatory statements remained posted on CounterPoint's website through the time of the hearing, *i.e.*, for approximately eight months.  (Hearing Tr. at 641.)  I find a 3:1 ratio of punitive damages to compensatory damages appropriately accounts for the nature and severity of Respondents' conduct.

In addition, I find a 3:1 ratio serves as an appropriate deterrent to Respondents and others from engaging in similar conduct in the future.  As the Supreme Court in *State Farm* explained, there is "a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish."  538 U.S. at 425.  Finally, while I disagree with Claimant's assertion that the *Trump* case is factually analogous to the present matter, the ratio of punitive to compensatory damages awarded by the

jury in that case was 3.55:1, and thus is in line with the ratio I have determined is appropriate here.

In sum, I conclude that, based on the particular facts and circumstances of this case, a punitive damages award of $2,250,000—a 3:1 ratio of punitive to compensatory damages—is reasonable and proportionate and should be awarded to Mr. McDonough.

## VI.   *Attorneys' Fees*

Respondents have requested attorneys' fees in connection with (i) their Motion for Sanctions for Claimant's Breach of Confidentiality Order; and (ii) their successful defense of Mr. McDonough's contract-based claims (Counts 1 and 2) and age discrimination claim (Count 7).

With respect to Respondents' Motion for Sanctions for Claimant's Breach of Confidentiality Order, I held on October 3, 2023 that Mr. McDonough had in fact breached the Consent Confidentiality Order.  At that time, I deferred resolution of what additional sanctions would be imposed for Mr. McDonough's breach of my order but invited Respondents to submit a statement of their time and expenses incurred in preparing the motion for sanctions, which Respondents submitted.  I hereby order that Mr. McDonough pay $20,000 to Respondents as contribution towards their attorneys' fees as a sanction for Mr. McDonough's breach of the Confidentiality Order.

Respondents contend that they are also entitled to an award of attorneys' fees and costs incurred in connection with their successful defense of Mr. McDonough's contract-based claims (Counts 1 and 2).  Under A.R.S. § 12-341.01(A), "[i]n any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney fees."

Respondents prevailed on Mr. McDonough's claims for breach of contract (Count 1) and breach of the implied covenant of good faith and fair dealing (Count 2), and I find they are

entitled to an award of reasonable attorneys' fees.  Respondents have requested leave to submit an application documenting the attorneys' fees and costs incurred in connection with the successful defense of Mr. McDonough's contract-based claims.  Respondents' request is denied. Under A.R.S. § 12-341.01(B), "[t]he award of reasonable attorney fees pursuant to this section should be made to mitigate the burden of the expense of litigation to establish a just claim or a just defense.  It need not equal or relate to the attorney fees actually paid or contracted, but the award may not exceed the amount paid or agreed to be paid."  I therefore find it unnecessary for Respondents to submit a detailed statement of their fees.  Instead, I order that Mr. McDonough pay $25,000 to Respondents as contribution towards their attorneys' fees incurred in successful defense of his contract-based claims.  Respondents shall notify me within 3 days of the issuance of this Final Award if the fees awarded in this regard exceed "the amount paid or agreed to be paid" on these claims.

Finally, Respondents have requested attorneys' fees incurred in successfully defending against Mr. McDonough's age discrimination claim (Count 7), arguing that Mr. McDonough litigated the claim in bad faith.  "A finding of bad faith is warranted where an attorney 'knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent.'"  *Stilwell v. City of Williams*, 2014 WL 1654350, at *1 (Apr. 25, 2014).  While Mr. McDonough's age discrimination was dismissed as to Mr. Bidwill on Respondents' Dispositive Motion and withdrawn as to the Arizona Cardinals, there is no evidence that Claimant litigated the claim in bad faith.  The fact that Claimant pursued this claim did not delay this arbitration and should have required very little, if any, additional work for Respondents' counsel.  "An award of attorneys' fees for bad faith 'is punitive and the penalty can be imposed only in exceptional cases and for dominating reasons of justice."  *Id.*  I do find

this to be an "exceptional case" warranting attorneys' fees for bad faith.

## Conclusion

For the foregoing reasons, I conclude that:

1. Mr. McDonough has failed to prove his claims for retaliation under the Arizona Employment Protection Act (Count 3), intentional infliction of emotional distress (Count 4), and invasion of privacy (Count 8), and these claims are therefore dismissed.

2. Mr. McDonough has proven his claim for defamation (Count 5). His request for special damages for lost future earnings is denied. His request for general damages for emotional distress and harm to reputation is granted, and he is awarded $600,000 in damages for emotional distress and $150,000 in damages for harm to reputation.

3. Mr. McDonough is awarded punitive damages of $2,250,000.

4. Mr. McDonough is ordered to pay $20,000 to Respondents as contribution towards their attorneys' fees as a sanction for Mr. McDonough's breach of the Confidentiality Order.

5. Mr. McDonough is ordered to pay $25,000 to Respondents as contribution towards their attorneys' fees incurred in successful defense of Mr. McDonough's contract-based claims.

6. All other motions or prayers for relief are dismissed.

Dated:  March 29, 2024

_Jeffrey A. Mishkin_

Jeffrey A. Mishkin