**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Terence William McDonough, et al., | No. CV-24-00764-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| Michael J Bidwill, et al., | |
| Defendants. | |

Terrence McDonough ("McDonough") once worked as the vice president of player personnel for the NFL's Arizona Cardinals (hereinafter, "the Club"). In 2023, McDonough filed an arbitration petition in which he asserted claims for breach of contract and retaliation against the Club and its owner, Michael J. Bidwill ("Bidwill"). In response, a public relations firm retained by the Club's law firm issued a statement that characterized McDonough's claims as "wildly false, reckless, and an opportunistic ploy for financial gain" and also included various references to McDonough's personal life, including allusions to "disturbing allegations of extreme domestic violence by Terry" and to a report from "a close family member . . . that Terry had 'abandoned responsibility' to one of his children and cut her off financially." Following the release of this statement, McDonough amended his arbitration petition to add claims for defamation and invasion of privacy.

In March 2024, the arbitration concluded. Although McDonough did not prevail on any of the claims he asserted in his original arbitration petition, he prevailed on his later-added defamation claim, obtaining an overall award of $3 million.

These developments provide the backdrop for this action, which was filed in April 2024. The three plaintiffs are McDonough, his wife Lynette McDonough ("Lynette"), and his daughter Caroline McDonough ("Caroline"). The six defendants are the Club, Bidwill, and the four entities or individuals who were allegedly responsible for formulating the public relations firm's statement: Counterpoint Strategies, LTD ("Counterpoint"), James McCarthy ("McCarthy"), Donald Peder Johnsen ("Johnsen"), and Gallagher & Kennedy ("G&K"). For ease of reference, the Court will refer to Lynette and Caroline as "the Family Plaintiffs," to the Club and Bidwill as "the Club Defendants," and to Counterpoint, McCarthy, Johnsen, and G&K as "the Public Relations Defendants." All three Plaintiffs assert claims for defamation, negligence, and intentional infliction of emotional distress ("IIED") against the Public Relations Defendants. Additionally, the Family Plaintiffs (but not McDonough) assert those same claims against the Club Defendants.

Now pending before the Court are two motions: (1) Defendants' motion to compel arbitration of McDonough's claims against the Public Relations Defendants (Doc. 70); and (2) Defendants' motion to dismiss the Family Plaintiffs' claims (Doc. 58). For the reasons that follow, both motions are granted.

## BACKGROUND

I.    Factual Allegations

The following facts, presumed true, are derived from Plaintiffs' operative pleading, the first amended complaint ("FAC"). (Doc. 51.)

A.    **The Parties**

McDonough worked for the Club from 2013 to 2024, most recently serving as the vice president of player personnel. (*Id.* ¶¶ 1, 19.) Lynette is McDonough's wife. (*Id.* ¶ 2.) Caroline is McDonough's only daughter. (*Id.* ¶ 77.) Caroline has special needs. (*Id.* ¶ 88.)

Bidwill is the principal owner, chairman, and president of the Arizona Cardinals Football Club LLC, which has already been defined above as "the Club." (*Id.* ¶ 4.)

Counterpoint is a business that performs communications consulting work. (*Id.* ¶¶ 6, 60-61.) McCarthy is the president and CEO of Counterpoint. (*Id.* ¶ 7.)

Johnsen is an Arizona-based attorney. (*Id.* ¶ 8.)[1] G&K is an Arizona-based law firm. (*Id.* ¶ 9.)

### B.    Underlying Factual Allegations

Although the FAC contains an array of factual allegations concerning the relationship between McDonough and the Club Defendants, the only relevant allegations bearing on the current disputes are as follows.

On May 24, 2022, McDonough signed a new employment agreement with the Club. (Doc. 70-1 at 16.) This agreement contained an arbitration provision, which includes following language:

> Employee and the Club agree that any dispute, controversy or claim (other than Excluded Claims, as defined below) that exists or that ever arises between Employee and the Club, its employees, directors, officers, agents or assigns, including, without limitation, any dispute arising from or relating to the terms of this Agreement (including without limitation any claim that all or any part of this Agreement is void or voidable), Employee's employment or termination of employment with the Club, and any claim or dispute arising under any public policy, contract, tort, federal, state, or local statute . . . shall be referred to the Commissioner of the NFL or his designee for binding arbitration, except as otherwise provided herein.

(*Id.* at 11.)

"In January 2023, after the Cardinals hired Monti Ossenfort as their new general manager, McDonough was advised that the Cardinals would honor the terms of his contract but that he was encouraged to seek employment with a different NFL franchise." (Doc. 51 ¶ 54.)

"On April 4, 2023, McDonough filed a confidential arbitration petition before NFL Commissioner Roger Goodell. Therein, McDonough pursued claims for retaliation, breach of contract, etc." (*Id.* ¶ 58.)

In the days preceding McDonough's arbitration filing, the Club Defendants, as well as Johnsen and G&K, "retained McCarthy and Counterpoint Strategies to defame and

---

[1]    Although the FAC is ambiguous on this point, Defendants have submitted undisputed evidence that Johnsen was employed by G&K. (Doc. 70-1 at 2 ¶ 6.)

humiliate each of the Plaintiffs." (*Id.* ¶ 59.) On an unspecified date after the arbitration filing, Defendants, led by McCarthy, published a statement purporting "to provide a public response along with broader context for some disappointing and irresponsible actions by Terry McDonough" (hereinafter, the "Counterpoint Statement"). (*Id.* ¶ 68). The Counterpoint Statement characterized McDonough's arbitration claims as "wildly false, reckless, and an opportunistic ploy for financial gain." (*Id.*) It also described McDonough as having a "volatile demeanor toward colleagues" and included allusions to "disturbing allegations of extreme domestic violence by Terry" and to "a spontaneous overture from a close family member of [McDonough's] . . . that Terry had 'abandoned responsibility' to one of his children and cut her off financially." (*Id.*) The FAC alleges that Defendants knew these statements to be untrue at the time of publication. (*Id.* ¶ 71.)

Following the release of the Counterpoint Statement, McDonough amended his arbitration petition to include claims for defamation and invasion of privacy. (*Id.* ¶ 80.)

On March 29, 2024, the arbitrator issued a final award, finding that McDonough had shown by clear and convincing evidence that the Club Defendants had defamed him by accusing him of abandoning his daughter and cutting her off financially and by accusing him of "extreme domestic violence." (*Id.* ¶¶ 86-93.)[2]

## II.    Additional Evidence Proffered By Defendants

In support of their motion to compel arbitration, Defendants submit two pieces of evidence bearing on the circumstances leading up to the issuance of the Counterpoint Statement.

First, Defendants submit a declaration from David Koeninger ("Koeninger"), who serves as the Club's chief legal officer. (Doc. 70-1 at 1 ¶ 2.) As relevant here, Koeninger avows that the Club Defendants retained Johnsen and G&K to represent them in the arbitration proceedings brought by McDonough (*id.* at 2 ¶ 6); that "[t]hrough their counsel [G&K], the [Club Defendants] also retained [McCarthy] of Counterpoint . . . to assist them

---

[2]    Although the FAC does not allege the size of the resulting award, McDonough asserts in one of his briefs that he "was awarded $3 million, including $2,250,000 in punitive damages." (Doc. 64 at 1.)

in responding to public statements made by [McDonough] and his attorneys regarding the claims asserted in his arbitration demand" (*id.* at 2 ¶ 7); and that "McCarthy and CounterPoint issued the statement at issue in this action on behalf of the [Club Defendants]" (*id.*).

Second, Defendants submit a declaration from McCarthy. (Doc. 70-2.) As relevant here, McCarthy avows that the Club Defendants "retained me and my firm to assist them in responding to public statements made by [McDonough] and his attorneys regarding the claims asserted in his April 4, 2023 arbitration demand" and that "I and my firm issued the statement at issue in this action on behalf of [the Club Defendants]." (*Id.* ¶ 3.)

III.    Relevant Procedural Background

On April 3, 2024, Plaintiffs filed a complaint in Maricopa County Superior Court. (Doc. 1-3.)

On April 4, 2024, Defendants filed a notice of removal. (Doc. 1.)

On May 2, 2024, Plaintiffs filed a motion to remand the case to state court. (Doc. 26.)

On May 31, 2024, after full briefing, the Court denied the motion to remand but ordered Defendants to file an amended notice of removal providing additional information concerning certain parties' citizenship. (Doc. 34.)

On June 13, 2024, Defendants filed an amended notice of removal. (Doc. 42.)

On July 8, 2024, Plaintiffs filed the FAC. (Doc. 51.)

On July 22, 2024, Defendants filed the pending motion to dismiss (Doc. 58), lodged a motion to compel arbitration (Doc. 59), and filed a motion to seal the lodged motion to compel arbitration (Doc. 60).

On August 5, 2024, Plaintiffs filed responses to the lodged motion to compel arbitration (Doc. 64) and the motion to dismiss (Doc. 65).

On August 14, 2024, the Court issued an order denying Defendants' motion to seal the lodged motion to compel arbitration but giving Defendants an opportunity to refile an unredacted version of the motion. (Doc. 68.)

1    On August 16, 2024, Defendants filed a reply in support of their motion to dismiss.

2    (Doc. 69.)  That same day, Defendants filed the pending, unredacted motion to compel

3    arbitration (Doc. 70), as well as a reply to Plaintiffs' response to the lodged motion to

4    compel arbitration (Doc. 72).

5    On February 6, 2025, the Court issued a tentative ruling.  (Doc. 75.)

6    On February 12, 2025, the parties stipulated to vacate oral argument and submit on

7    the tentative ruling.  (Doc. 77.)

8    **DISCUSSION**

9    I.    <u>Motion to Compel Arbitration of McDonough's Claims</u>

10   A.    **Legal Standard**

11   The Federal Arbitration Act ("FAA") applies to contracts "evidencing a transaction

12   involving commerce."  9 U.S.C. § 2.  Under the FAA, written agreements to arbitrate

13   disputes "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at

14   law or in equity for the revocation of any contract."  *Id.*  Thus, absent a valid contractual

15   defense, the FAA "leaves no place for the exercise of discretion by a district court, but

16   instead mandates that district courts shall direct the parties to proceed to arbitration on

17   issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds, Inc.*

18   *v. Byrd*, 470 U.S. 213, 218 (1985).

19   In general, a district court's role under the FAA is "limited to determining (1)

20   whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement

21   encompasses the dispute at issue."  *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d

22   1126, 1130 (9th Cir. 2000).  These two issues are sometimes referred to as the "gateway"

23   questions of arbitrability.  *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010).

24   Although the gateway questions are ordinarily resolved by the court, parties may agree to

25   arbitrate one or both of the gateway issues by including a delegation clause in the

26   arbitration agreement: "An agreement to arbitrate a gateway issue is simply an additional,

27   antecedent agreement the party seeking arbitration asks the federal court to enforce, and

28   the FAA operates on this additional arbitration agreement just as it does on any other."  *Id.*

at 70. *See generally Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022) ("First, a court must resolve any challenge that an agreement to arbitrate was never formed, even in the presence of a delegation clause. Next, a court must also resolve any challenge directed specifically to the enforceability of the delegation clause before compelling arbitration of any remaining gateway issues of arbitrability. Finally, if the parties did form an agreement to arbitrate containing an enforceable delegation clause, all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance."). The evidence of the parties' intent to delegate such issues to the arbitrator must be "clear and unmistakable." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).

The party seeking to compel arbitration bears the burden of proof. *Ashbey v. Archstone Property Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015). "In determining whether parties have agreed to arbitrate a dispute, we apply general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration. The presumption in favor of arbitration, however, does not apply if contractual language is plain that arbitration of a particular controversy is not within the scope of the arbitration provision." *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044-45 (9th Cir. 2009).

B. ***Revitch***

As discussed in more detail below, some of the disputed issues raised in the parties' motion papers include (1) whether the Public Relations Defendants may seek to compel arbitration despite their status as non-signatories to the employment contract between McDonough and the Club containing the arbitration agreement; and (2) whether the Public Relations Defendants qualify as "agents" of the Club, such that McDonough's claims against them in this action fall within the scope of the arbitration agreement. Although these issues overlap in some respects, the Ninth Circuit's decision in *Revitch v. DIRECTV, LLC*, 977 F.3d 713 (9th Cir. 2020), is instructive in understanding how (and in which order) they should be evaluated.

In *Revitch*, the plaintiff entered into a wireless services contract in 2011 with non-party AT&T Mobility that included a broad arbitration clause covering "all disputes and claims between" Revitch and AT&T Mobility, "including but not limited to claims arising out of or relating to any aspect of the relationship between them." *Id.* at 715 (cleaned up). This arbitration agreement also stated that any references to AT&T Mobility included its "affiliates." *Id.* In 2018, seven years later, the plaintiff sued DIRECTV for sending him unsolicited, prerecorded telephone calls in violation of the Telephone Consumer Protection Act ("TCPA"). *Id.* In response, DIRECTV moved to compel arbitration under the theory that because it had been acquired by AT&T Mobility's parent company in 2015, it had "become an 'affiliate' of AT&T Mobility within the meaning of the wireless services agreement and should therefore be able to piggyback onto the arbitration clause, notwithstanding that it was not an affiliate at the time Revitch signed the wireless services contract with AT&T Mobility four years earlier." *Id.* The district court denied DIRECTV's motion to compel arbitration and the Ninth Circuit affirmed. Along the way, the court rejected DIRECTV's (and the dissenting judge's) view "that the question of whether Revitch is an affiliate of AT&T Mobility under the wireless services agreement is a matter of the contract's scope to be resolved at the second step of our FAA analysis, not a matter of contract formation to be resolved at the first." *Id.* at 719. The court explained that "the question we must answer is whether the arbitration clause in the Revitch-AT&T Mobility wireless services contract is a valid agreement between Revitch and DIRECTV to arbitrate their disputes. Nothing in our precedents requires that we answer that question at step two rather than step one." *Id.* Thus, the court was "not persuaded by DIRECTV's argument that we must evaluate Revitch's claim against it as a matter of the scope of the contract between Revitch and AT&T Mobility." *Id.*

Given *Revitch*'s clear holding on this point, the Court will begin by addressing the first gateway question—whether the arbitration clause in McDonough's employment contract with the Club is an agreement to arbitrate between McDonough and the Public Relations Defendants. *See also Caremark, LLC*, 43 F.4th at 1030 (noting that "contract-

formation issues are always matters for judicial resolution" and that "the issues reserved to the courts for decision always include whether an arbitration agreement was formed") (cleaned up).

### C.    **The First Gateway Question**

#### 1.    The Parties' Arguments[3]

Defendants argue that all of McDonough's claims are subject to arbitration because "[t]here is no question that a valid agreement to arbitrate exists" and "it is equally clear that "McDonough's arbitration agreement with the Club covers the claims in the Amended Complaint." (Doc. 70 at 6-7.)  Defendants emphasize the clauses in the arbitration agreement providing that the agreement covers "any dispute, controversy or claim . . . that exists or that ever arises between Employee and the Club . . . *its agents* or assigns," including "*any claim or dispute arising under tort*." (*Id.* at 7.)  As for whether the Public Relations Defendants qualify as "agents" of the Club, Defendants begin by noting that the original complaint specifically alleged that the Public Relations Defendants were each "the agent, servant and/or employee of the [Club], and each Defendant acted within the course and scope of his, or her, or its authority as an agent, servant and/or employee of the [Club]." (*Id.* at 8, citing Doc. 1-3 ¶ 14.)  According to Defendants, although the FAC no longer contains this allegation, "withdrawal of this allegation in the Amended Complaint cannot avoid [Plaintiff's] obligation to arbitrate his claims under the terms of his agreement with the Club." (*Id.*)  Additionally or alternatively, Defendants argue that the "remaining allegations, and the evidence, still make clear that these [Public Relations] Defendants are being sued in their capacity as agents of the Club." (*Id.*)  Defendants also contend that because "McDonough brought the same tort claims, based on identical facts and circumstances, against the Club in arbitration," McDonough has implicitly "acknowledg[ed] they fall within the scope of the provision." (*Id.* at 7.)  Last, Defendants

---

[3]    When addressing the Public Relations Defendants' ability to compel arbitration, the parties do not always differentiate between the first and second gateway questions in the manner that *Revitch* requires.  Accordingly, the Court has simply summarized all of the parties' relevant arguments here.

argue that (1) the Club has the independent right to enforce the arbitration provision on behalf of its agents; and (2) the Public Relations Defendants also have standing to compel enforcement, notwithstanding their status as non-signatories.  (*Id.* at 10-11.)

McDonough responds that because his claims in this action are based solely on the Counterpoint Statement, those claims "do not arise from [his] employment agreement." (Doc. 64 at 2-3.)  According to McDonough, this mismatch has two consequences: (1) "the presumption in favor of arbitrability mandated by the [FAA] does not arise"; and (2) "that same circumstance leaves this Court with no authority to grant the motion."  (*Id.* at 1.)  In support of these arguments, McDonough relies primarily on Judge O'Scannlain's concurrence in *Revitch*.  (*Id.* at 3-4.)  Separately, McDonough argues that his claims are not covered by the arbitration provision because the Public Relations Defendants do not qualify as "agents" of the Club.  (*Id.* at 6-7.)  McDonough emphasizes Defendants' failure to "submit [any] evidence that the [Club] controlled their actions."  (*Id.*)  Consequently, McDonough argues that the Public Relations Defendants, as non-signatories to the employment agreement, have no power to enforce the arbitration provision.  (*Id.* at 4-6.) Last, McDonough argues that any agency relationship between the Club Defendants and the Public Relations Defendants could have arisen only after he signed the 2022 employment agreement, which is significant because courts have held that arbitration provisions "phrased in the future tense to include a signatory's 'affiliates,' 'agents,' and the like—do not cover future affiliates or agents of the signatory."  (*Id.* at 9-10.)

In reply, Defendants argue that McDonough's arguments "rest entirely on his selective quotation from his arbitration agreement, and omit language showing that he agreed to arbitrate not only claims related to his employment but also any dispute, controversy or claim with the Club and its agents, *including claims asserted under tort and state common law*."  (Doc. 72 at 3., emphasis added.)  Defendants also argue that "even under McDonough's selective reading of his agreement, the claims he asserted must be arbitrated because they do, in fact, 'arise out of' his employment with the Club."  (*Id.*) Defendants then seek to distinguish McDonough's cited cases and argue that "[t]he

CounterPoint Statement was not a separate or independent act taken by the Agent Defendants—the statement was issued *on the Club's behalf* during the course of McDonough's employment dispute with the Club." (*Id.* at 5.) Defendants thus argue that "the Court not only has authority to compel McDonough to arbitrate his claims against the Agent Defendants, but it is readily apparent that those claims fall within McDonough's agreement to arbitrate." (*Id.*) Defendants also argue that "McDonough is simply wrong that he may avoid arbitration because the Agent Defendants are not 'signatories' to his arbitration agreement." (*Id.*) Defendants contend that a series of cited cases support the proposition that "Arizona law permits non-signatories to enforce arbitration agreements under ordinary agency principles." (*Id.* at 6.) Defendants then reiterate their arguments in support of the agency status of the Public Relations Defendants and contend that "the affidavits submitted by Defendants supply all the 'evidence' needed to prove the obvious: the Club's lawyers and PR firm served as its agents." (*Id.* at 7.) Last, Defendants argue that "McDonough's temporal argument—that the [Public Relations] Defendants were not agents when he entered into his contract—fares no better" because "[u]nlike the cases McDonough cites, the [Public Relations] Defendants here are not 'future' agents of the Club attempting to rely on a years-old agreement to compel to arbitration claims that have nothing to do with McDonough's employment—they were alleged agents during the term of McDonough's employment, and they issued the statement on behalf of the Club as part of an employment dispute." (*Id.*)

> ## 2. Analysis

As noted, the first question under *Revitch* is whether McDonough, by signing the employment contract containing the arbitration provision, entered into an arbitration agreement with, and/or enforceable by, the Public Relations Defendants.[4]

---

[4] The Court agrees with McDonough that, for purposes of this analysis, the FAA's presumption of arbitrability is inapplicable. *Revitch*, 977 F.3d at 719 (explaining that treating "the question of whether Revitch is an affiliate of AT&T Mobility under the wireless services agreement [a]s a matter of the contract's scope to be resolved at the second step of our FAA analysis" would "subvert the Supreme Court's FAA jurisprudence" because "if we were always to treat the question of who is a party to a contract as a matter of scope, then in turn, we would be required always to err on the side of accepting individuals or entities as parties who could invoke an arbitration clause, even

This question is governed by state law.  *See, e.g., Revitch*, 977 F.3d at 716 ("Does a valid agreement to arbitrate exist between Revitch and DIRECTV?  To answer the question, we look to state contract law."); *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013) ("[A] litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement.").  Both sides agree that Arizona law applies.  (Doc. 64 at 4-5; Doc. 72 at 6.)

Arizona law supports Defendants' position that if the Public Relations Defendants qualify as agents of the Club—an issue addressed below—they may enforce the arbitration provision notwithstanding their status as non-signatories to the employment agreement.  In *Rowe v. Exline*, 63 Cal. Rptr. 3d 787 (Cal. Ct. App. 2007), the California Court of Appeal recognized that "the law permit[s] a nonsignatory to compel arbitration if sued as a signatory's agent."  *Id.* at 793.  That statement is significant because the Arizona Court of Appeals subsequently quoted this passage with approval and indicated that Arizona follows the same rule, albeit in a case that did not involve an agent's attempt to enforce an arbitration agreement.  *Sun Valley Ranch 308 Ltd. P'ship ex rel. Englewood Properties, Inc. v. Robson*, 294 P.3d 125, 134 (Ariz. Ct. App. 2012) ("We agree with the holding of *Rowe*.").

Arizona is not an outlier in following this rule.  *See, e.g., Letizia v. Prudential Bache Securities, Inc.*, 802 F.2d 1185, 1187-88 (9th Cir. 1986) (concluding that individual defendants, who were non-signatories to an arbitration agreement between their employer and the plaintiff, could compel arbitration pursuant to that agreement and deeming this outcome consistent with "the majority view"); *Creative Telecommunications, Inc. v. Breeden*, 120 F. Supp. 2d 1225, 1240 (D. Haw. 1999) ("Federal courts have consistently afforded agents . . . the benefit of arbitration agreements entered into by their principals to

---

if the other party would never have consented to such an arrangement when it entered into the contract"); *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n. 11 (9th Cir. 2006) ("The question here is not whether a particular issue is arbitrable, but whether a particular party is bound by the arbitration agreement.  Under these circumstances, the liberal federal policy regarding the scope of arbitrable issues is inapposite.").

the extent that the alleged misconduct relates to their behavior . . . in their capacities as agents of the corporation.").  Indeed, the case for allowing enforcement is particularly strong here because the arbitration agreement expressly states that it governs claims by McDonough against the Club's "agents."  *See, e.g., Ridgeway v. Nabors Completion & Production Servs. Co.*, 725 F. App'x 472, 475 (9th Cir. 2018) ("Tidelands and the City of Long Beach have standing to enforce the arbitration agreement because . . . the arbitration agreement defines 'the Company' subject to the arbitration agreement to include agents of Nabors."); *Torres v. Simpatico, Inc.*, 781 F.3d 963, 971 (8th Cir. 2015) (concluding that "the Non-Signatory Parties . . . could invoke and enforce the arbitration provision," where the provision stated that "all controversies, disputes, or claims between us and our affiliates, and our and their respective members, officers, managers, agents, and/or employees, and you . . . must be submitted for binding arbitration," because that language was "sufficiently broad and inclusive to express an intent to benefit not only the actual signatories and named beneficiaries, but also the other Non-Signatory Parties . . . [including] agents"); *Shields v. Frontier Tech., LLC*, 2011 WL 13070409, *7 (D. Ariz. 2011) ("The Arbitration Agreement states that the term Insight means the employer of the Employee and includes by reference its parent company, subsidiaries and affiliates and their respective directors, officers, employees, and agents. . . .  Thus, the very terms of the Arbitration Agreement require Plaintiff to arbitrate any claims against the individual Insight Defendants as well.") (cleaned up).

The next question is whether Defendants have met their burden of establishing that the Public Relations Defendants do, in fact, qualify as the Club's agents.  Under Arizona law, "[a]gency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.  An agency relationship can derive from either actual or apparent authority.  Actual authority may be proved by direct evidence of express contract of agency between the principal and agent or by proof of facts implying such contract or the

1    ratification thereof." *Ruesga v. Kindred Nursing Centers, L.L.C.*, 161 P.3d 1253, 1261

2    (Ariz. Ct. App. 2007).

3         Defendants have met their burden of establishing that each Public Relations

4    Defendant qualifies as an "agent" under these principles. The FAC alleges that "the

5    Cardinals, Johnsen and Gallagher & Kennedy retained McCarthy and Counterpoint

6    Strategies to defame and humiliate each of the Plaintiffs" by publishing the Counterpoint

7    Statement. (Doc. 51 ¶ 59.) The FAC also alleges that the Counterpoint Statement

8    expressly stated that it was to be "[a]ttribute[d] to [McCarthy], external public relations

9    advisor to the Cardinals." (*Id.* ¶ 68.) Standing alone, these allegations show that each

10   Public Relations Defendant qualifies as the Club's agent in relation to the issuance of the

11   Counterpoint Statement. *See, e.g*, *Comm'r v. Banks*, 543 U.S. 426, 436 (2005) ("The

12   relationship between client and attorney, regardless of the variations in particular

13   compensation agreements or the amount of skill and effort the attorney contributes, is a

14   quintessential principal-agent relationship."); *Rojas v. Fed. Aviation Admin*, 927 F.3d

15   1046, 1063 (9th Cir. 2019), *on reh'g en banc*, 989 F.3d 666 (9th Cir. 2021) ("[C]onsultants

16   are agents whose statements can bind their paying clients.").

17        The declarations provided by Defendants further establish the existence of an

18   agency relationship between each Public Relations Defendant and the Club in relation to

19   the Counterpoint Statement. Those declarations show that the Club Defendants retained

20   Johnsen and G&K to represent them in the arbitration proceeding, that Johnsen and G&K

21   then retained McCarthy and Counterpoint to provide public relations assistance concerning

22   the arbitration proceeding, and that McCarthy and Counterpoint then issued the statement

23   on behalf of the Club.[5]

24   _____

     [5]    Given these determinations, it is unnecessary to resolve Defendants' contention that
25   Plaintiffs' seeming admission of an agency relationship in their original complaint (Doc.
     1-3 ¶ 14), which does not appear in the FAC, further supports the finding of an agency
26   relationship. *Compare Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859 (9th Cir. 1995) ("[A]
     statement in a complaint may serve as a judicial admission.") *with Ramirez v. Cnty. of San*
27   *Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015) ("It is well-established in our circuit that
     an amended complaint supersedes the original, the latter being treated thereafter as non-
28   existent. In other words, the original pleading no longer performs any function.") (cleaned
     up). *See also Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1998)
     ("Factual assertions in pleadings and pretrial orders, *unless amended*, are considered

Notwithstanding all of this, McDonough contends that an agency relationship is lacking because Defendants "submit no evidence that the Cardinals controlled the [Public Relations Defendants'] actions." (Doc. 64 at 6.) This undeveloped argument lacks merit. "The principal's control may concern only the overall mission, not operational details. For instance, the principal may exercise control simply by giving initial instructions to the agent on what actions to take. If the principal requests another to act on the principal's behalf, indicating that the action should be taken without further communication and the other consents so to act, an agency relationship exists." *Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1253 (10th Cir. 2020) (cleaned up). "[A]s the Restatement (Second) of Agency explains, the principal's exercise of control may be very attenuated . . . . [C]ourts have not required a particularly invasive level of control to support a finding that a principal-agent relationship exists. They have concluded that a person may be an agent although the principal lacks the right to control . . . the agent's exercise of professional judgment. This minimal level of control required to establish an agency relationship stands in contrast to the much more significant and intrusive right of control that makes an agent an employee." *Id.* at 1254 (cleaned up). Here, it is undisputed that the Club Defendants retained the Public Relations Defendants to achieve an overall mission—which the FAC describes as attempting "to defame and humiliate each of the Plaintiffs" (Doc. 51 ¶ 59) and which Defendants' declarations describe as "to assist [the Club Defendants] in responding to public statements made by [McDonough] and his attorneys regarding the claims asserted in his arbitration demand" (Doc. 70-1 at 2 ¶ 7)—and left it to the Public Relations Defendants' professional judgment to figure out the operational details. That is enough to establish the minimal level of control necessary for an agency relationship.

This leaves McDonough's temporal argument. In McDonough's view, the fact that the Public Relations Defendants did not become agents of the Club Defendants until after he executed the employment agreement shows that he could not have agreed to arbitrate

_____

judicial admissions conclusively binding on the party who made them.") (emphasis added).

1    with them.

2    *Revitch* provides a helpful starting point in analyzing this argument.  As noted, the

3    issue in *Revitch* was whether the plaintiff, by signing a wireless services contract in 2011

4    with AT&T Mobility that included an arbitration clause encompassing AT&T Mobility's

5    "affiliates," had agreed to arbitrate claims against DIRECTV, which was not an affiliate of

6    AT&T Mobility in 2011 but became an affiliate in 2015, that were unrelated to wireless

7    services.  977 F.3d at 714-15.  The Ninth Circuit concluded that the plaintiff had not agreed

8    to arbitrate with DIRECTV.  *Id.* at 718.  McDonough seems to view this outcome as

9    establishing a bright-line rule that whenever a particular entity does not become an "agent"

10   or "affiliate" of the signatory of an arbitration agreement until after the date of the

11   execution—which is the situation here—that entity is barred from seeking to enforce the

12   arbitration agreement.

13   The Court does not share this overbroad interpretation of *Revitch*.  As an initial

14   matter, the outcome in *Revitch* turned in part on the specific wording of the arbitration

15   agreement at issue, which "extend[ed] to 'all disputes and claims between' Revitch and

16   AT&T Mobility, 'includ[ing], but . . . not limited to . . . claims arising out of or relating to

17   any aspect of the relationship between' them."  *Id.* at 715.  The Ninth Circuit explained

18   that "[h]ad the wireless services agreement stated that 'AT&T' refers to 'any affiliates,

19   both present and future,' we might arrive at a different conclusion.  However, absent this

20   or similar forward-looking language, we are convinced that the agreement does not cover

21   entities that became affiliated with AT&T Mobility years after the contract was signed in

22   an unrelated corporate acquisition."  *Id.* at 718.  Here, although the arbitration provision

23   does not specifically say that it includes "any agents, both present and future," it does

24   contain at least some of the sort of forward-looking language that was absent in *Revitch*—

25   it obligates McDonough to arbitrate "any dispute, controversy or claim . . . that exists *or*

26   *that ever arises* between [McDonough] and the Club, its employees, directors, officers,

27   agents or assigns."  (Doc. 70-1 at 11, emphasis added.)

28   More important, this case also differs from *Revitch* in other factual respects.  There,

although the Ninth Circuit noted that DIRECTV might qualify as an "affiliate" of AT&T Mobility under the plain meaning of that term, it concluded that such an interpretation was unwarranted in light of California's rule that contract language should not be construed to "lead to absurd results." 977 F.3d at 717. Applying that doctrine, the court held that it would be "undoubtedly absurd" to characterize DIRECTV as an affiliate of AT&T Mobility "in this extreme case." *Id.* at 719 n.3. Those "extreme" features included that (1) DIRECTV did not become an affiliate of AT&T Mobility until "years after the contract was signed"; and (2) the two entities became affiliates "in an unrelated corporate acquisition." *Id.* at 718.

The Ninth Circuit reached a similar outcome in *Perez v. Discover Bank*, 74 F.4th 1003 (9th Cir. 2023). There, the plaintiff took out a student loan in 2010 with Citibank pursuant to a loan agreement containing an arbitration provision stating that "either party, including Citibank's successors or assigns, could elect binding arbitration for any claims 'arising out of or in connection with [the] loan.'" *Id.* at 1006. The following year, in 2011, Discover Bank acquired ownership of Plaintiff's loan with Citibank. *Id.* Many years later, in 2018, the plaintiff applied for a loan from Discover Bank. *Id.* This was a "new, distinct loan." *Id.* at 1010. After Discover Bank denied the plaintiff's application for this new loan, she sued Discover Bank under various anti-discrimination statutes. *Id.* at 1007. Discover Bank, in turn, moved to compel the plaintiff to "arbitrate her discrimination claims via the [2010] Citibank agreement," presumably under the theory that it qualified as a "successor or assign" of Citibank under that agreement. *Id.* at 1010. The Ninth Circuit rejected this attempt to compel arbitration, explaining that "just as the *Revitch* plaintiff could not have anticipated that his cell phone agreement would bind him to arbitration for claims accruing seven years later in an unrelated dispute, Perez could not reasonably have expected that she would be forced to arbitrate the unrelated claims that Discover discriminated against her eight years later when it denied her application for a new, distinct loan." *Id.* (cleaned up).

This case does not share either of the "extreme" features that undermined the

arbitration requests in *Revitch* and *Perez*. First, there was not a period of "years" between when McDonough executed the employment agreement containing the arbitration provision and when the Public Relations Defendants became the Club's agents—the agreement was executed in May 2022 and the agency relationship arose less than a year later, when the Club retained the Public Relations Defendants in anticipation of McDonough's April 2023 arbitration filing. Second, the genesis of this agency relationship was not "unrelated" to McDonough's execution of the employment agreement containing the arbitration provision. To the contrary, the Club retained the Public Relations Defendants to provide assistance with an arbitration proceeding concerning whether the Club had breached the employment agreement. (Doc. 70-1 at 2 ¶ 5.) Thus, even though Arizona (like California) follows the rule that "courts must avoid an interpretation of a contract that leads to an absurd result," *Roe v. Austin*, 433 P.3d 569, 575 (Ariz. Ct. App. 2018), it would not be absurd to conclude that McDonough consented to arbitrate with the Public Relations Defendants here, where he expressly agreed to arbitrate "any dispute, controversy or claim . . . that ever arises between [McDonough] and the Club['s] . . . agents," the Public Relations Defendants became the Club's agents within a year of when the contract was signed, and the genesis of the agency relationship was intertwined with the subject matter of the contract.[6]

### D.    **The Second Gateway Question**

Having determined that McDonough entered into an arbitration agreement with, and/or enforceable by, the Public Relations Defendants, the Court now turns to the second gateway question—whether that agreement encompasses the dispute at issue.

As background, the FAA limits the scope of arbitration clauses by only empowering courts to enforce them when the controversy "arises out of" the contract in which the arbitration clause appears. 9 U.S.C. § 2. The Ninth Circuit has "held that 'arising from' is broad in scope . . . . However, [it has] never interpreted either 'arising from' or 'arising

---

[6]    This conclusion makes it unnecessary to resolve the Club Defendants' alternative argument that, under *Aldrete v. Metro Auto Auction LLC*, 2022 WL 60544 (D. Ariz. 2022), they have independent standing to enforce the agreement on behalf of their agents.

out of' so broadly such that there need not be any relationship whatsoever between the original contract or event and the resulting controversy." *Revitch*, 977 F.3d at 722 (O'Scannlain, J., concurring).

In *Revitch*, although the panel declined to order arbitration based on its resolution of the first gateway question, Judge O'Scannlain wrote a concurrence explaining that the second gateway question supported the same outcome because the claims against DIRECTV did not "arise out of" the contract containing the arbitration agreement. *Id.* Noting the paucity of case law interpreting the phrase "arising out of," Judge O'Scannlain stated that although "the 'arising out of' language in § 2 has generated little judicial attention," "it appears that there is always some relationship between the controversy and the underlying contract." *Id.* at 722-23. Judge O'Scannlain then cited several cases in which some relationship between the contract and the controversy motivated the court to apply the FAA and enforce the arbitration provision. *Id.* at 723.

One of those cases was *Marmet Health Care Center, Inc. v. Brown*, 565 U.S. 530 (2012). There, families of nursing home patients brought negligence suits against the nursing home on behalf of the patients. *Id.* at 531. The patients had signed arbitration provisions requiring them to arbitrate "all disputes." *Id.* A West Virginia court had ruled that the negligence claims were not subject to arbitration under the FAA but the Supreme Court reversed, concluding that "[t]he West Virginia court's interpretation of the FAA was both incorrect and inconsistent with clear instruction in the precedents of this Court" because "[the FAA] includes no exception for personal-injury or wrongful-death claims. It 'requires courts to enforce the bargain of the parties to arbitrate.'" *Id.* at 532-33. In *Revitch*, Judge O'Scannlain cited *Marmet* as exemplifying the principle that even when an underlying controversy does not directly concern the terms of the contract containing the arbitration clause, it may still be viewed as "arising out of" the contract for purposes of § 2 of the FAA—and thus be subject to arbitration—if it involves "some type of foreseeable misconduct that occurred during the course of performing the contract." 977 F.3d at 723 (O'Scannlain, J., concurring). Judge O'Scannlain concluded that "[f]unctionally, the

'arising out of' language in § 2 appears to serve as a boundary to the types of controversies that are covered by the FAA: Federal courts are required to compel arbitration for those controversies that actually stem from the contract containing the arbitration clause. But when the dispute is wholly unrelated to the contract, the FAA is silent; federal courts have no power to compel arbitration." *Id.* at 723-24.

This case is much closer to *Marmet* than *Revitch* or *Perez*. There is one contract here—the employment agreement between the Club and McDonough—and McDonough's claims against the Public Relations Defendants are not "wholly unrelated" to that agreement. As discussed above in relation to the first gateway question, the decision to formulate and issue the Counterpoint Statement was intertwined with McDonough's claim that the Club had violated the employment agreement. It is also notable that McDonough brought the same defamation-related claims he now seeks to assert against the Public Relations Defendants in his earlier arbitration proceeding against the Club Defendants. McDonough fails to explain why he believed those claims were sufficiently related to the employment agreement to support his earlier demand for arbitration but are now too attenuated from the employment agreement to support arbitration.

For these reasons, the second gateway question is satisfied—the arbitration agreement encompasses the dispute at issue.[7]

E.    **Unconscionability**

1.    The Parties' Arguments

Defendants argue that "McDonough cannot circumvent his contractual obligation to arbitrate by challenging the enforceability of his agreement here and claiming it is 'unconscionable.' Rather, if McDonough chooses to attack the agreement's enforceability, he must do that in arbitration." (Doc. 70 at 11.)

---

[7]    To the extent McDonough's arguments regarding the second gateway question are not premised on the "arising out of" language of § 2 of the FAA, and are instead premised on the notion that his claims in this action fall outside the scope of his arbitration provision, any such argument is easily rejected. As noted, the arbitration provision encompasses "any claim or dispute arising under any public policy, contract, *tort*, federal, state, or local statute." (Doc. 70-1 at 11, emphasis added.)

In response, McDonough first argues that "to the extent the arbitration agreement may be read to apply to this dispute, it is unconscionably overbroad." (Doc. 64 at 2.) In support, McDonough cites several cases sustaining unconscionability challenges to arbitration provisions. (*Id.* at 11-13.) McDonough also contends that the arbitration agreement is unconscionable because it "places unfettered discretion in the Commissioner of the NFL to adjudicate any dispute that comes before him or, if [he] does not want to hear it, to hand-pick the arbitrator." (*Id.*) Next, in response to Defendants' delegation argument, McDonough contends that parties may not delegate issues related to the existence of an arbitration agreement and that "[o]nly if this Court first determines a valid agreement exists to arbitrate Plaintiffs' claims against the G&K and the CounterPoint defendants may the Court examine the terms of that agreement to determine whether issues of arbitrability have been delegated solely to the arbitrator." (*Id.* at 14.) McDonough also argues that "the claimed arbitration agreement at issue does not delegate issues of arbitrability to the arbitrator" because it lacks the "clear and unmistakable" delegation language that courts require. (*Id.* at 14-15.)

In reply, Defendants emphasize the language in the arbitration agreement providing that McDonough agreed to delegate "any claim that all or any part of this Agreement is void or voidable," which they contend includes "issues of enforceability, including whether the agreement is unconscionable." (Doc. 72 at 8.) Defendants also dispute the relevance of McDonough's cited cases, arguing that they "merely stand for the proposition that issues of *formation* of a contract cannot be delegated to an arbitration." (*Id.* at 9.) Here, Defendants argue, the issue is not formation but validity, which can be delegated. (*Id.* at 9.) (*Id.*) Last, Defendants argue that "McDonough waived any arguments regarding unconscionability of his agreement when he initiated an arbitration of identical claims against the Club under the very same arbitration agreement." (*Id.*)

### 2. Analysis

Arbitration agreements, like other contracts, "may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *Jackson*, 561

U.S. at 68 (cleaned up).  However, such challenges also may be delegated to an arbitrator, provided there is "clear and unmistakable" evidence that the parties agreed to have the arbitrator decide them.  *Brennan*, 796 F.3d at 1130.

McDonough's unconscionability challenge is a quintessential example of a challenge to the validity of an arbitration agreement.  *Compare Williams v. Experian Info. Sols. Inc.*, 2024 WL 3876171, *18 (D. Ariz. 2024) ("Here, as discussed, the dispute over the applicability of the February 2023 Arbitration Agreement is best conceptualized as a non-delegable contract formation/supersession issue, *not a delegable validity challenge akin to an unconscionability challenge*.") (emphasis added).  Because it is a validity challenge rather than a formation challenge, it may be delegated to the arbitrator if the parties' agreement contains "clear and unmistakable" evidence of an intent to delegate it.  *Brennan*, 796 F.3d at 1130.  That requirement is satisfied here.  McDonough agreed to arbitrate "without limitation any claim that all or any part of this Agreement is void or voidable."  (Doc. 70-1 at 11.)  This language clearly and unmistakably evinces an intent to arbitrate validity challenges such as unconscionability.  *Flores v. Nat'l Football League*, 658 F. Supp. 3d 198, 211 (S.D.N.Y. 2023) ("Where, as here, the parties have agreed that the arbitrator will decide issues regarding whether the arbitration agreement is 'void or voidable,' they have 'clearly and unmistakably' delegated to the arbitrator the power to determine . . . whether the arbitration agreement as a whole is unenforceable for unconscionability or any other applicable contract defense.").  *See generally Caremark*, 43 F.4th at 1026 (finding that the parties clearly and unmistakably agreed to delegate the question of arbitrability where the agreement provided that "[t]he arbitrator(s) shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of the agreement to arbitrate, including but not limited to, any claim that all or part of the agreement to arbitrate is void or voidable for any reason"); *Momot v. Mastro*, 652 F.3d 982, 984 (9th Cir. 2011) (finding the same where the agreement provided that disputes as to "the validity or application of any of the [arbitration] provisions . . . shall be resolved exclusively by binding arbitration").

McDonough's attempts to distinguish these cases are unavailing. McDonough appears to argue that his arbitration agreement fails to meet the "clear and unmistakable standard" because it does not, as in several of Defendants' cited cases, expressly provide "exclusive authority" to the arbitrator to resolve disputes about the validity of the arbitration provision. (Doc. 64 at 14-15.) But the standard does not require any such specific verbal formula—it only requires "clear and unmistakable" evidence. The parties' agreement to arbitrate "without limitation, any claim that all or any part of this Agreement is void or voidable" qualifies as clear and unmistakable evidence of an intent to delegate the issue of unconscionability.

McDonough's attempt to distinguish *Flores* fares no better. He contends that in *Flores*, the court "not[ed] only that the coach and the Cardinals had delegated the issue of whether the agreement was unconscionable, not whether an agreement to arbitrate existed in the first place." (Doc. 64 at 15.) But because the Court has now concluded that an agreement to arbitrate was formed between McDonough and the Public Relations Defendants, this distinction is immaterial. The only issue being delegated here is McDonough's unconscionability challenge.

Finally, McDonough seems to argue that even if he generally agreed to arbitrate with the Public Relations Defendants, he only agreed with the Club—and not with the Public Relations Defendants—to delegate the question of validity. (*Id.* at 14.) In support, McDonough cites *Kramer*, but he fails to acknowledge that the arbitration provisions in *Kramer* were expressly limited to the plaintiffs and the signatory. *Kramer*, 705 F.3d at 1127 ("Here, the arbitration agreements do not contain clear and unmistakable evidence that Plaintiffs and Toyota agreed to arbitrate arbitrability. While Plaintiffs may have agreed to arbitrate arbitrability in a dispute with the Dealerships, the terms of the arbitration clauses are expressly limited to Plaintiffs and the Dealerships. For example, Scholten's arbitration clause states that '[e]ither you or we may choose to have any dispute between you and us decided by arbitration.' The language of the contracts thus evidences Plaintiffs' intent to arbitrate arbitrability with the Dealerships and no one else. The Dealerships are

not a party to this action.")  In contrast, and as discussed in earlier portions of this order, the arbitration agreement here expressly encompasses the Club's "agents."

For these reasons, McDonough must wait for arbitration to raise his unconscionability challenge.  Defendants' motion to compel arbitration as to McDonough is granted.

II.    Motion To Dismiss The Family Plaintiffs' Claims

The Family Plaintiffs assert claims for defamation, IIED, and negligence.  (Doc. 51 ¶¶ 98-138.)  As to Lynette, the FAC alleges that the accusation in the Counterpoint Statement that McDonough had engaged in "extreme domestic violence" would lead a reasonable person to view Lynette as "a person of disrepute" and to "have contempt for her and ridicule her because she tolerates being a wife who stays with her husband despite him subjecting her to continuous acts of 'extreme violence'" and because "she is somehow deserving of being beaten by her husband." (*Id.* ¶¶ 73, 75.)  As to Caroline, the FAC alleges that the accusation in the Counterpoint Statement that McDonough had "abandoned responsibility" to one of his children and "cut her off financially" would lead a reasonable person to view Caroline as "a person of disrepute" and to "have contempt for her and ridicule her because she is so worthless so as to have been abandoned by her own father and that she is undeserving of his financial support and love" and is otherwise "somehow deserving of being abandoned by her own father." (*Id.* ¶¶ 78-79.)  The Family Plaintiffs' IIED and negligence claims are based on the same portions of the Counterpoint Statement. (*Id.* ¶¶ 123-38.)

A.    **Legal Standard**

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "[A]ll

well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1444-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

B. **Defamation**

1. The Parties' Arguments

Defendants argue that "the Family Plaintiffs fail to plead facts sufficient to allege two of the essential elements of defamation." (Doc. 58 at 4.) "First, they cannot allege that the CounterPoint Statement is capable of a defamatory meaning." (*Id.*) As to Lynette, Defendants elaborate that "[b]ased on a plain reading of the text, the CounterPoint Statement makes no assertions at all about [her]." (*Id.* at 6.) Defendants also characterize the Family Plaintiffs' proposed interpretations of the Counterpoint Statement—that a reasonable person reading it would have contempt for Lynette as someone "deserving of being beaten by her husband" and someone who "tolerates being a wife who stays with her husband despite him subjecting her to continuous acts of 'extreme domestic violence'"— as "nonsense" and "completely unsupported by the actual statement." (*Id.*) "Rather, to the extent readers of the CounterPoint Statement could come away with any conclusions at all about Lynette, a reasonable reader could only conclude that she had been subjected to McDonough's actions, through no fault of her own." (*Id.* at 7.) As to Caroline, Defendants make a similar argument, contending that the Family Plaintiffs' proposed interpretation "ha[s] zero support in the text or context of the CounterPoint Statement—which makes no reference whatsoever to Caroline McDonough being 'worthless,' 'unde[]serving of . . . financial support and love,' or 'deserving of being abandoned.' No reasonable reader could reach such an outlandish conclusion." (*Id.* at 9-10.) Second, Defendants argue that "the Family Plaintiffs cannot allege that the CounterPoint Statement is 'of and

concerning' either of them." (*Id.* at 4.)  Defendants argue that because the Counterpoint Statement does not contain "targeted assertions of fact" about the Family Plaintiffs—but rather only about McDonough's actions—it fails to satisfy this requirement.  (*Id.* at 10.)

In response, the Family Plaintiffs argue that although the Counterpoint Statement was not "aimed" at them, the challenged portions of the statement are nevertheless capable of defamatory meaning as to them pursuant to the legal theories of "third-party defamation" and "defamation by implication."  (Doc. 65 at 4.)  The Family Plaintiffs also argue that Defendants' suggestion that "accusing a person of being a 'victim' can never be defamatory" ignores the Court's analysis in *McKnight v. McKnight*, 2021 WL 4133970 (D. Ariz. 2021).  (*Id.* at 4-5.)  In response to the "of and concerning" issue, the Family Plaintiffs argue that Defendants' cited cases are inapposite and that the FAC "adequately sets forth that the Counterpoint [S]tatement 'targeted issues of fact' that Lynette McDonough is a victim of 'extreme domestic [v]iolence' and that Caroline McDonough was 'abandoned' by her own father."  (*Id.* at 5.)

In reply, Defendants argue that the theories of "third-party defamation" and "defamation by implication" are irrelevant to the issue of defamatory meaning.  (Doc. 69 at 3.)  Next, Defendants contend that the Family Plaintiffs "cannot muster a single citation for the proposition that being described as a 'victim,' as being 'abandoned,' or being described in any similar fashion, is defamatory" and that the one case they do cite, *McKnight*, supports Defendants.  (*Id.* at 4.)  Last, Defendants argue that "[b]ecause the Family Plaintiffs rely only on conclusory allegations—and fail to meaningfully respond to Defendants' argument—they have failed to meet their burden of establishing that the CounterPoint Statement is 'of and concerning' them, and their defamation claims must be dismissed on this additional ground."  (*Id.* at 6.)

2. Analysis

Arizona "follows the Restatement (Second) of Torts . . . on claims relating to defamation of a private person."  *Desert Palm Surgical Grp., P.L.C. v. Petta*, 343 P.3d 438, 449 (Ariz. Ct. App. 2015).  Under the Restatement, "[t]o create liability for defamation

1    there must be: (a) a false and defamatory statement concerning another; (b) an unprivileged

2    publication to a third party; (c) fault amounting at least to negligence on the part of the

3    publisher; and (d) either actionability of the statement irrespective of special harm or the

4    existence of special harm caused by the publication." Restatement (Second) of Torts § 558.

5         As for the first element, "[t]o be defamatory, a publication must bring the defamed

6    person into disrepute, contempt, or ridicule, or must impeach [that person]'s honesty,

7    integrity, virtue, or reputation." *Turner v. Devlin*, 848 P.2d 286, 288-89 (Ariz. 1993)

8    (citations omitted). Thus, "[i]n fulfilling its gatekeeping role, the [trial] court first must

9    determine whether, under all the circumstances, a statement is capable of bearing a

10   defamatory meaning." *Takieh v. O'Meara*, 497 P.3d 1000, 1006 (Ariz. Ct. App. 2021)

11   (citation omitted). Additionally, "defamatory statements must be published in such a

12   manner that they reasonably relate to specific individuals. While the individual need not

13   be named, the burden rests on the plaintiff to show that the publication was of and

14   concerning him." *Hansen v. Stoll*, 636 P.2d 1236, 1240 (Ariz. Ct. App. 1981) (citations

15   and internal quotation marks omitted). A plaintiff need not prove that "every reader could

16   make the connection, as publication to any individual will suffice. But the [reader's

17   identification of the plaintiff] must be reasonable under the circumstances." *Id.* at 1241

18   (citation omitted). Once a plaintiff meets this burden, "the question of identification is for

19   the jury to decide." *Id*.

20        Lynette ascribes two distinct defamatory meanings to the Counterpoint Statement—

21   first, that it suggests "she is somehow deserving of being beaten"; and second, that it would

22   cause persons "to have contempt for her and ridicule her because she tolerates being a wife

23   who stays with her husband" despite the "extreme domestic violence." (Doc. 51 ¶ 73, 75.)

24   The first proffered interpretation is unreasonable as a matter of law. The Counterpoint

25   Statement portrays Lynette[8] as a victim of McDonough's misconduct. Courts across the

26   country have held that identifying a person as the victim of a violent crime is not

27

28   _____

     [8]    This conclusion assumes, as the Family Plaintiffs contend but Defendants dispute,
     that the statement is "of and concerning" Lynette.

defamatory.  *See, e.g., Banerjee v. Continental Inc., Inc.*, 2016 WL 5939748, *9 (D. Nev. 2016) ("[S]ituations such as being falsely portrayed as a victim of a crime . . . or being portrayed as destitute, may place a person in a harmful false light without rising to the level of defamation."); *Sarwer v. Conde Nast Publications, Inc.*, 237 A.D.2d 191, 191 (N.Y.S. 1997) ("Plaintiff's causes of action alleging that certain statements in a magazine article entitled *Point Zero*, published in defendants' magazine Vanity Fair, in November 1989, were defamatory, were properly dismissed.  The 79 statements in the article claimed to be defamatory were either not about plaintiff at all but rather her family members, particularly her father, or, if referable to plaintiff, not susceptible of a defamatory connotation, the effect of the article as a whole being to leave the reader with only sympathy for plaintiff as a victim of child abuse.") (citations omitted); *Mead v. True Citizen, Inc.*, 417 S.E.2d 16, 17-18 (Ga. Ct. App. 1992) (newspaper article that incorrectly described the plaintiff "as the victim of the crime" of burglary "was neither defamatory nor libelous" as a matter of law); *Salerno v. Philadelphia Newspapers, Inc.*, 546 A.2d 1168, 1172 (Pa. Super. 1988) ("The inevitable conclusion a reader must arrive at, is that, if the mob were in fact involved, Joseph Salerno, Sr. was an innocent victim of vengeance . . . .  Nowhere does the article explicitly state, nor even implicitly suggest, that the appellant, as the victim of mob retaliation, was himself associated with 'the mob.'  We hold that the trial court correctly ruled, as a matter of law, that the published material was not capable of defamatory meaning.").  *See also Colandrea v. Town of Orangetown*, 490 F. Supp. 2d 342, 350-51 (S.D.N.Y. 2007) (concluding that "Plaintiff's claims for defamation are dismissed," where "Plaintiff's only allegation of defamation against *her* is that the actions of defendants have falsely portrayed her as a victim of domestic violence," and emphasizing that "[w]ithout an allegation of a false and defamatory statement, it is axiomatic that a plaintiff cannot establish a cause of action for defamation") (cleaned up).

Lynette's second theory fares no better.  It would be one thing if the Counterpoint Statement specifically stated that Lynette had chosen to tolerate or excuse the domestic violence.  It is at least theoretically possible that such a statement could be construed, at

least at the pleading stage of the case, as bringing Lynette into disrepute, contempt, or ridicule or impeaching Lynette's honesty, integrity, virtue, or reputation.[9]   But the Counterpoint Statement said no such thing—it merely asserted that "in recent days we have learned of disturbing allegations of extreme domestic violence by Terry, as detailed below in this response" and then elaborated that "in recent days [we have] uncovered a series of disturbing emails to and from Terry's work email account that include alarming, first-hand allegations of extreme domestic abuse by Terry."   (Doc. 51 ¶ 68.)   Even assuming a reasonable reader could infer that Lynette was the victim of the alleged domestic violence, the Counterpoint Statement says absolutely nothing about Lynette's response to it or whether she chose to remain married to McDonough despite it.[10]   The Family Plaintiffs cannot avoid dismissal by attacking a hypothetical statement Defendants did not actually make.

*McKnight* is not to the contrary.  There, the plaintiff alleged that the defendant (her father and a well-known singer) had defamed her by stating on social media that, when she was under 18 years old, she had sex with an adult cousin.  *McKnight*, 2021 WL 4133970 at *1.  The defendant argued the statement was not defamatory because it portrayed the plaintiff as the innocent victim of a sex crime.  *Id.* at *2.  The Court rejected this argument, concluding that the challenged statement could reasonably "be construed as accusing Plaintiff of voluntarily and consensually engaging in incestuous conduct (even though her consent was not, by virtue of her age, legally valid)" and that such a statement could be viewed as defamatory "in light of the fact that the taboo against incest has been a consistent and almost universal tradition with recorded proscriptions against incest existing as early

---

[9]    To be clear, the Family Plaintiffs do not cite any case, from any jurisdiction, endorsing the proposition that it is defamatory to state that a spouse chose to remain married after being subjected to domestic abuse.  The absence of such authority speaks volumes.

[10]    Notably, the Counterpoint Statement does not specify when the domestic violence occurred.  This omission is significant because even a reader who knew that Lynette was McDonough's spouse (and thus could infer that Lynette was the victim) still would not have enough information to draw any inferences about Lynette's reaction.  For example, if the incident had just occurred, the mere fact that Lynette was still married to McDonough would raise no inference about her plans to stay with McDonough.

as 1750 B.C. and has been characterized as one of the most important human cultural developments and is found in some form in all societies." *Id.* at *4.  This case is distinguishable for a host of reasons, including that the specific statement at issue—and not the hypothetical statement the Family Plaintiffs wish to challenge—makes no mention or even implication of voluntary conduct by Lynette.[11]

This leaves Caroline, whose theory is that "[a] reasonable person hearing" that McDonough had "abandoned" her and "cut her off financially" would "believe [her] to be a person of disrepute, have contempt for her and ridicule her because she is so worthless so as to have been abandoned by her own father and that she is undeserving of his financial support and love" and is "somehow deserving of being abandoned by her father."  (*Id.* ¶¶ 78-79.)  For the same reasons given above in relation to Lynette's first proposed defamatory meaning, this interpretation of the Counterpoint Statement is unreasonable as a matter of law.  Even assuming the assertions in the Counterpoint Statement are "of and concerning" Caroline, those assertions indicate that it was McDonough who acted wrongly by abandoning his "responsibility" to his child.  The statement paints Caroline as a victim of this misconduct, which is insufficient to establish defamatory meaning.

C.    **Negligence And IIED**

1.    The Parties' Arguments

Defendants argue that because "the Family Plaintiffs' additional tort claims are premised solely on the publication of the CounterPoint Statement . . . [a]s the defamation claims fail, these claims likewise cannot proceed."  (Doc. 58 at 13.)  Alternatively, Defendants argue that "even considered independently, the Family Plaintiffs' additional claims are still facially defective."  (*Id.*)  More specifically, Defendants argue that the negligence claims fail because (1) "there is no non-conclusory allegation that Defendants owed them an affirmative duty"; and (2) "[t]he Complaint contains only the most

---

[11]    The Court further notes that the act of choosing to remain married after being subjected to domestic violence is not remotely comparable to a "taboo" that implicates "a consistent and almost universal tradition" dating back to 1750 B.C. that has "been characterized as one of the most important human cultural developments." *McKnight*, 2021 WL 4133970 at *4.

threadbare, and conclusory, allegations of harm in support of the Family Plaintiffs' negligence claim." (*Id.* at 13-15.)  Turning to the IIED claims, Defendants contend they fail "because [1] Defendants' alleged conduct was not 'extreme and outrageous,' and [2] the Family Plaintiffs cannot allege [severe] emotional distress." (*Id.* at 15.)  As for the latter point, Defendants elaborate that "[t]here are no factual allegations describing any physical symptoms the CounterPoint Statement allegedly caused the Family Plaintiffs" that could meet the high standard set by Arizona law.  (*Id.* at 17.)

In response, the Family Plaintiffs argue that "no Arizona authority has ever held that an IIED claim, cannot survive on its own when brought with a claim for defamation." (Doc. 65 at 6.)  The Family Plaintiffs also argue that Defendants "ignore well-founded law that '[o]nly when reasonable minds could differ in determining whether conduct is sufficiently extreme or outrageous does the issue go to the jury'" and contend that "[c]ertainly 'reasonable minds' can believe that issuing a press release claiming Lynette McDonough is a victim of 'extreme domestic violence' is extreme and outrageous conduct." (*Id.* at 7.)  Regarding the negligence claims, the Family Plaintiffs contend that "Arizona courts have not commented upon the duty requirement in a defamation claim based upon negligence" but argue that "some scholarly journals" support the proposition that "the 'duty' element encompasses a defendant's necessity to use reasonable care before publishing defamatory statements." (*Id.*)

In reply, Defendants argue that "[t]he Family Plaintiffs do not meaningfully dispute that their negligence . . . claims cannot survive if their defamation claims are dismissed." (Doc. 69 at 7.)  Defendants also reiterate their argument that "when other tort claims are premised entirely on allegedly defamatory speech (as is the case here), the additional torts must fail if the defamation claim fails." (*Id.*)  Finally, Defendants contend that "[t]he Family Plaintiffs have effectively abandoned their negligence and IIED claims by failing to address Defendants' arguments." (*Id.*)

…

…

1    2.    Analysis

2        "To establish a claim for negligence, a plaintiff must prove four elements: (1) a duty

3    requiring the defendant to conform to a certain standard of care; (2) a breach by the

4    defendant of that standard; (3) a causal connection between the defendant's conduct and

5    the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz.

6    2007).  Whether a duty exists "is a legal matter to be determined *before* the case-specific

7    facts are considered." *Quiroz v. ALCOA Inc.*, 416 P.3d 824, 828 (Ariz. 2018).  Under

8    Arizona law, "[d]uties of care may arise from special relationships based on contract,

9    family relations, or conduct undertaken by the defendant," as well as "from the nature of

10   the relationship between the parties." *Gipson*, 150 P.3d at 232.  "Public policy may [also]

11   support the recognition of a duty of care." *Id.*

12       The FAC alleges only that "[e]ach Defendant owed a duty of care to each Plaintiff,

13   to use reasonable care when making public statements of an[d] concerning each Plaintiff."

14   (Doc. 51 ¶ 126.)  This sort of conclusory language is insufficient to survive a motion to

15   dismiss.  *Iqbal*, 556 U.S. at 678-80.  The FAC does not allege a special relationship or a

16   public policy basis for this alleged duty.  Nor do the Family Plaintiffs advance any such

17   arguments in their response brief.  Instead, the Family Plaintiffs merely cite one section

18   from a treatise on defamation to support the proposition that "[t]he 'duty' element

19   encompasses a defendant's necessity to use reasonable care before publishing defamatory

20   statements."  (Doc. 65 at 7.)  This argument is unavailing.  The treatise does not explain

21   the source of this duty and recognizing a free-floating duty not to defame any person who

22   might foreseeably feel defamed would run contrary to Arizona law, under which

23   "foreseeability is not a factor to be considered by courts when making determinations of

24   duty." *Gipson*, 150 P.3d at 231.

25       In a related vein, many states follow the rule that a plaintiff "cannot maintain a

26   negligence claim based solely on a duty not to defame." *Oliphant v. Richards*, 167 S.W.3d

27   513, 518 (Tex. Ct. App. 2005).  *See also Bailey v. Priority Ambulance*, 2020 WL 10056272,

28   *4 (N.D. Ga. 2020) ("In other words, [plaintiff's] negligence claim is no more than a

repetition of his defamation claim.  He never identifies any duty owed by Defendant—other than perhaps the implication that it owed him a duty not to defame him—or how it breached such a duty.  And where a negligence claim is premised entirely on false statements underlying a defamation claim, a plaintiff cannot separately maintain a claim for negligence on top of defamation."); *Trachtenberg v. Failedmessiah.com*, 43 F. Supp. 3d 198, 205 (E.D.N.Y. 2014) ("[P]laintiff's failure to plead that defendant owed a duty to plaintiff and that defendant breached that duty strongly suggests that plaintiff's negligence claim is duplicative of her defamation claim.  Here, the conduct plaintiff alleges—that defendant published a false article about her—falls well within the tort of defamation; therefore, defamation, and not negligence, is where plaintiff's claim appropriately lies."); *Gaber v. Mortgage Asset Research Institute, Inc.*, 2010 WL 3039885, *3 (D.N.J. 2010) ("Plaintiffs' claim is barred because it is actually a claim for defamation and both New Jersey and Pennsylvania prevent a plaintiff from bringing a defamation claim as a negligence claim.").  The Family Plaintiffs have not identified any reason to suspect Arizona would deviate from this rule, while Defendants have cited cases that suggest Arizona would follow it.  *Fendler v. Phx. Newspapers Inc.*, 636 P.2d 1257, 1262-63 (Ariz. Ct. App. 1981) (where the six-count complaint asserted claims all arising from an allegedly libelous statement, and the libel claim in Count One was dismissed at summary judgment, concluding that the remaining claims in Counts Two through Six were properly dismissed as well).  This provides an additional, if related, reason why the Family Plaintiffs' negligence claims are subject to dismissal.

As for IIED, such a claim has three elements under Arizona law: (1) "the conduct by the defendant must be 'extreme' and 'outrageous'"; (2) "the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct"; and (3) "severe emotional distress must indeed occur as a result of defendant's conduct."  *Citizen Publ'g Co. v. Miller*, 115 P.3d 107, 110 (Ariz. 2005) (quoting *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987)).  For the first element, "the Court need not determine whether Defendants' conduct was outrageous enough to

create liability, only whether reasonable persons could differ as to whether the conduct is 'extreme and outrageous.'"  *Morgan v. Freightliner of Arizona, LLC*, 2017 WL 2423491, *8 (D. Ariz. 2017) (quoting *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 905 P.2d 559, 563 (Ariz. Ct. App. 1995)).  "[C]onduct necessary to sustain an intentional infliction claim falls at the very extreme edge of the spectrum of possible conduct."  *Reel Precision, Inc. v. FedEx Ground Package Sys., Inc.*, 2016 WL 4194533, *2 (D. Ariz. 2016) (quoting *Watts v. Golden Age Nursing Home*, 619 P.2d 1032, 1035 (Ariz. 1980)).  "It 'must completely violate human dignity.  The conduct must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'"  *Reel Precision*, 2016 WL 4194533 at *2 (quoting *Pankratz v. Willis*, 744 P.2d 1182, 1189 (Ariz. Ct. App. 1987)).

The FAC alleges that the Counterpoint Statement "caused Plaintiffs to suffer extreme emotional distress, such that an average member of the community would regard their conduct as atrocious, intolerable in a civilized community, and beyond all possible bounds of decency." (Doc. 51 ¶ 137.)  In their response brief, the Family Plaintiffs contend that "[c]ertainly 'reasonable minds' can believe that issuing a press release claiming Lynette McDonough is a victim of 'extreme domestic violence' is extreme and outrageous conduct." (Doc. 65 at 7.)[12]  The Court disagrees.  The Family Plaintiffs cite no cases—nor could the Court find any—that support this conclusion.  The Counterpoint Statement only indirectly references the Family Plaintiffs, presenting them as victims of McDonough's conduct.  If this presentation is not defamatory as a matter of law—and it is not, for the reasons discussed above—it certainly cannot qualify as the sort of "extreme or outrageous" conduct sufficient to support an IIED claim, which "does not include 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'"  *Christakis v. Deitsch*, 478 P.3d 241, 245 (Ariz. Ct. App. 2020) (citation omitted).  No reasonable person could conclude that the issuance of the Counterpoint Statement, as least as it relates to Lynette and Caroline, "completely violate[s] human dignity . . . [and] strike[s] to the very

---

[12]    The Court presumes that the Family Plaintiffs also intended to make a similar assertion as to Caroline.  Even assuming so, the outcome here is unchanged.

core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." *Pankratz*, 744 P.2d at 1189.

Finally, as an additional basis for dismissal, the Family Plaintiffs did not respond to Defendants' argument that the FAC fails to allege the sort of "severe emotional distress" required to sustain an IIED claim under Arizona.  Thus, the Family Plaintiffs have forfeited any argument on that issue.  *Hurry v. Fin. Indus. Regulatory Auth., Inc.*, 782 F. App'x 600, 602 (9th Cir. 2019) ("Plaintiffs' failure to respond to that argument constitutes waiver.").

III.    <u>Leave To Amend</u>

Although the Family Plaintiffs do not request leave to amend in the event of dismissal, the Ninth Circuit has suggested that, in certain circumstances, "a district court should grant leave to amend even if no request to amend the pleading was made." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (citation omitted).

The decision whether to grant leave to amend is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which "advises the court that 'leave [to amend] shall be freely given when justice so requires.'" *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).  "This policy is 'to be applied with extreme liberality.'" *Id.* Thus, leave to amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

Here, although the Court is skeptical that the Family Plaintiffs will be able to plead new facts that will remedy the deficiencies identified above, and although the Family Plaintiffs already amended their complaint once before, Rule 15(a)'s policy of "extreme liberality" counsels in favor of giving the Family Plaintiffs one last chance to amend.

…

…

…

…

…

Accordingly,

**IT IS ORDERED** that:

1.      Defendants' motion to compel arbitration (Doc. 70) is **granted**.  McDonough must proceed to arbitration as to his claims against the Public Relations Defendants. Within 14 days of the issuance of this order, McDonough and the Public Relations Defendants must file a joint notice indicating whether any affected party wishes for McDonough's claims against the Public Relations Defendants to be stayed pending the resolution of the arbitration proceeding.  *Smith v. Spizzirri*, 601 U.S. 472, 473-74 (2024) ("Section 3 of the FAA specifies that, when a dispute is subject to arbitration, the court 'shall on application of one of the parties stay the trial of the action until [the] arbitration' has concluded.  The question here is whether § 3 permits a court to dismiss the case instead of issuing a stay when the dispute is subject to arbitration and a party requests a stay pending arbitration.  It does not.") (citation omitted).

2.      Defendants' motion to dismiss (Doc. 58) is **granted**.  The Family Plaintiffs' claims are dismissed in their entirety.

3.      The Family Plaintiffs may file a Second Amended Complaint ("SAC") within 14 days of the issuance of this order.  If the Family Plaintiffs file a SAC, the changes shall be limited to attempting to cure the deficiencies raised in this order and the Family Plaintiffs shall, consistent with LRCiv 15.1(a), attach a redlined version of the pleading as an exhibit.

Dated this 12th day of February, 2025.

Dominic W. Lanza
United States District Judge